# EXHIBIT A

*4/3/95*
*Extra Copy for DAB*
*Proofed/ok NL*

# LEASE

between

## WHITE FLINT LIMITED PARTNERSHIP,

### AS LANDLORD

and

*NL*

*D & B Holding*
~~DAVE & BUSTER'S~~, INC.,
a Delaware corporation

### AS TENANT

### LOCATION

*NL*

*Dave & Busters*
~~D&B HOLDING, INC.~~
White Flint
11301 Rockville Pike
Third Level
North Bethesda, Maryland 20895

## TABLE OF CONTENTS

**Article**                                                                    **Page**

1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2
    1.1 Ground Lease; Operating Agreement . . . . . . . . . . . . . . . . . . . .   2
    1.2 Demising of Premises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2
    1.3 Measurement of Demised Premises . . . . . . . . . . . . . . . . . . . . . .   5

2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5
    2.1 Term of Lease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5
    2.2 Commencement Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5
    3.1 Right to Extend . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6
    4.1 Annual Base Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6
    4.2 Percentage Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7
    4.3 Tenant's Records and Statements of Gross Sales . . . . . . . . . . . . . .   9
    4.4 Additional Audit Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10
    4.5 Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11
    5.1 Tenant's Business Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11
    5.2 Real Estate Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11
    5.3 Common Areas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16
    6.1 Construction Allowance . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16
    6.2 Construction of the Demised Premises . . . . . . . . . . . . . . . . . . . .   17

7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17
    7.1 Landlord's Repairs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17
    7.2 Tenant's Duty to Maintain . . . . . . . . . . . . . . . . . . . . . . . . . . .   17
    7.3 Requirements of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18
    7.4 Tenant's Alterations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18
    7.5 Permits and Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19
    8.1 Duties of Landlord . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19
    8.2 Landlord Covenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20
    9.1 Tenant Covenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20
    9.2 Utility Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22
    10.1 Microwave Transmission and Other Communication Equipment . . . . . .   22
    10.2 Equipment Not to Interfere with Equipment of Others . . . . . . . . . . . .   23

11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24
    11.1 Use; Operating Covenant, Exit Rights and Termination . . . . . . . . . .   24
    11.2 Restrictive Covenant . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25
    11.3 Radius Restriction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27
    12.1 Assignment and Subletting . . . . . . . . . . . . . . . . . . . . . . . . . .   27

13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28
    13.1 Fixtures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28
    13.2 Landlord Waivers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29
    14.1 Exterior Signs and Canopy . . . . . . . . . . . . . . . . . . . . . . . . . .   29
    14.2 Interior Signs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29
    15.1 All-Risk Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29
    15.2 Insurance Proceeds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

**Article**                                                              **Page**

    15.3  Waiver of Subrogation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30
    15.4  Tenant's Contribution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30
    15.5  Tenant's Public Liability Insurance . . . . . . . . . . . . . . . . . . . . . . . . .   30
    15.6  Insurance and Indemnification by Landlord . . . . . . . . . . . . . . . . .   30
    15.7  Indemnification by Tenant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31

16  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31
    16.1  Abatement or Adjustment of Rent . . . . . . . . . . . . . . . . . . . . . . . . .   31
    16.2  Repairs and Restoration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31
    16.3  Tenant's Reentry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32
    16.4  Extention of Term and Extention of Obligation to Operate . . . . .   32
    16.5  Sharing of Insurance Proceeds Upon Termination . . . . . . . . . . . . .   33

17  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33
    17.1  Total Taking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33
    17.2  Partial Taking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33
    17.3  Restoration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33
    17.4  The Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34
    17.5  Temporary Taking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34
    17.6  Release . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

18  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35
    18.1  Landlord's Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35
    18.2  Landlord's Right to Cure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36
    18.3  Tenant's Right to Cure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36

19  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37
    19.1  Subordination of Lease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37
    19.2  Quiet Enjoyment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37
    19.3  Zoning and Good Title . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37

20  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39
    20.1  Extension Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39
    20.2  Holding Over . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39
    20.3  Waivers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39
    20.4  Disputes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39
    20.5  Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40
    20.6  Plate Glass . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40
    20.7  Attorneys' Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40
    20.8  Force Majeure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41
    20.9  Waiver of Landlord's Lien . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41
    20.10 Estoppel Certificates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41
    20.11 Recordation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41
    20.12 Invalidity of Particular Provision . . . . . . . . . . . . . . . . . . . . . . . . . .   41
    20.13 Transfer of Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41
    20.14 Captions and Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42
    20.15 Brokerage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42
    20.16 Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42
    20.17 Tolling of Lease Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42
    20.18 Tenant's Financing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42
    20.19 Late Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43
    20.20 Guaranty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43
    20.21 Supplemental Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43

21  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43
    21.1  Permits and Zoning; Conditions Precedent . . . . . . . . . . . . . . . . . .   43
    21.2  Termination in Event of Change in Laws . . . . . . . . . . . . . . . . . . . .   44

22  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   44
    22.1  Limitation of Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   44

## TABLE OF EXHIBITS

Exhibit "A"  -  Legal Description of White Flint Mall

Exhibit "A-1"  -  Plot Plan of Shopping Center and Enclosed Mall

Exhibit "B"  -  Lease Plan Identifying Demised Premises

Exhibit "C"  -  Memorandum of Lease

Exhibit "D"  -  Permitted Title Exceptions

Exhibit "E"  -  Landlord and Tenant Works Letters

Exhibit "F"  -  Signage and Exterior Design

Exhibit "G"  -  Guaranty of Lease by Edison Brothers Stores, Inc.

Exhibit "H"  -  Landlord Security for Construction Allowance

Exhibit "I"  -  Intentionally Deleted

Exhibits "J-1"  -  Non-Disturbance, Subordination and Attornment Agreements from
and "J-2"       Ground Lessor and Mortgagee

Exhibit "K"  -  Radius Area Maps

Exhibit "L"  -  Landlord's Restricted Area

## LEASE

    **THIS LEASE** made as of the 7th day of *March*, 1995, by and between WHITE FLINT LIMITED PARTNERSHIP, a Maryland limited partnership (hereinafter called "Landlord"), and **D&B HOLDING, INC.**, a Delaware corporation, c/o 501 N. Broadway, St. Louis, Missouri 63102 Attention: Legal Department (hereinafter called "Tenant").

### RECITALS:

    A.    Landlord is the ground lessee of the land (the "Land") legally described on Exhibit A attached hereto and made a part hereof, commonly known as White Flint.

    B.    The Land is improved with the "Shopping Center." The "Shopping Center" consists of and shall mean, as the same may be changed and modified from time to time (but subject to any limitations set forth in this Lease) the area outlined on Exhibit A-1 attached hereto and improvements thereon from time to time constituting an integrated retail shopping center (known as White Flint) which Landlord has constructed in the vicinity of the intersection of Rockville Pike and Nicholson Lane in Montgomery County, Maryland and presently containing buildings designated as "Bloomingdales" and "Lord & Taylor" (hereinafter called the "Department Stores") (the Department Stores and the building constructed by Landlord are hereinafter referred to collectively, referred to as the "Buildings"). It is expressly understood and agreed that the attached site plan, Exhibit A-1, sets forth only the general layout and manner of development of the Shopping Center, and except as otherwise provided herein it is not and shall not be deemed to be a warranty, representation, agreement or undertaking on the part of Landlord that the Shopping Center will be exactly as shown thereon, or that the same thereof will be or remain the same, or more or less. Subject only to the limitations contained in this Lease, Landlord, may at any time, and from time to time change the Common Areas (hereinafter defined) but only as permitted under Section 5.3 below. Landlord may also make other improvements to the Shopping Center including, without limitation, the construction of additional department stores and other stores, malls, walkways, covered deck or underground parking, hotels, motels, office buildings and other free standing buildings provided no such other improvements shall materially and adversely affect Tenant, including, without limitation, any such improvement which would interfere with the (i) visibility of the "Facade Sign" (as hereinafter defined) from Rockville Pike (provided such Facade Sign may be replaced with a substitute Facade Sign (of substantially the same size and with comparable visibility from automobile traffic on Rockville Pike) which is reasonably acceptable to Tenant); (ii) ingress to or egress from the Demised Premises, access to the Shopping Center and the "Enclosed Mall," as identified on Exhibit A-1 (the "Enclosed Mall") parking ramps or pedestrian bridges; (iii) the use of parking areas or access thereto from the Demised Premises; or (iv) changes to the facilities or areas which are granted to Tenant on an exclusive or semi-exclusive basis under Section 1.2 (any such material and adverse interference being hereinafter called a "Material Interference"). Landlord may, and hereby reserves the right, at any time, and from time to time, to add land or eliminate land from the Shopping Center (in the event land is added, for Real Estate tax purposes, it shall be considered part of the Shopping Center only when developed as a part of the Shopping Center) provided no such elimination shall cause or result in a Material Interference with the Demised Premises. It is expressly understood and agreed that, notwithstanding anything in this Lease to the contrary, actions by Landlord which would otherwise constitute a Material Interference shall be deemed not to be a Material Interference provided Landlord provides sixty (60) days' advance notice to Tenant, provides alternative arrangements (after consultation with Tenant) to be sure the impact on Tenant's business is minimal, which alternative arrangements do not have a material and adverse impact on access to the Demised Premises or the ability of Tenant's customers to park in reasonable proximity to the Demised Premises (it being acknowledged that any change in the third floor parking deck adjacent to the Demised Premises or the pedestrian ramp leading thereto would constitute a "Material Interference") and the conditions do not exist for a period exceeding six (6) months (eighteen (18) months in the case of an expansion of the Shopping Center of Fifty Thousand (50,000) square feet or more). Any alternative arrangements shall be subject to Tenant's approval, not to be unreasonably withheld or delayed.

    C.    Landlord wishes to lease certain premises in the Shopping Center and grant certain continuing rights in the Shopping Center to Tenant, and Tenant wishes to lease these premises and accept these rights from Landlord.

    **NOW, THEREFORE,** Landlord and Tenant, in consideration of the mutual promises contained in this Lease, agree as follows:

## ARTICLE 1

All of the above Recitals shall be included in and made a part of the Lease as fully as if re-recited herein.

Section 1.1  **Ground Lease; Operating Agreement**.

(a)  Notwithstanding anything to the contrary contained in this Lease, Landlord's interest in the Shopping Center and Tenant's interest in this Lease are and shall be subject and subordinate in all respects to a certain ground lease dated August 27, 1975 by and between White Flint Associates, as lessor, and Landlord, as lessee, a memorandum of which has been recorded in Liber 4697, Folio 801 of the Land Records of Montgomery County, Maryland (as it may be or may have been amended or supplemented from time to time, hereinafter called the "Ground Lease"), a full and complete copy of which has been furnished by Landlord to Tenant.  In the event the Ground Lease shall be terminated for any reason whatsoever, Tenant shall, upon the written request of the lessor under said Ground Lease, attorn to said lessor and recognize said lessor as landlord hereunder and continue to be bound by all of the terms, covenants and conditions of this Lease.  Nothing contained in this Section or elsewhere in this Lease shall be deemed to create any rights in Tenant with respect to the Ground Lease and under no circumstances shall Tenant be deemed a third-party beneficiary thereof (provided no amendment or supplement to the Ground Lease shall in any manner interfere with or result in a loss or diminution of Tenant's rights or an increase in Tenant's obligations under this Lease.)  The lessor under the Ground Lease has executed and delivered the Non-Disturbance, Attornment and Subordination Agreement in the form attached hereto as Exhibit J (the "NSDA") which NSDA has been executed by Tenant simultaneously herewith.

(b)  Notwithstanding anything to the contrary contained in this Lease, the Shopping Center, including without limitation the Common Areas, and the Demised Premises, are and shall be subject and subordinate to that certain Construction, Operation and Reciprocal Easement Agreement among Landlord, Federated Department Stores, Inc. and Adcor Realty Corporation, dated as of September 2, 1975 (a memorandum of which has been recorded in Liber 4697, Folio 814 of the Land Records of Montgomery County, Maryland) a full and complete copy of which has been furnished by Landlord to Tenant, as the same may be or may have been amended or supplemented from time to time; provided that such Agreement shall not prevent Tenant from using the Demised Premises for the authorized use set forth in Section 11.1.  That Agreement, as it may be or may have been amended or supplemented from time to time is hereinafter called the "Operating Agreement."  Nothing contained in this Section or elsewhere in the Lease shall be deemed to create any rights in Tenant with respect to the Operating Agreement and under no circumstances shall Tenant be deemed a third-party beneficiary thereof, provided no amendment or supplement to the Operating Agreement shall in any manner interfere with or result in a loss or diminution of Tenant's rights or an increase in Tenant's obligations under this Lease.  Landlord represents and warrants that it has delivered to Tenant for its review the provisions of the Operating Agreement, as amended or supplemented as of the date hereof.  The Landlord further represents and warrants that it will not in the future in any manner amend or supplement such Operating Agreement in any manner which will increase Tenant's obligations or decrease Tenant's rights under this Lease.  Landlord does not represent and warrant that the Operating Agreement by its terms will permit valet parking.

Section 1.2  **Demising of Premises**.

Landlord, in consideration of the rents to be paid and the covenants and agreements to be performed by Tenant, demises and leases to Tenant, and Tenant takes and leases from Landlord, certain premises located on the third floor of the Building and delineated on the lease plan ("Lease Plan") attached hereto as Exhibit "B" and made a part hereof (the "Demised Premises"), consisting in the aggregate of approximately 60,000 square feet of floor area (the "Demised Premises Square Footage"), together with the following rights for the term of the Lease and extensions thereof which rights are unrecorded easements for the benefit of Tenant, Tenant's subtenants, licensees and concessionaires and their respective customers, invitees, contractors, agents and employees

(A)  to the non-exclusive use of the area located on Level I in the rear of the Buildings and designated as such on the Lease Plan Exhibit "B" for staging, deliveries, trash disposal and for the use of a trash dumpster to be provided and maintained by Landlord (including the existing trash chute leading directly from the Demised Premises to the trash dumpster),

(B)     the non-exclusive use of the existing escalators and stairways and the existing central mall passenger elevators serving the Demised Premises and the Enclosed Mall, which central elevator shall be appropriately decorated by Landlord with neon type strips, signage and other decorative features to be identified with Dave & Buster's as shown on the "Approved Plans" as hereinafter referred to,

(C)     to the exclusive use of one of the two existing service elevators serving the Demised Premises and the non-exclusive use of the other existing service elevator serving the Demised Premises (each service elevator shall have a capacity of 6,000 pounds and be upgraded to good, operating condition and be in accordance with all codes; the exclusive elevator for Tenant's use shall be programmed to stop only at loading level and on the third floor and the other service elevator shall be programmed or keyed to have access to the third floor only by Tenant),

(D)     to the exclusive use of the exits, exit corridors and stairwells serving only the Demised Premises (except for emergencies),

(E)     to the non-exclusive use of the existing pedestrian bridge and its canopy from the parking deck to the Demised Premises (provided mall customers may enter and exit the Enclosed Mall through such pedestrian bridge during normal Dave & Buster's operating hours and otherwise subject to Tenant's reasonable rules and regulations governing its Demised Premises and with the further understanding that such means of egress and ingress to and from Common Areas by patrons of the enclosed mall is being made available as a courtesy by Tenant and shall not be considered a required enclosed mall exit for code purposes or otherwise be deemed a pedestrian right-of-way),

(F)     to the exclusive use of a new pedestrian ramp if required by code for exiting from the Demised Premises (which may also be used by all customers of the Shopping Center in the event of an emergency),

(G)     subject to the Operating Agreement, to the use of a 200 car parking area proximate to Dave & Buster's exterior entrance on the third level of the parking deck as designated on Exhibit B for Tenant's exclusive customer valet parking,

(H)     to the non-exclusive use of any cab stand, or other private or public transportation drop off point (hereinafter called a "Drop Off Stand"), subject to the rights of the public generally,

(I)     to the non-exclusive use of other parking spaces in the parking decks and in the ground level parking areas, it being understood and agreed that at all times during the Term and any extension thereof the then current parking ratio for the Shopping Center will comply with applicable zoning and codes,

      The use without charge of the parking spaces for the Shopping Center including parking spaces in the parking decks shall be except for the valet parking area described in G above on a "first-come, first-serve" self-park basis for Shopping Center customers and employees (meaning that no less than the number of spaces specified above will be made available to the general public for Shopping Center purposes and not leased out on a weekly, monthly or other long term basis),

(J)     to the exclusive use of the Equipment described in Section 10.1 and the right to install, maintain and operate the Equipment, as defined in and subject to the conditions specified in Section 10.1, together with the right of access to the Equipment and HVAC systems serving the Demised Premises and connection of the Equipment and said HVAC systems to the Demised Premises,

(K)     to the non-exclusive use of all of the Common Areas including the Enclosed Mall which shall be kept operational for Tenant's use at all times when Tenant is open for business and one-half hour before Tenant opens for business and one-half hour after Tenant closes for business with 24 hour, seven day a week access for Tenant's employees

and contractors. The parking areas shall remain open to the public at least one hour before Tenant opens for business and one hour after Tenant closes for business with the ability for Tenant's employees to park on a seven (7) day, twenty-four (24) hour a day basis and the ability to exit the parking area on a twenty-four hour a day basis. Landlord shall provide security in the Common Areas for customers, invitees and employees consistent with shopping center practices for first class regional shopping centers taking into account the nature and hours of Tenant's business provided Landlord shall not be required to assume the burden of problems created by Tenant's customers and Tenant shall not be required to assume any burden with respect to Landlord's invitees or customers of other tenants of the Shopping Center (Tenant shall be responsible for providing security for its customers, invitees and employees within its Demised Premises. Landlord and Tenant agree to cooperate with each other and with local police organizations as to security matters and each party agrees that it shall not attempt to "solve" its respective security problems by making an incident the other parties' problem. For example, if a customer of Tenant becomes disruptive and is required to leave the Demised Premises, then Tenant shall be required to coordinate the customer's removal with Shopping Center security and, when appropriate, local police in an effort to make certain the customer leaves the Shopping Center property),

(L)  to the non-exclusive use of the exits, exit stairwells and corridors used in common with other tenants or occupants and their respective invitees and customers of the Buildings, vent ducts, Buildings utility systems and other facilities or areas of the Buildings or Shopping Center designated by Landlord from time to time for use in common by Buildings tenants and occupants and their respective invitees and customers subject, however, to the terms and conditions of this Lease,

(M)  subject to the Operating Agreement, to be the sole operator of the dedicated valet parking area described (to be located within the area delineated on the Lease Plan) which valet parking and customer drop-off area shall be run by Tenant, or Tenant's agents, employees or contractors for the sole benefit and exclusive use of the agents, employees, contractors, customers and invitees of Tenant,

(N)  the right to install, run, maintain, repair and replace pipes, duct shafts and utility lines through other premises in the Shopping Center in the locations specified on the Lease Plan or as previously disclosed to and approved by Landlord and in the Plans and Specifications and in locations which, in Landlord's reasonable judgment, will not materially and adversely interfere with the business of other tenants in the Shopping Center,

(O)  the right to a temporary staging, assembly and storage area, subject to availability, of at least five thousand (5,000) square feet which Tenant may use through Tenant's opening date and for twenty (20) days thereafter,

(P)  the right, subject to all approvals as set forth below and Landlord's approval not to be unreasonably withhold, as to the location, effect on parking and height and dimensions of temporary structures and equipment to locate a travelling show entertainment complex on the parking lot facing Rockville Pike, or in other parking areas, for up to ninety (90) days per event no more than one (1) time per year at no additional cost or rental provided any such use shall be subject to (x) termination in the event Landlord expands the Buildings into the parking areas (provided no such expansion may result in a Material Interference), (y) Tenant's securing of all required governmental approvals and (z) department store approvals and approvals from the tenants known as Cheesecake Factory, Border's Books & Music and Bertolini's Italian Restaurant.

Landlord acknowledges that Tenant is executing this Lease in reliance on the continuation of the rights granted above as appurtenant to the Demised Premises throughout the term of the Lease, subject to the terms and conditions of Articles 16 and 17, and that the continuation of these rights is a material element inducing Tenant to execute this Lease

provided in the absence of intentional fraud or intentional willful misrepresentation by Landlord or intentional acts of Landlord, Landlord shall not be liable for punitive or consequential damages. To preserve the continued existence of these rights, Landlord and Tenant hereby agree and intend that the foregoing rights shall run for the term of the Lease and shall be binding upon any entity or person who succeeds to all or any portion of Landlord's interest or estate in the Land. Landlord further agrees that any conveyance of all or any portion of its estate or interest in the Land to any entity or person, whether by operation of law, by foreclosure, or voluntarily, shall expressly be made subject to the continued existence of the foregoing rights until the term of the Lease has expired or is sooner terminated. Any person or entity succeeding to all or any estate or interest of Landlord in the Land subject to these rights shall specifically assume in writing the obligation to maintain and perform the foregoing rights for the benefit of Tenant and the Demised Premises. To provide record notice of this understanding contemporaneously with the execution and delivery of this Lease, Landlord and Tenant agree to execute and deliver a Memorandum of Lease in the form attached hereto as Exhibit C, provided the party recording the Memorandum of Lease shall pay for the cost of recording.

Section 1.3   **Measurement of Demised Premises.**

Landlord and Tenant shall remeasure the Demised Premises to determine the actual number of square feet of floor area within twenty (20) days after final approval of the Plans and Specifications and the Demised Premises as so remeasured (the "Demised Premises Square Footage") shall then equal this revised number. In measuring the Demised Premises only "Usable Floor Area" shall be included. By "Usable Floor Area" is meant the entire floor area of the Demised Premises with the exception of the elevators (shafts or elevator cores) stairwells, ducts or shafts, shear walls, the floor area of the columns and trash chute; and shall be measured from the interior face of exterior walls and to the interior face of demising walls. Upon completion of the remeasurement, Landlord and Tenant shall execute a supplement to this Lease establishing the Demised Premises Square Footage and the rent, Tenant's pro-rata share of Taxes, Common Area Maintenance and the Tenant Improvement Allowance shall be based upon such computation and if the Demised Premises Square Footage results in less than 60,000 square feet, the Annual Base Rent and Tenant's pro-rata share of Real Estate Taxes, Common Area Maintenance and Tenant Improvement Allowance shall be reduced proportionately. If such computation shows the Demised Premises as being greater than 60,000 square feet then for purposes of computing Rent hereunder the Demised Premises square footage shall be deemed to be 60,000 square feet. If Landlord and Tenant are unable to agree on the Demised Premises Square Footage, the Landlord's architect and the Tenant's architect shall attempt to agree on the Demised Premises Square Footage and if the Landlord's architect and the Tenant's architect are unable to agree on the Demised Premises Square Footage, the two architects shall select a third architect with experience in calculating square footage and the decision of such third architect shall be binding as to the Demised Premises Square Footage.

## ARTICLE 2

Section 2.1   **Term of Lease**.

The term of this Lease shall begin on the Commencement Date (as defined in Section 2.2), and shall, subject to the other provisions contained in this Lease, terminate on the last day of January of the twentieth (20th) Lease Year of the term hereof (the "Main Term"). For purposes of this Lease except as provided in 4.1 below, a Lease Year shall be the twelve-month period commencing on February 1st and terminating on the last day of the following January, except however, that if the Commencement Date shall be other than February 1st, the "First Lease Year" shall be the period commencing on the Commencement Date and terminating on the last day of the second January thereafter, and this Lease shall then terminate, unless extended, on the last day of the twentieth Lease Year (the "Expiration Date").

Section 2.2   **Commencement Date.**

The "Commencement Date" shall mean the earlier of (i) the date on which Tenant shall commence to conduct business on the Demised Premises (i.e., the Grand Opening, as opposed to a so-called "soft opening" not to exceed a thirty (30) day period for training, conducting benefit events and for "shakedown purposes"); or (ii) one hundred twenty (120) days after the "Substantial Completion Date" (as defined in the Work Letter attached as Exhibit E to this Lease).

## ARTICLE 3

Section 3.1 **Right to Extend**.

Tenant shall have the right, at its election, to extend the original term of this Lease for three (3) successive additional periods of five (5) years each. Each additional option period shall be exercisable upon the following terms and conditions:

(a)    Tenant shall give Landlord written notice of such election to extend the term of this Lease not later than twelve (12) months prior to the expiration of the Main Term or the first or second extended term provided if Tenant shall fail to give such notice, Tenant's rights shall not be extinguished until Landlord shall give written notice to Tenant that such right to extend the term shall be extinguished and of no further force and effect fifteen (15) days after such notice if Tenant fails to elect the renewal Term within fifteen (15) days after receipt of such notice but in no event shall the last day of Term extend beyond the thirty-fifth (35th) Lease Year and further provided that notwithstanding the failure of Tenant to give such notice prior to the expiration of the Main Term or the renewal term then in effect, Annual Base Rent shall be increased as provided in subsection (c) below, effective on the date on which the Main Term or the renewal term then in effect would have expired;

(b)    At the time of the exercise of such election Tenant shall not be in default with respect to any material term under this Lease beyond any applicable grace or notice periods; and

(c)    Each such extended term shall be upon the same terms and conditions as during the Main Term hereof, except that Tenant shall have no further election to extend the term of this Lease beyond the third extended term and Tenant shall pay to Landlord and Landlord shall accept Annual Base Rent during such additional terms at the yearly rate of: Fifteen and No/100 Dollars ($15.00) times the Demised Premises Square Footage during the first extension term; Seventeen Dollars and Fifty Cents ($17.50) times the Demised Premises Square Footage during the second extension term; and Twenty and No/100 Dollars ($20.00) times the Demised Premises Square Footage during the third extension term, each payable in twelve equal monthly installments, in advance, on the first day of each calendar month occurring during such extended term, and prorated for the fractional portion of any month, and Percentage Rent as set forth in Section 4.2 below.

If Tenant elects to exercise any such option to extend, the term of this Lease shall be automatically extended for the period of such additional term without necessity for the execution of any instrument by Landlord to effect the same, and in such event the phrases "the term of this Lease" and "the term hereof" as used in this Lease shall include such additional term.

## ARTICLE 4

Section 4.1 **Annual Base Rent**.

Tenant agrees to pay Landlord without (except as specifically provided in this Lease), set-off, diminution, counterclaim, deduction, recoupment or demand and Landlord agrees to accept during the term hereof, at such place as Landlord shall from time to time direct by notice to Tenant, "Annual Base Rent" for each Lease Year (or partial lease year) during the Main Term of this Lease at the yearly rate of Eleven Dollars ($11.00) times the Demised Premises Square Footage and at the yearly rates established in Section 3.1(c) for any extension terms (provided Annual Base Rent for any portion of the last Lease Year of the Main Term after the twentieth (20th) anniversary of the Commencement Date shall be at the yearly rate for the first year of the first extension term). Solely for the purpose of calculating Annual Base Rent during the Main Term or any extension term of this Lease, a Lease Year shall mean each succeeding twelve (12) month period (or portion of a month), or portion thereof, occurring during the term, commencing with the first day of the month following the month in which the Commencement Date occurs (unless the Commencement Date falls on the first day of a month) and continuing thereafter until expiration of the term.

Annual Base Rent shall be payable in advance in equal monthly installments on the first day of each and every calendar month during the term of this Lease, and pro-rated for the fractional portion of any month. No Annual Base Rent shall be due or payable during any so-called "soft opening" which shall not exceed 15 days or any employee training period which shall not exceed thirty (30) days (including the fifteen (15) day soft opening period), but Gross Sales during such soft-opening shall be included for purposes of determining

Percentage Rent unless generated from charity events or trade events. In the event for any reason the last Lease Year contains less than 365 days, there shall be a similar pro-rata reduction in the Gross Sales Base which are the basis for percentage rent for such last Lease Year except that the daily figure shall be one/three hundred sixty fifth (1/365th) of the amount used as the basis for determining Gross Sales.

Section 4.2   **Percentage Rent.**

(a)     In addition to Annual Base Rent, Tenant agrees to pay to Landlord as "Percentage Rent" three percent (3%) of the amount by which the Gross Sales made in, on or from the Demised Premises during each Lease Year (or portion thereof) exceed (i) Ten Million Dollars ($10,000,000.00) during the Main Term; (ii) Thirteen Million Six Hundred Thirty Six Thousand Three Hundred Sixty-Three Dollars ($13,636,363) during the first option term; (iii) Fifteen Million Nine Hundred Nine Thousand Ninety Dollars ($15,909,090) during the second option term; and (iv) Eighteen Million One Hundred Eighty One Thousand, Eight Hundred Eighteen Dollars ($18,181,818) during the third option term (each of the foregoing amounts being hereinafter called the "Gross Sales Base").

(b)     If the Commencement Date is a day other than February 1st, then there shall be added to the Ten Million Dollars ($10,000,000) referred to in (a)(i) above an amount equal to the number of days which exceed 365 days in such first Lease Year multiplied by Twenty-Seven Thousand Three Hundred Ninety-Seven Dollars Twenty-Six Cents ($27,397.26) to take into account such additional days in such first Lease Year. The obligation to pay Percentage Rent shall not imply any obligation on the part of Tenant to be open or operate beyond any operating covenant expressly provided in this Lease.   Furthermore, Tenant makes no representation or warranty that its actual Gross Sales from the Demised Premises shall ever reach the level where Percentage Rent shall be payable and Landlord acknowledges the same.

(c)     Percentage Rent shall be paid by Tenant within ninety (90) days after the end of each Lease Year.  However, if during any month of a Lease Year, Tenant's Gross Sales for that Lease Year exceed the corresponding Gross Sales Base, then by the twentieth (20th) day of each month after the month in which the Gross Sales Base is exceeded, Tenant shall pay to Landlord the Percentage Rent applicable to that portion of the Gross Sales from the prior month which when added to Gross Sales for the total Lease Year to date are in excess of the Gross Sales Base and shall continue to make such payments of Percentage Rent for each month thereafter during the applicable Lease Year, subject to adjustment or recapture as provided in this Article 4.  Within twenty (20) days after the end of each calendar month (or at the end of each 4-5-4 period or 13-period, 4 weeks per period if Tenant's accounting is based on such period), Tenant shall provide a statement of Gross Sales for such month or period, as the case may be.  Within ninety (90) days after the end of each Lease Year, Tenant shall deliver to Landlord a statement signed and certified by a financial officer of Tenant authorized and responsible for such matters setting forth the Gross Sales for that Lease Year and any under payments or over payments of Percentage Rent shall be adjusted and then paid to the entitled party within fifteen (15) days after the statement is delivered.

(d)     The term "Gross Sales" as used herein means (but subject to the exclusions set forth below) the total amount charged by Tenant or anyone in Tenant's behalf or by permitted concessionaires or permitted licensees of Tenant in connection with any and all sales of food, beverages, goods, articles and any other merchandise or service to patrons and customers, made or rendered on, in or from the Demised Premises (whether or not through a private club or function), or for off-site catering originating at the Demised Premises, and sales, wherever made, including telephone sales of merchandise stored on the Demised Premises, or merchandise shipped from other locations on order taken in or through the Demised Premises, either personally or by telephone or in writing, or by persons reporting to the Demised Premises, whether or not such amounts shall be for cash or on credit (including interest, finance charges or insurance payments to be paid by the customer to Tenant because of a charge, credit, or deferred payment sale), whether paid or unpaid, collected or uncollected, including, without limiting the generality of the foregoing but subject to the exclusions set forth below, all proceeds from private parties, catering, all automatic or coin-operated vending, weighing, toy rides, games, and any other machines or devices, including telephones, lottery tickets, or other dispensing or sanitary facilities as shall be permitted in the Demised Premises, whether or not owned or operated by Tenant, except those which are operated for the sole benefit and enjoyment of Tenant's employees. Except for the exclusions set

forth below each charge or sale upon installment or credit shall be treated as a sale for the full price in the month during which such charge or sale shall be made, irrespective of the time when Tenant shall receive payment (whether full or partial) thereof. The amount of any deposit on a lay-away sale, or any other deposit not refunded, shall be included in Gross Sales when applied to the purchase price or forfeited. There shall be deducted from Gross Sales that part of the sales price of merchandise which is paid for by the trade-in or trade-up of other merchandise of the customer (although the proceeds from the subsequent sale of such trade-in merchandise shall be included in Gross Sales hereunder).

The following shall be excluded from "Gross Sales":

(A)     Sales at a discount to employees of Tenant, subtenants, licensees and concessionaires not to exceed, however, one (1%) percent of Gross Sales; sums received as charges for delivery (provided Tenant passes through and does not retain a 3rd party's charge) to customers for products sold from the Demised Premises by Tenant or by any subtenant, licensee or concessionaire; sales from vending machines and telephone revenues used solely for employee purposes; revenues retained or charges collected by third parties from public telephones located in the Demised Premises and any revenues or charges associated with so-called "automatic teller machines" or other financial services extended by a financial institution or credit issuer from the Demised Premises to customers (however there shall be included in Gross Sales any rentals or fees received by Tenant from the provider of ATM banking or other financial services);

(B)     All sums representing so-called sales, value added and similar taxes collected directly from customers and paid to governmental agencies, based upon present and future laws of the federal, state or local government and collected by Tenant or by any subtenant, licensee or concessionaire in the operation of its business on the Demised Premises, and any other tax, excise or duty which is levied or assessed against or collected by Tenant or by any subtenant, licensee or concessionaire for and paid to any federal, state, municipal, or local authority based on sales of specific merchandise or services sold on, or the privilege or license to sell or distribute specific merchandise or services from the Demised Premises;

(C)     The transfer of merchandise by Tenant, a subsidiary or affiliate of Tenant or a subtenant, a licensee or a concessionaire from the Demised Premises to another store or a place of business owned or operated by Tenant, or a subsidiary or affiliate of Tenant or by a subtenant, a licensee or a concessionaire made for the convenient operation of Tenant's business shall not constitute a sale, unless such transfer is made for the purpose of avoiding the payment of Percentage Rent hereunder; catalog or similar sales placed off the Demised Premises through an off-the-Demised Premises central receiving station (but not including so-called "take-out" orders); provided catalog sales made directly from the Demised Premises but filled from outside the Demised Premises will be included to the extent such sales exceed one percent (1%) of Gross Sales;

(D)     Proceeds from the sale of gift certificates or similar vouchers, provided, however, that when redeemed for merchandise at the Demised Premises the retail price of the goods allocable to such redemption shall be included in Gross Sales;

(E)     Donations or sales at discount of merchandise to non-profit charitable and religious institutions, but only to the extent said donations and sales are less than one percent (1%) of Gross Sales for each Lease Year;

(F)     Cash or credit refunds, exchanges and/or redemptions to or with customers on transactions otherwise included in Gross Sales;

(G)     Sales of fixtures, machinery, games and equipment or other property after use in Tenant's, a subtenant's, a licensee's or a concessionaire's business;

(H)     Sums received in partial payment for merchandise sold upon the "layaway" or "will call" basis, provided said sum will be included in Gross Sales when the sale has been concluded by delivery of merchandise to the customer.

Any partial payments which are forfeited by customers shall be included in Gross Sales;

(I)     Service charges, finance charges, interest and other such charges imposed by credit card companies for their services;

(J)     Proceeds from and gratuities with respect to parking or transportation services, whether or not such services are provided at, to or from the Demised Premises;

(K)     Promotional, test or other "free plays" or slugs;

(L)     Revenues from charity or "benefit" events provided at cost to the extent Tenant does not profit therefrom but only to the extent such sales are less than two percent (2%) of Gross Sales for each Lease Year;

(M)     Receipts from the sale of waste or scrap materials resulting from Tenant's, a subtenant's, a licensee's or a concessionaire's operations on the Demised Premises;

(N)     The amount of any gratuities given by patrons to employees of Tenant, or employees of any permitted subtenant, contractor, agent, licensee or concessionaire of Tenant;

(O)     The value of food and beverages for employees for which no billing is presented for payment to the recipients;

(P)     Rentals and other fees from licenses, concessions, assignments and sublettings, the gross sales of which are included in Gross Sales; otherwise the actual rental or fees shall be included;

(Q)     The amount of bad debts to the extent that a deduction is taken and allowed on Tenant's federal income tax return for the applicable Lease Year not to exceed three percent (3%) of Gross Sales for each Lease Year;

(R)     All proceeds from lottery sales, by ticket or otherwise and from other gaming, including without limitation, Keno (however, there shall be included in Gross Sales that portion of any gaming sales proceeds retained by Tenant, minus awards paid to customers and/or payments made to gaming authorities - for example if Tenant sells $100,000 of lottery or other gaming tickets and pays out $80,000 in prizes and pays $15,000 to the State or other gaming authority the amount included in Gross Sales would be $5,000); provided that the foregoing is intended to exclude only Gross Sales from State or government sponsored gaming devices and should gaming or gambling be legalized the proceeds shall be included in Gross Sales less all amounts paid to customers and governmental authorities;

(S)     So-called "cover" or "door" charges, to the extent "dedicated" for professional entertainment but only if such "cover" or "door" charges with respect to any particular event result in no profit to Tenant; if Tenant profits from the receipt of such charges, then the entire amount of such charges with respect to the particular event shall be included in Gross Sales or gratuities to entertainers;

(T)     The cost to Tenant of Tenant's prizes and other gifts and "premiums" awarded or given to patrons at the Demised Premises, either for promotional purposes or as the result of skillful or successful play of Tenant's amusements, may be deducted and offset by Tenant against Gross Sales; and

(U)     Parking charges or cover charges to the extent reimbursed or redeemed, in whole or in part, by Tenant.

## Section 4.3   Tenant's Records and Statements of Gross Sales.

The business of Tenant and of any permitted subtenant, licensee or concessionaire shall be operated so that sales will be recorded in Tenant's normal course of business with receipts maintained manually or electronically in a manner similar to the manner in which sales are recorded in Tenant's other operations; nothing herein shall require Tenant to alter or change the systems or practices by which Tenant records sales or Tenant's record keeping system.   Furthermore, Tenant shall keep at all times during the Lease Term, at the

accounting office of Tenant located in the United States, full, complete and accurate books of account and records in accordance with generally accepted accounting principles and practices or principles generally applicable to Tenant's operations with respect to all operations of the business to be conducted on, in or from the Demised Premises, including the recording of Gross Sales and the receipt of all merchandise into and the delivery of all merchandise from the Demised Premises during the Lease Term, and shall, with respect to the Demised Premises and to the extent of Tenant's normal course of business, retain such books and records, copies of all tax reports and tax returns submitted to taxing authorities, as well as copies of contracts, vouchers, checks, inventory records, dated cash register tapes, sales slips and invoices and other documents and papers in any way relating to the operation of such business for at least three (3) years from the end of the period to which they are applicable or, if any audit is required or a controversy should arise between the parties hereto regarding the Rent payable hereunder, until such audit or controversy is terminated even though such retention period may be after the expiration of the Lease Term or earlier termination of this Lease.  Upon request in writing no more frequently than annually (provided if any annual audit shall reveal an error of more than three (3%) such request may be made semi-annually) such books and records shall be open at all reasonable times for the inspection of Landlord or its duly authorized representatives as provided in this Section 4.3 and 4.4 hereof, who shall have full and free access to such books and records, the right to make copies of the same and the right to require of Tenant, its agents and employees, such information or explanation with respect to such books and records as may be necessary for a proper examination and audit thereof.

The annual statements provided for in Section 4.2(c) hereof shall be accompanied by a certificate signed by an officer of Tenant stating specifically that the person certifying such statement has read the definition of "Gross Sales" contained in this Lease, that they have examined the report of Gross Sales of such Lease Year, that their examination included such tests of Tenant's books and records as they considered necessary under the circumstances, and that such report accurately presents the Gross Sales of such Lease Year. In the event Tenant shall be delinquent in furnishing Landlord with a monthly Gross Sales statement, Landlord shall have the right, after five (5) days prior written notice to Tenant, and is hereby authorized, to secure whatever unaudited Gross Sales information Landlord deems appropriate directly from Tenant's store manager at the Demised Premises. Furthermore, Landlord shall have the right, in the event of Tenant's delinquency in delivering monthly Gross Sales statements, after ten (10) days prior written notice to Tenant, to conduct an examination or audit of Tenant's books and records with the cost thereof, together with any charges occasioned thereby, and any Percentage Rent due as a result thereof, to be the obligation of Tenant and to be paid to Landlord immediately upon demand.

Section 4.4  **Additional Audit Rights**.

The acceptance by Landlord of payments of Percentage Rent shall be without prejudice to Landlord's rights to an examination of Tenant's books, records and accounts in order to verify the amount of Gross Sales. Landlord may, at any reasonable time, but no more than once in any one Lease Year cause a complete audit to be made of Tenant's entire books, records and other documents relating to the Gross Sales from the Demised Premises (including the books and records of any subtenant, licensee or concessionaire) for all or any part of the three-year period immediately preceding such audit. If such audit shall disclose that any of Tenant's annual statements of Gross Sales understates Gross Sales made during the reporting period of the statement to the extent of three percent (3%) or more, Tenant shall pay Landlord, as Additional Rent within ten (10) days after demand, the cost of said audit together with the deficiency in Percentage Rent, which deficiency shall be payable in any event together with interest thereon from the date when due at the rate of two percent (2%) above the prime rate published in the Wall Street Journal or the maximum rate permitted by law, whichever is less.  In addition, if any such audit by Landlord shall disclose an intentional understatement of one percent (1%) or more, then thereafter Landlord shall have the right to require that Tenant's annual statements of Gross Sales provided for in Section 4.2(c) hereof be certified to by an independent certified public accountant at the cost of Tenant.  The furnishing by Tenant of any willfully or fraudulently inaccurate statement of Gross Sales may be deemed, at Landlord's sole option and discretion, a violation, breach and default under this Lease.

Section 4.5  **Definitions**.

"Annual Base Rent" and "Percentage Rent" shall have the meanings set forth in Sections 4.1 and 4.2, respectively, "Additional Rent" shall mean any other sums due from Tenant under this Lease, and "Rent" shall include Annual Base Rent, Percentage Rent and Additional Rent.

## ARTICLE 5

Section 5.1 **Tenant's Business Taxes**.

Tenant shall pay before delinquency all taxes, assessments, license fees and public charges levied, assessed or imposed upon its business operation, as well as directly upon its trade fixtures, furnishings, merchandise and personal property of any kind owned, installed or used by Tenant in or upon the Demised Premises. It is the intention of both parties that leasehold improvements, but not trade fixtures, personal property or merchandise, become part of the real property upon installation. Real Estate Taxes on the real property are payable by Landlord pursuant to Section 5.2.

Section 5.2 **Real Estate Taxes**.

(a)     Tenant shall pay, as Additional Rent, Tenant's Proportionate Share of any Real Estate Taxes assessed and levied against the Shopping Center during the term. "Tenant's Proportionate Share" of Real Estate Taxes shall be equal to the product of the Real Estate Taxes payable by Landlord for any tax year (or portion, in which case, Tenant's Proportionate Share shall be pro-rated) occurring during the term multiplied by a fraction, the numerator of which shall be the Demised Premises Square Footage and the denominator of which shall be the total Usable Floor Area (as hereinabove defined) on all levels of all Buildings in the entire Shopping Center including all Department Stores and other Buildings which are included in the tax parcel. If the Floor Area of the Shopping Center is increased, the denominator shall be increased proportionately.

(b)     Since Taxes are paid a full year in advance in Montgomery County, if Landlord has already paid Real Estate Taxes for the tax year in which the Rent Commencement Date occurs Tenant shall, on or before the Commencement Date, reimburse or pay Tenant's Proportionate Share Real Estate Taxes for the then current tax fiscal year.

(c)     Tenant shall not be required in any manner to subsidize the payment of taxes by any other occupant such as, without limitation, a Department Store.   Tenant's Proportionate Share of Real Estate Taxes shall not include Real Estate Taxes which are assessed and levied against the Shopping Center for any portion of a tax year falling outside the term, and Tenant shall pay Tenant's Proportionate Share of Real Estate Taxes only for the portion of the tax year falling within the term.  For example, since Real Estate Taxes in Montgomery County, Maryland are payable July 1 of each calendar year in one installment at discount and through September without penalty, if Tenant were to open for business on January 1, 1996, Tenant would be obligated to pay Tenant's Proportionate Share of Real Estate Taxes only for the second half of the 7-1-95 through 6-30-96 tax year and if this Lease were to terminate on January 1, 2015, Tenant would be obligated to pay Tenant's Proportionate Share of Real Estate Taxes only for the first half of the 2014-2015 tax year. Tenant's Proportionate Share of the Real Estate Taxes for each tax year would be further adjusted for the portion of the tax year not falling within the term (i.e. multiplying Tenant's Proportionate Share of Real Estate Taxes by a fraction, the numerator of which would be the number of days of the tax year falling within the term and the denominator of which would be 365).

(d)     Notwithstanding the actual real estate taxes for the 1994-1995 tax year, Real Estate Taxes for the 1994-1995 tax year (both County and State) shall be deemed to be One Dollar Fifty-Five Cents ($1.55) per square foot and if Tenant were to pay Tenant's Proportionate Share of Real Estate Taxes for the 1994-1995 tax year, Tenant's Proportionate Share of Real Estate Taxes would have been One Dollar Fifty-Five Cents ($1.55) times the Demised Premises Square Footage which based on the above Proportionate Share assuming square footage of 60,000 would be Ninety-Three Thousand Dollars ($93,000.00).  Any increase in the foregoing amount per square foot of the Demised Premises Square Footage can result only from an increase in the assessment on the tax parcel or an increase in the tax rate for tax years after the 1994-1995 tax year.

(e)     For the purpose of this Section 5.2, the term "Real Estate Taxes" shall include only the real property taxes assessed by Montgomery County and the State of Maryland against the tax parcel which includes the Demised Premises and shall not include any special assessments, water and sewer rents and other governmental impositions imposed upon or against the Shopping Center of any other kind or nature whatsoever, extraordinary as well as ordinary, foreseen and unforeseen or any estate, inheritance, succession, capital levy, corporate franchise, gross receipts, transfer or income tax of Landlord, any tax on rentals or any charges in replacement or substitution of or similar in character to the foregoing exclusions, nor shall any of the same be deemed taxes payable by Tenant hereunder, unless and to the extent the same be imposed in lieu of the taxes and assessments payable by

Tenant hereunder, and then only to the extent that any such tax is solely applicable to commercial property owners and the same would be payable if the Shopping Center were the only property of Landlord subject to such alternate tax. In the event a tax is levied in substitution for or in lieu of a tax which Landlord presently pays without reimbursement from Tenant, Landlord shall pay such new tax without reimbursement from Tenant. If there shall be more than one taxing authority, the real estate taxes for any period shall be the sum of the real estate taxes for said period attributable to each taxing authority. Notwithstanding anything herein to the contrary, should any governmental taxing authority levy, assess or impose a tax, excise or assessment in substitution of (but not in addition to) the existing method of taxation, Tenant shall (subject to the aforementioned limitations) be responsible for and shall pay such tax, excise and/or assessment or shall within fifteen (15) days of demand reimburse Landlord for the amount thereof, as the case may be.

Landlord, for the tax parcel for the portion of the Shopping Center which includes the Demised Premises, shall submit to Tenant true copies of the then current real estate tax bill and shall bill Tenant for Tenant's Proportionate Share of Real Estate Taxes any amount that may be payable by Tenant not more than thirty (30) days prior to the date when such real estate taxes shall become due without interest or penalty and upon request of Tenant shall send to Tenant a receipt showing the payment thereof. Notwithstanding anything herein to the contrary, Tenant shall pay its Proportionate Share of Real Estate Taxes within twenty (20) days of being billed by Landlord, but in no event shall Tenant be required to pay its Proportionate Share of Real Estate Taxes more than thirty (30) days prior to the date such Taxes can be paid with the benefit of the highest discount available.

Within thirty (30) days after Landlord receives any reassessment notices, Landlord shall send to Tenant a copy thereof. Upon receipt of a written request from Tenant, Landlord shall inform Tenant as to whether or not Landlord intends to appeal such assessment together with an explanation of Landlord's decision. Tenant shall cooperate with Landlord to secure a reduction in Real Estate Taxes. If after Tenant shall have made a payment on account of Real Estate Taxes, Landlord shall receive a refund or credit of any portion of the Real Estate Taxes on which such payment shall have been based, Tenant's share of the refund or credit and any interest earned thereon shall be deemed to be trust funds and Landlord shall, after deducting the proportion of all expenses paid by Landlord, if any (including reasonable attorneys' and appraisers' fees) incurred in obtaining such refund, pay to Tenant a share of the refund or grant Tenant a credit which is in the same proportion as Tenant's Proportionate Share of Real Estate Taxes. If Landlord endeavors at any time to contest or negotiate any tax or assessment against the Shopping Center to limit the increase of any tax assessment or to obtain a reduction in the assessed valuation upon the Shopping Center for the purpose of reducing any such tax assessment, Tenant agrees to pay its share of Landlord's reasonable expenses in the same proportion as Landlord's Proportionate Share of Real Estate Taxes in so contesting or negotiating, said proportionate share to be determined and paid in the same manner as set forth in this Article for Taxes and to include, but not be limited to, legal, tax consultant and appraisal fees provided Tenant is delivered a breakdown of such expenses and provided Tenant receives the benefit of its proportionate share of any reduction.

Landlord hereby covenants to apply all sums paid by Tenant to Landlord pursuant to this Section to the payment when due of all Real Estate Taxes and Landlord shall promptly, upon request from Tenant, deliver to Tenant a photostatic copy of every available tax bill, showing full payment thereof.

Unless Tenant, within three (3) years after any tax statement is furnished, shall give notice to Landlord that it disputes same, specifying the basis for such assertion, each statement furnished to Tenant by Landlord under any provision of this Article shall be conclusively binding upon Tenant as to the amount due from Tenant for the period represented thereby; provided, however, that additional amounts due may be required to be paid by any supplemental statement furnished by Landlord. Pending resolution of any dispute, Tenant shall pay the amount due in accordance with the statements furnished by Landlord. Landlord agrees, upon prior written request, during normal business hours to make available for Tenant's inspection, at the offices of Landlord or its agent, Landlord's books and records which are relevant to any disputed amount provided that such amount shall have been paid by Tenant to Landlord. The three (3) year claim period shall be extended for any statement that conceals or misrepresents the Real Estate Taxes for the period of time during which the concealment and misrepresentation remained undiscovered by Tenant, together with a reasonable additional period of time to allow assertion of a claim against Landlord, after discovery of the concealment or misrepresentation.

Section 5.3  **Common Areas.**

(a)  Use by Tenant; Maintenance.  Tenant and its agents, employees, customers and invitees are, except as otherwise specifically granted to Tenant under Section 1.2 or as otherwise provided in this Lease, authorized, empowered and privileged during the Lease Term to use the Common Areas for their respective intended purposes in common with other persons and on a non-exclusive basis.  Tenant shall be entitled to all of the rights granted under Section 1.2.  Landlord agrees to maintain and operate, or cause to be maintained and operated, the Common Areas.

(b)  Common Areas Defined.  In this Lease, "Common Areas" means all areas, facilities and improvements provided, from time to time, in the Shopping Center (except those within any Department Store building or granted for the exclusive benefit of any Department Store or within any other store premises) for the mutual convenience and use of tenants or other occupants of the Shopping Center, their respective agents, employees, customers and invitees and shall include, to the extent provided, but not be limited to, the enclosed mall, parking areas and facilities, including, without limitations, parking decks, roadways, entrances, sidewalks, walkways, stairways, escalators, elevators, service corridors, truck-ways, ramps, loading docks, delivery areas, landscaped areas, package pickup stations, public restrooms and comfort stations, access and interior roads, retaining walls, bus stops, and lighting facilities.  Any multi-level parking facility located from time to time in the Shopping Center is herein called a "Parking Deck".

(c)  Changes by Landlord.  Tenant agrees that Landlord shall, at all times have, except as specifically limited by the terms of this Lease, the right of making such changes, rearrangements, additions or reductions therein and thereto from time to time which in its opinion are deemed to be desirable and for the best interest of all persons using the Common Areas or which are a result of any federal, state or local environmental protection or other law, rule, regulation, guideline or order including, but not limited to, the location, relocation, enlargement, reduction or addition of accommodations for access to the Shopping Center by public transportation, driveways, malls, entrances, exits, automobile parking spaces, employee and customer parking areas, the direction and flow of traffic, installation of prohibited areas, landscaped areas, and any and all other facilities of the Common Areas.  Except as specifically limited by the terms of this Lease, Landlord (or others so entitled to) may from time to time make, anywhere within the Shopping Center, alterations, reductions, or additions to the Common Areas or building on the Shopping Center or any lands added thereto, temporarily close the Common Areas for such purposes, construct additional buildings or improvements on the Common Areas or elsewhere and make alterations thereto, build additional stories on any buildings, construct multi-level or elevated parking facilities, and construct roofs, walls, and any other improvements over, or in connection with any part, or all of, the mall areas in order to enclose same.  Notwithstanding the foregoing, Landlord covenants and agrees to provide and maintain during the Term, except where prevented or prohibited by fire or other casualty or by any federal, state or local environmental protection or other law, rule, regulation, guideline or order or by any other cause beyond Landlord's reasonable control, adequate parking facilities at the Shopping Center.  Notwithstanding any right reserved by Landlord under this Section, unless required by any federal, state or local law, rule or order, no such additions or changes shall cause or result in a Material Interference to the Demised Premises.  Landlord shall complete all major repairs to the parking decks prior to the Commencement Date.

(d)  Rules and Regulations; Hours of Operation of Common Areas.  Tenant agrees that Landlord may establish and from time to time change, alter and amend, and enforce against Tenant, such reasonable rules and regulations as Landlord may deem necessary or advisable for the proper and efficient use, operation and maintenance of the Common Areas; provided that all such rules and regulations affecting Tenant and its customers, invitees, agents and employees shall generally apply equally and without discrimination to all retail tenants of the Shopping Center and provided same do not materially diminish Tenant's rights hereunder (exclusive of the Department Stores and Specialty Stores).  The rules and regulations herein provided for may include, but shall not be limited to, the hours during which the Common Areas shall be open for use.  Notwithstanding the aforegoing, Landlord acknowledges that the Demised Premises may remain open until late hours in the morning and Tenant's employees, contractors and invitees will require access to the Demised Premises and parking on a twenty-four hour a day basis and that the Common Areas shall be available for Tenant during the hours described in subsection K of Section 1.2 above, that the Common Area lighting and security will be maintained during said hours.  No rule or regulation or other action (except for necessary repairs) and except for actions taken in connection with an expansion which do not constitute a Material Interference as defined in Section B (Recitals) shall be taken by Landlord which will restrict or impede the use of the Tenant's Valet Parking Area and parking decks serviced by the pedestrian bridge

to the Demised Premises. Landlord may, in its sole discretion, charge customers of the Shopping Center for automobile or other vehicular parking on the parking areas but only if (i) such a charge for parking is necessitated by or results from charges or taxes levied or assessed by law or any governmental authority on the parking facilities of the Shopping Center, or (ii) such a charge is otherwise mandated or required by law or governmental authority, or (iii) such a charge is customary in regional shopping centers in the Washington, D.C. metropolitan area or, (iv) such a charge is in connection with a valet parking service (excluding Tenant's valet parking service), or (v) such a charge is instituted to discourage the use of the parking facilities of the Shopping Center by persons other than customers, their employees, agents, contractors or invitees or others with business at the Shopping Center; provided that in the event Landlord shall elect to impose a charge for customer parking pursuant to clauses (i), (ii), (iii), (iv) or (v) above, Tenant shall have the right to validate customer parking tickets and Landlord shall reimburse Tenant the parking charges with would otherwise have been payable with respect to the validated tickets. Tenant shall use prudent efforts to require all trucks or other vehicles serving Tenant to use the service area provided by Landlord which shall not be changed or modified without Tenant's consent (which shall not be unreasonably withheld or delayed) provided minor modifications may be made which do not impair or interfere with Tenant's use of the loading area. Tenant shall cause all such vehicles servicing Tenant to be promptly loaded or unloaded and removed; and shall use its prudent efforts to see that all such trucks or other vehicles owned or operated by, or on behalf of, or serving Tenant shall comply in all respects with any applicable, reasonable and non-discriminatory rules and regulations governing use of truck or vehicle access, parking, loading and unloading facilities, and permissible hours and places therefore, as the same may be from time to time established, modified or amended by Landlord as aforesaid. No delivery trucks shall be permitted on the Parking Decks, if any.

(e)   Landlord's Control. Except for those areas given over to Tenant's control under Section 1.2 Landlord shall, as between Landlord and Tenant, at all times during the lease term have the sole and exclusive control, management and direction of the Common Areas, and may at any time and from time to time during the Lease Term exclude and restrain any person from use or occupancy thereof, excepting, however, Tenant and other tenants of Landlord and bona fide invitees of either who make use of said Common Areas in accordance with the rules and regulations established by Landlord from time to time with respect thereto and the rights of Tenant in and to the Common Areas shall at all times be subject to the rights of others to use the same in common with Tenant, and it shall be the duty of Tenant to keep all of said Common Areas free and clear of any obstructions created or permitted by Tenant or resulting from Tenant's operation. Landlord may at any time and from time to time close all or any portion of the Common Areas to make repairs or changes or to such extent as may, in the opinion of Landlord, be necessary to prevent a dedication thereof or the accrual of any rights to any person or to the public therein, to close temporarily any or all portions of the said Common Areas to discourage non-customer parking, and to do and perform such other acts as in and to said Common Areas as, in the exercise of good business judgment, Landlord shall determine to be advisable with a view to the improvement of the convenience and use thereof by tenants, their employees, agents, customers and invitees. Landlord hereby reserves the exclusive right with respect to the use of the Common Areas for advertising purposes subject to Tenant's rights to signage and informational displays as provided in this Lease.

(f)   Employee Parking. Landlord may from time to time designate a particular employee parking area or areas to be used by tenants of the Shopping Center which given the nature of Tenant's late hour business shall be convenient to the Demised Premises recognizing the need to provide safety to Tenant's employees and subject to Tenant's approval. If Landlord does so, Tenant and its employees, agents, and permitted licensees, concessionaires and/or subleases shall park their vehicles only in those portions of the parking areas designated for that purpose by Landlord. Tenant shall notify each of its employees of the provisions of this Section prior to their commencing any employment connected with the Demised Premises and shall also inform them that their cars are subject to being towed away at such employees' expense in case of any violation, regardless of whether prior notice is given by Landlord.

(g)   Landlord's Use of Common Areas. Subject to Tenant's rights to use the parking area under Section 1.2(G) above, Landlord reserves the right at any time to utilize the Common Areas including, without limitation, the enclosed mall, for promotions, exhibits, carnival type shows, rides, outdoor shows, displays, automobile and other product shows, the leasing of kiosks and food facilities, landscaping, decorative items, and any other use which, reasonable in Landlord's judgment, tends to attract customers to, or benefit the customers of, the Shopping Center but no such use shall be located on the third level of the parking deck and no such use shall be permitted which would constitute a Material Interference to Tenant.

(h)   Common Area Costs and Expenses.  All costs and expenses incurred by Landlord, or others on Landlord's behalf, in operating, maintaining, repairing and replacing the Common Areas (herein called "Common Area Costs") shall be charged and pro-rated in the manner hereinafter set forth.  Such Common Area Costs shall include all costs and expenses of every kind and nature as may be paid or incurred by Landlord (including appropriate reserves) in operating, policing, protecting, managing, equipping, lighting, repairing, replacing and maintaining the Common Areas including, but not limited to, the cost and expenses of:

(i)   operating, maintaining, repairing, replacing, lighting, cleaning, sweeping, painting, resurfacing and striping of and removing snow, ice and debris from, the Common Areas, including, without limitation, the enclosed mall and Parking Decks, maintaining, repairing and replacing Common Area ducts, conduits and similar items, fire protection systems, sprinkler systems, utility, security alarm systems, storm and sanitary drainage systems and other utility systems, Shopping Center signs on and off the Shopping Center site, directional signs and markers, and on and off-site traffic regulation and control signs and devices;

(ii)   premiums for all insurance, if any, maintained by Landlord including, without limitation, liability insurance for bodily injury, death and property damage, insurance on the Shopping Center (including the Common Areas and, without limitation, the enclosed mall and Parking Decks) against fire, extended coverage including sprinkler damage, vandalism and malicious mischief, theft or other casualties, workmen's compensation, plate glass insurance for glass exclusively serving the Common Areas, and loss of rent insurance for up to a twelve month period;

(iii)   interior and exterior replanting and replacing of flowers, shrubbery, plants, trees, and other landscaping, and all water used to irrigate flowers, shrubbery, plants, trees and other landscaping located inside or outside the enclosed mall;

(iv)   repair and maintenance of the Enclosed Mall and parking deck structures including, without limitation in each case, floors, ceilings, roof, skylights and windows;

(v)   maintenance, repair, replacement, inspection and depreciation of the elevators and escalators and other original equipment of the Shopping Center (it being understood, as well, that depreciation on all other items will be limited to original items only and no depreciation on replacement items will be included), and all personal property taxes and other charges incurred in connection with such equipment;

(vi)   all license and permit fees and any and all parking surcharges that may result from any environmental or other laws, rules, regulations, guidelines or orders (less therefrom any income to Landlord from customer parking charges related thereto) the cost of obtaining and operating public transportation or shuttle bus systems, if the same are required by any environmental or other law, rule, regulation, guideline or order of if the same are for the benefit of employees of tenants in the Shopping Center or do, in Landlord's judgment, benefit the customers of the Shopping Center (less the income to Landlord derived therefrom) and the cost and expenses of maintaining employee parking areas, including roping of same and security therefor;

(vii)   music program services and loudspeaker systems (whether rented or purchased) including the electricity therefor;

(viii)   the cost of all electricity and other utilities with respect to the Common Areas including, but not limited to, electricity for lighting the Enclosed Mall and parking facilities (including the parking decks) and electricity to run the vertical transportation system in the Shopping Center (but excluding therefrom the mall heating, ventilating and air conditioning system) and the cost of removal of all trash and debris (including garbage, trash and debris from the Demised Premises) and the removal of such trash and debris from the Shopping Center and from Tenant's dumpsters on at least a daily basis and the maintenance of trash dumpsters and compactors;

(ix)   personnel, including, without limitation, security and maintenance people, to implement the operation, maintenance, repair and replacement of the Common Areas, the Shopping Center manager, his secretary and the mall management bookkeeper or bookkeepers (including without limitation the payroll, payroll taxes and employee benefits of such implementing personnel, manager, secretary and bookkeepers where personnel is employed less than full-time for the Shopping Center, salaries will be apportioned); and

(x)   Landlord's administrative costs and overhead in an amount equal to fifteen percent (15%) of the total aggregate costs and expenses of operating, maintaining,

repairing and replacing the Common Areas including, but not limited to, those items in Sections 5.3 (h)(i) through (vii) above (but specifically excluding therefrom depreciation, the salaries of the Shopping Center manager and other personnel and the actual cost of electricity and other utilities).

Contributions, if any, of Department Stores and Specialty Stores to Landlord toward Common Area Costs shall be applied to reduce Common Area Costs for the period covered thereby before apportionment and determination of Tenant's pro rata share thereof. Specialty Stores shall be defined as retail stores of between 25,000 and 75,000 square feet of GLA.

Landlord may cause any or all maintenance services for the Common Areas to be provided by an independent contractor or contractors or other parties. Notwithstanding anything to the contrary contained hereinabove, no costs or expenses in connection with the original construction and installation of the Common Areas shall be included in Common Area Costs.

Landlord's determination of the cost of all electricity and other utilities used with respect to the Common Areas, as more particularly set forth in Section 5.3 (h)(viii) above shall be based upon the reasonable estimate of Landlord.

If Landlord from time to time acquires, or makes available, additional land not presently part of the Shopping Center for parking or other Common Area purposes and incorporates such additional land into the Shopping Center and such Common Area is available to customers of the Shopping Center, then Common Area Costs shall also include all expenses incurred by Landlord in connection with the operating, maintenance and repair of the Common Areas on said additional land but shall not include any cost for the acquisition, lease, financing or improvement thereof.

(i)     Tenant's Share of Common Area Costs.  Tenant shall pay to Landlord, as Additional Rent, the following amount for the operation, maintenance, repair and replacement of the Common Areas:

(a)     Subject to adjustment as hereinafter provided, Tenant initially shall pay Landlord an annual amount equal to $2.00 times the Demised Premises Square Footage, payable monthly in advance in equal monthly installments on the first day of each calendar month, as its full contribution toward its share of Common Area Costs (including trash removal) through the end of the first Lease Year.

(b)     The amount payable by Tenant under (a) above shall be increased as of the first day of the second Lease Year and every Lease Year thereafter by an amount equal to the lesser of (i) Landlord's actual percentage increase in Common Area Costs for such Lease Year or (ii) the increase, as of the first day following such anniversary in the same proportion as the Consumer Price Index for All Urban Consumers (U.S. City Average) published by the Bureau of Labor Statistics of the United States Department of Labor (the "Consumer Price Index") most recently reported as of such adjustment date bears to the Consumer Price Index reported for the first full calendar month of the Main Term, all such adjustments to be apportioned for fractional years, but in no event under (i) or (ii) above shall such increase for any particular Lease Year be greater than six percent (6%) on a non-compounded basis (i.e. six percent (6%) per year on a cumulative basis based on the initial Two Dollars ($2.00) and not six percent (6%) on the amount of Common Area Costs for the preceding Lease Year provided the six percent (6%) cap shall be increased proportionately for the first adjustment to take into account that the first Lease Year may contain more than 365 days.

(j)     Sprinkler Fee:  No sprinkler fee.


## ARTICLE 6

Section 6.1  **Construction Allowance.**

Landlord shall pay to Tenant an amount equal to fifty dollars ($50.00) times the Demised Premises Square Footage, but not to exceed Three Million Dollars ($3,000,000.00), as a construction allowance (the "Construction Allowance"), to defray so-called "soft" and "hard" costs incurred by Tenant in performing Tenant's Construction, including, without limitation, permit or impact fees; construction costs and fees; architectural, design and engineering fees; and costs due any materialman or equipment supplier or vendor.  Tenant may first request disbursement of the Construction Allowance monies only after the Conditions Precedent (as defined in Article 21) have been fulfilled or waived by Tenant.

Tenant's request for disbursement of Construction Allowance monies shall be in writing (and may be transmitted by fax), shall be made no more than one time per month and shall include a copy of the current payment applications and draw requests from Tenant's various contractors, architects, engineers, planners, suppliers and vendors. All requisitions made by the twentieth (20th) of a month shall be paid by the fifth (5th) day of the following month. As a prerequisite to any advance, Tenant shall furnish a lien waiver from Tenant's general contractor with exception for the payment to be made. Landlord may withhold from the final payment an amount equal to one hundred and twenty-five percent (125%) of the amount estimated by Tenant's architect to complete any punch list items (such withheld amount to be disbursed on an item by item basis as such punch list items are completed but no more frequently than monthly).

Section 6.2   **Construction of the Demised Premises.**

Landlord agrees to perform and complete the Landlord Work described in the Landlord Work Letter attached hereto as Exhibit E and Tenant agrees to perform and complete the Tenant Work described in Exhibit E.

## ARTICLE 7

Section 7.1   **Landlord's Repairs.**

Throughout the term hereof, Landlord shall keep in good upkeep and repair in accordance with standards of first-class regional enclosed mall shopping centers (including the performance of all obligations for which costs and expenses are included under Section 5.3(h) above:   (i) the exterior of the Shopping Center, Common Areas, and structural portions of the Shopping Center and Demised Premises, the roof, the loading dock and entrances, and other portions of the Shopping Center and the Demised Premises (unless such repairs to the Demised Premises are the responsibility of Tenant as hereinafter set forth or necessitated by Tenant's failure to maintain or repair and are not covered by insurance), including, without limitation, the structural portions of the floor slab, the bearing walls, foundations, gutters, downspouts, and all structural members, the plumbing, electrical, water, sewerage and other utility lines serving the Demised Premises and located outside of the Demised Premises and the plumbing, electrical, water, sewerage and other utility lines within the Demised Premises that do not exclusively serve the Demised Premises; and (ii) the parking areas, including pedestrian ramps, parking decks and other Common Areas, including without limitation service court area, trash chute and dumpsters and other facilities servicing the Demised Premises and (iii) to the Demised Premises if as a result of defective or faulty installation or construction by Landlord or Landlord's contractor.   Except as provided above and as otherwise expressly provided in this Lease, Landlord shall not be obligated to repair or maintain the doors, windows, interior plumbing and other utility lines within the Demised Premises exclusively.

Landlord shall have the right at any time and from time to time to use any part of the roof and exterior walls of the Demised Premises for the purpose of making repairs or replacements to equipment, systems and structural components serving the Buildings, provided that Landlord shall undertake all commercially reasonable efforts not to (except for a temporary basis which does not constitute a Material Interference) interfere with Tenant's business, signage or operation (hereinafter "Tenant's business").   Landlord shall further have the right to install, maintain, use, repair and replace pipes and wires leading through the Demised Premises and serving other parts of the Buildings at such locations and in a manner reasonably acceptable to Tenant which will avoid, in Tenant's good faith, commercially reasonable business judgment, any interference with Tenant's business at the Demised Premises. All work performed by Landlord as permitted herein shall be performed in a good and workmanlike manner using quality materials and as expeditiously as possible at such times as do not constitute a Material Interference with Tenant's business.

Section 7.2   **Tenant's Duty to Maintain.**

Tenant shall at all times, from and after delivery of possession of the Demised Premises to Tenant, at its own cost and expense, maintain said Demised Premises in good and tenantable condition, and make all needed repairs to the Demised Premises and every part thereof, except for repairs required to be made by Landlord under this Lease and except as hereinbefore provided. Tenant's obligations under this Section shall not include repairs required by Landlord under any construction warranty and shall include, but not be limited to, repairing and maintaining items as are required by any governmental agency having jurisdiction thereof (whether the same is ordinary or extraordinary, foreseen or unforeseen), walls (other than exterior walls, exterior windows which are sealed over by Tenant at Tenant's election, and demising walls), ceilings, utility meters, ducts, pipes and

conduits within and serving the Demised Premises, all fixtures, heating, ventilating and air conditioning equipment, plumbing fixtures, lines and other apparatus, sprinkler equipment and other equipment within and serving only the Demised Premises or outside the Demised Premises but exclusively serving the Demised Premises, the store front or store fronts, all Tenant's signs, locks and closing devices, and all window sash, casement or frames, doors and door frames; provided that Tenant shall make no adjustment, alteration or repair of any part of the sprinkler or sprinkler alarm system in or serving the Demised Premises without Landlord's prior approval. Subject to Article 16, all glass within the Demised Premises is at the sole risk of Tenant, and any glass broken shall be promptly replaced by Tenant with glass of the kind, size and quality as is then required by applicable building codes. Tenant shall permit no waste, damage or injury to the Demised Premises and Tenant shall initiate and carry out a program of regular maintenance and repair of the Demised Premises, including the painting or refinishing of all areas of the interior and the storefront, so as to impede, to the extent possible, deterioration by ordinary wear and tear and to keep the same in attractive condition. As used in this Article, the term "exterior walls" shall not be deemed to include the storefront or storefronts, plate glass, window cases or window frames, doors or door frames and security grilles or similar enclosures. Tenant will not overload the electrical wiring serving the Demised Premises or within said Demised Premises and will install at its expense, but only after obtaining Landlord's written approval, any additional electrical wiring which may be required in connection with Tenant's business.

Section 7.3  **Requirements of Law**.

Landlord agrees that if any governmental or quasi-governmental authority has or hereafter shall condemn or otherwise declare all or any part of the Demised Premises as unsafe or as not in conformity with the laws and regulations with respect to items which are Landlord's duty to repair pursuant to this Lease, or if any governmental or quasi-governmental authority has ordered or required, or shall hereafter order or require, any alterations or repairs to or installations in the Demised Premises, with respect to items or matters which are Landlord's duty to repair pursuant to this Lease or as a result of work undertaken elsewhere in the Shopping Center by or on behalf of Landlord, Landlord will immediately, at Landlord's own cost and expense, rebuild or make such alterations, installations and repairs as may be necessary to comply with such laws, orders or requirements (the validity of which Landlord shall be entitled to contest). If by reason of such laws, orders or the work done by Landlord in connection therewith Tenant is deprived of the use of the Demised Premises for more than twenty-four (24) consecutive hours, thereafter, the Annual Base Rent, Percentage Rent, Additional Rent and other charges payable by Tenant under this Lease shall be abated or adjusted, as the case may be, in proportion to that time during which, and to the extent, Tenant is deprived of a portion of the Demised Premises. If the deprivation of use continues beyond forty eight (48) consecutive hours, then the abatement shall be retroactive to the onset of the deprivation of use. If, however, such condemnation, law, order or requirement, as in this Article set forth, shall be with respect to any items or matters which is Tenant's duty to repair pursuant to this Lease, then Tenant will immediately, at Tenant's own cost and expense, comply therewith and no abatement or adjustment of rent shall be granted, provided however, that Tenant shall be entitled to contest the validity thereof. With respect to the Americans With Disabilities Act ("ADA"), Tenant shall, at its expense, comply with those portions of the ADA relating to Tenant's business operations or Tenant's Work's or alterations performed by Tenant in the Demised Premises and Landlord, at Landlord's expense, shall comply with those portions of the ADA applicable to the remainder of the Buildings (specifically including, without limitation, the Parking Decks), the other Common Areas and the remainder of the Shopping Center. Landlord shall use reasonable efforts to undertake such work at a time and in a manner so as to minimize disruptions to Tenant's normal business operations.

Section 7.4  **Tenant's Alterations**.

Tenant shall have the right, at its sole expense, from time to time, to redecorate the Demised Premises and to make such additions, alterations and changes in parts of the interior of the Demised Premises which Tenant deems expedient or necessary; provided, however, that such alterations and changes when completed shall not impair the structural soundness of the Demised Premises or the Buildings or overload the capacity of Buildings systems. Tenant may, at its sole option, remove all such redecoration, alterations and changes. Tenant shall further have the right, upon twenty (20) days prior written notice to Landlord, to install, run, maintain, repair and replace duct shafts and utility lines through other premises and the Buildings in the locations specified on Exhibit "E" only and, provided the lease of any other tenant is not violated thereby, in other locations which will not materially and adversely interfere with the business of other tenants or which will not otherwise materially adversely affect business of Landlord or other Tenants in the Shopping Center. Landlord shall execute and deliver upon request of Tenant instruments embodying

the approval of Landlord which may be required by any public or quasi-public authority for the purpose of obtaining any licenses or permits for the making of such alterations, changes and/or installations in, to or upon said Demised Premises and Tenant agrees to pay for such licenses or permits. Tenant indemnifies and holds Landlord harmless from and against all mechanics' liens or claims by reason of such alterations or additions which may be made by or on behalf of Tenant on the Demised Premises. Anything contained in this Section 7.4 to the contrary notwithstanding, Tenant shall not make structural changes to the Demised Premises other than in connection with Tenant's Construction or in substantial conformance with Exhibit F without Landlord's prior approval, which approval shall not be withheld or delayed unreasonably. Tenant shall provide to Landlord, prior to commencement of any work by Tenant, for informational purposes only, copies of any plans and specifications for any alterations made to the Demised Premises; in no event shall this sentence be construed to create any rights of approval in favor of Landlord except solely with respect to structural changes or capacity of Building utility systems or changes to the exterior of the Demised Premises to the extent provided above. Landlord acknowledges that Tenant's designs and plans for the Demised Premises are proprietary to Tenant and while Landlord may utilize same in fulfilling its obligations hereunder, it shall limit disclosure of such to a need to know basis and then shall caution any recipient to also keep such information confidential.

Section 7.5 **Permits and Expenses**.

Each party agrees that it will procure all necessary permits before making any repairs, alterations, other improvements or installations, including without limitation, any alterations made pursuant to Section 7.4. Each party shall give written notice to the other of any repairs required of the other pursuant to the provisions of this Article 7. The party responsible for the repairs required by this Article 7 shall promptly commence and diligently complete such repairs, subject however, to delays occasioned by events of Force Majeure.

Each party agrees to pay promptly when due the entire cost of any work done by a party upon the Demised Premises so that the Demised Premises at all times shall be free of liens for labor and materials. Each party indemnifies and holds harmless the other party and the other party's shareholders, officers, directors, agents and employees from and against any and all injury, loss, claims or damage to any person or property occasioned by or arising out of the doing of any such work by the first party or its employees, agents or contractors. Each party further agrees to use materials of good quality, comply with all governmental requirements, and perform the work done pursuant to this Section 7.5 in a good and workmanlike manner.

## ARTICLE 8

Section 8.1 **Duties of Landlord**.

During the Main Term of this Lease and any extension thereof, Landlord shall:

(a)  Pay all real and personal property taxes, levies and assessments applicable to the Shopping Center not payable by Tenant.

(b)  Pay for all personal liability and casualty insurance to be provided by Landlord as hereinbelow provided;

(c)  Pay all wages, worker's compensation insurance, unemployment taxes and other costs and expenses of employees necessary to maintain and operate the Shopping Center;

(d)  Put Tenant's trade name (or the trade name of Tenant's assigns or subtenants, which names may be limited in number as determined in Landlord's reasonable discretion, to prevent confusion or unsightly clutter) on any and all of the Buildings directories and in the parking garage to direct Tenant's customers into the parking garage and from the parking garage to the Demised Premises and on all Ring Road signage with tenant names; and

(e)  Continuously maintain the Common Areas as above provided and maintain adequate and suitable trash receptacles and dispose of all trash and debris at Landlord's expense, including garbage, trash and debris deposited by Tenant.

Section 8.2 **Landlord Covenants**. Landlord shall take reasonable steps to cause other tenants and occupants of the Shopping Center to refrain from performing any acts or carrying on any practices which would violate Tenant's rights under this Lease, and

reasonable legal action to prevent any other tenant or occupant from engaging in any act or practice which would violate Tenant's exclusive rights or which would interfere with the right of quiet enjoyment granted to Tenant or Tenant's right to use of the Common Areas.

Landlord shall not renovate, remodel, enlarge or otherwise perform any work in, on or about the Shopping Center ("Landlord's Remodel") which causes a Material Interference except as permitted under B of the Recitals with Tenant's normal business operations in the Demised Premises.

## ARTICLE 9

Section 9.1   **Tenant Covenants**.

Tenant covenants and agrees as follows:

(a)     At the expiration of the term, as same may be extended, to remove its goods and effects and those of all persons claiming under it and to yield up peaceably to Landlord the Demised Premises in the condition required by Section 7.2.

(b)     To permit Landlord and its agents on reasonable notice and at reasonable times to inspect the Demised Premises and to show the Demised Premises to prospective purchasers or Mortgagees, provided that Landlord shall not thereby unreasonably interfere with the conduct of Tenant's business; and to permit Landlord to enter the Demised Premises upon reasonable notice, but only on an "after hours" and "off peak" basis (unless in an emergency or unless Tenant has "Gone Dark" as defined in Section 11.1) to make such repairs, improvements, alterations or additions thereto as may be required by Landlord under the provisions of this Lease. If by reason of such repairs, improvements, alterations or additions, Tenant is deprived of the use of the Demised Premises for more than twenty four (24) consecutive hours, thereafter, the Annual Base Rent, Percentage Rent, Additional Rent and other charges shall be abated or adjusted, as the case may be, in proportion to that time during which, and to the extent of that portion of the Demised Premises of which Tenant shall be deprived. Further, if the deprivation of use continues beyond forty-eight (48) consecutive hours, then the abatement shall be retroactive to the onset of the deprivation of use.

(c)     Tenant shall not perform any acts or carry on any practice which may damage the Demised Premises or be a nuisance or menace to other tenants in the Shopping Center.

(d)     Tenant will use, maintain and occupy the Demised Premises in a careful, safe and lawful manner in conformity with this Lease and applicable government laws and ordinances.

(e)     Tenant will keep the inside (if visible and not built over or blacked out) and outside of all glass in the doors and windows of the Demised Premises clean; will keep all interior wall and ceiling surfaces clean; will maintain the Demised Premises, at its own expense, in a clean, orderly and sanitary condition and reasonably free of insects, rodents, vermin and other pests; will not permit unreasonable accumulation of garbage, trash and other refuse, but will deposit such refuse in dumpsters and/or compactors provided by Landlord and Landlord shall cause such garbage and trash to be removed on a regular basis at Landlord's sole cost and expense.

(f) the Demised Premises, including Tenant's show windows, if any, and signs, shall be kept neat, clean and in good order by Tenant at Tenant's expense, including necessary and periodic repainting thereof, and including such repair, repainting and cleaning work as, in Landlord's reasonable judgment, shall be necessary to maintain such premises in good order and in keeping with the general standards of maintenance and good appearance of the Shopping Center. Tenant's show windows, if any, shall be used for display purposes only and no debris, disposal containers, material scraps, cartons, wrappings or other similar items shall be permitted in said windows.

(g) Tenant shall only conduct selling, merchandising, display, advertising or soliciting in connection with its business inside the Demised Premises, and, when expressly permitted by this Lease or in writing by Landlord so to do hereunder, outside the Demised Premises in any of the Common Areas of the Shopping Center

or otherwise, and only in a dignified manner and in conformity with the highest standards of practice obtaining among superior type stores, shops or concerns dealing in the same or similar merchandise.

(h) Tenant will keep the display windows in the Demised Premises electrically lighted and any and all electric signs lighted during all business hours, for reasonable periods before and after such hours, and for such other periods as may be required by the general rules governing the conduct of tenants of the Shopping Center.

(i) Tenant shall not cause or permit any unusual or objectionable noises or odors to emanate from the Demised Premises, (it being understood that food odors may emanate from exhaust fans) or display offensive signs or merchandise for sale purposes in its show windows.

(j) Tenant shall not obstruct, encumber or use for any purpose, other than ingress or egress to and from the Demised Premises, the Common Areas, or the entrances, vestibules, stairways or halls thereof, and shall not engage in or permit any selling, merchandising, display, advertising or soliciting anywhere within the Shopping Center outside of the Demised Premises, unless the same shall be expressly permitted by this Lease or by Landlord in writing.

(k) Except as expressly permitted by this Lease, Tenant shall not install any exterior lighting or plumbing fixtures, shades or awnings or any interior or exterior decorations, carpeting or other floor covering, or painting, or build any fence or enclosure or make any changes to Tenant's store front or the interior or exterior appearance of the Demised Premises without Landlord's prior written consent. Except for etched glass, standard hours, credit card information and the like (each of which shall be done in a first-class manner) absolutely no materials of any kind may be affixed to the exterior or interior surface of Tenant's show windows. All advertising must be professionally made and displayed and have the approval of Landlord.

(l) No auction, loss of lease, fire, bankruptcy or going out-of-business sale shall be conducted at the Demised Premises, nor shall any other special sale or sales be carried on therein other than such as are incident to the normal and established routine of Tenant's business with its regular clientele. Nothing herein shall be deemed to restrict the absolute freedom of Tenant to determine its own selling prices nor shall it preclude the conduct of periodic seasonal, promotional or normal clearance sales.

(m) Any business conduct or practice promulgated, carried on or maintained by Tenant which, includes "head shops" and/or similar devices in the Demised Premises devoted to the sale of articles of merchandise normally used or associated with illegal or unlawful activities, such as the sale of paraphernalia used in conjunction with controlled drugs or business practices which might confuse or mislead, or tend to confuse or mislead, the public shall be immediately discontinued by Tenant upon the written demand of Landlord.

(n) Except as expressly permitted under this Lease, Tenant will not utilize any advertising medium within the Shopping Center which can be seen, heard (other than music or noise which may be generated in the Demised Premises but heard outside of entrances and exits within a reasonable distance) or experienced outside the Demised Premises including, but not limited to, flashing lights, searchlights, loudspeakers, phonographs, radios or television; will not display, paint, place or cause to be displayed, painted or placed, any handbills, bumper stickers or other advertising devices on any vehicle parking in the parking area of the Shopping Center, whether belonging to Tenant or to Tenant's agent, or to any other persons, will not distribute, or cause to be distributed, in the Shopping Center any handbills or other advertising devices and will not conduct or permit any activities that might constitute a nuisance.

(o) Tenant will not load or permit the loading or unloading of merchandise, supplies or other property nor ship nor receive outside the area and entrance designated therefor, nor permit the parking or standing, outside of said area, of trucks, trailers, or other vehicles or equipment engaged in such loading or unloading in a manner to interfere with the use of any Common Areas or any pedestrian or vehicular use or good regional shopping center practice.

(p) Tenant shall not permit the accumulation or placing of rubbish, trash, garbage, debris, boxes, cans or other articles of any kind or description whatsoever, or any of the aforesaid, including merchandise or fixtures, in the area surrounding

the Demised Premises, or in any other part of the Shopping Center other than in such compactors or receptacles as may be provided therefor.

(q)     Other than associated with Tenant's own business or associated with events sponsored by Tenant, Tenant will not permit the use of any portion of the Demised Premises for solicitations, demonstrations or itinerant vending, or any activities inconsistent with reasonable standards of good regional shopping center practice.

(r)     Tenant shall include the name "White Flint" or refer to "White Flint" in all advertising and marketing materials which both:  (1) advertise or market the Demised Premises; and (2) provide information as to its specific location (i.e. when referring to the Shopping Center Tenant shall refer to White Flint and not for example the "Bloomingdale's" Shopping Center in North Bethesda.  Nothing herein contained shall be construed to mandate when Tenant must refer to the Shopping Center in its advertising or marketing materials or prohibit Tenant from using "Washington, D.C." in its advertising, marketing or promotional materials or merchandise).

Section 9.2   **Utility Services**.

(a)     Landlord has provided and shall continue to provide throughout the term the mains, conduits, points of connection, and other facilities at the locations in the Buildings specified on Exhibit "E" or in the approved Plans and Specifications to supply water, sanitary sewer, sprinkler service, gas and electricity to the Demised Premises.

(b)     Tenant shall pay for all utility services serving the Demised Premises directly in accordance with the rules and regulations of the public or private utility company or governmental agency supplying same.  Unless caused by the negligent or willful act or omission of Landlord, or its employees, agents or contractors, Landlord shall not be liable for any interruption in the supply of any utility to the Demised Premises.

(c)     All utilities serving the Demised Premises shall be separately metered. Tenant shall be responsible for installing any meters (at Tenant's sole cost and expense) or other devices for the measurement of Tenant's consumption of utilities supplied to the Demised Premises.  Tenant shall make application for and arrange for the installation of all such meters or other devices and Tenant shall be solely responsible for, and promptly pay, as and when the same become due and payable, all charges for water, sewer, gas, electricity, telephone, and any other utility used or consumed in the Demised Premises.

(d) When absolutely necessary by reason of accident or other cause occurring in the Demised Premises or elsewhere in the Shopping Center, or in order to make any repairs of alterations or additions or improvements in or relating to the Demised Premises or to other portions of the Shopping Center, Landlord reserves the right to interrupt the supply to the Demised Premises or to the Common Areas, of steam, electricity, water, gas, and other utilities, if any, and also to suspend the operation of the heating or air-conditioning system in or to the Demised Premises or any other portion of the Shopping Center, including the enclosed malls, until said repairs, alterations, additions or improvements shall have been completed.  Landlord shall undertake any and all commercially reasonable steps to minimize interruption to Tenant's business and whenever possible shall limit such interruption to hours when Tenant is not open for business.  Provided Landlord shall pursue such work with reasonable diligence, there shall be no abatement in Rent because of any such interruption or suspension unless such interruption or suspension shall render the Demised Premises substantially untenantable for a period in excess of three (3) consecutive business days in which event Tenant shall thereafter until such time as the Demised Premises are again tenantable be entitled to an equitable abatement of Rent in accordance with the reasonable determination of Landlord.


### ARTICLE 10

Section 10.1   **Microwave Transmission and Other Communication Equipment**.

(a)     Landlord hereby grants Tenant the right, for the term or any extension thereof, at Tenant's cost and expense, to install, maintain and operate microwave transmission and communication devices and satellite dishes (collectively the

"Equipment") on the roof of the Shopping Center at locations reasonably proximate to the Demised Premises designated by Landlord to be used in connection with Tenant's business and to provide access for communications and electrical wires and conduits to be installed at Tenant's sole cost and expense from the Demised Premises to and from the Equipment, provided that:

(i)    the dimensions, design, placement, material composition, installation, technical operating characteristics (including, without limitation, operating frequency, power consumption and mechanical stability) of the Equipment on the roof including the location and the manner of installation is subject to the prior approval of Landlord, which shall not be unreasonably withheld, conditioned or delayed (all such Equipment to be reasonably screened subject to Landlord's approval, such approval not be unreasonably withheld);

(ii)    Tenant shall be responsible for any repairs to the roof as a result of such installation maintenance and removal and shall take appropriate measures are taken to maintain all roof warranties in full force and effect;

(iii)    Tenant shall use commercially reasonable efforts to prevent the interference with the reception of television, radio or other signals at the Buildings or interference with the equipment of other tenants; and

(iv)    nothing in this Section 10.1, including, without limitation, the installation of the Equipment, shall delay the Commencement Date.

(b)    Tenant shall have the right to access the Equipment to install, maintain, repair, replace, test, improve and remove the Equipment. Tenant agrees that Landlord shall have the right to control access to the Equipment as reasonably necessary to prevent access thereto by unauthorized persons or for purposes other than those expressly permitted in this Section 10.1. If Tenant proposes to do more than just maintain, repair or replace existing Equipment or to install Equipment materially different from that previously approved by Landlord, then Landlord shall have the right to approve Tenant's plans and specifications, which approval shall not be unreasonably withheld or delayed.

(c)    Tenant shall be responsible, at Tenant's sole expense, for the installation, structural design, maintenance, operation, repair, replacement, and removal of the Equipment in accordance herewith, including, without limitation, the cost of all utilities and supplies. Tenant shall further be responsible, at Tenant's sole expense, for repairing any damage to the Equipment caused by Tenant (subject to Landlord's duty to repair under Article 16), Tenant's agents, employees or contractors including repairs to the roof following removal. Tenant agrees that upon termination of this Lease, Tenant shall remove all of the Equipment and repair the Equipment to the condition required hereby, ordinary wear and tear and damage by casualty excepted.

(d)    Tenant shall install, operate and maintain the Equipment in accordance with all applicable laws, ordinances and regulations and maintain all required permits and licenses in accordance with applicable law which are required for the operation of the Equipment. Tenant understands and agrees that in addition to the Equipment, the roof of the Shopping Center may also contain, at Landlord's discretion, other communications equipment and facilities operated and/or maintained by Landlord, other tenants or occupants of the Shopping Center, or other users permitted by Landlord. Landlord agrees, and shall obligate every other user or tenant of the roof of the Buildings authorized by Landlord to avoid operating communication equipment and facilities in a manner which creates a nuisance or unreasonably interferes with the operation of Tenant's Equipment and Tenant agrees not to interfere with the use of the equipment of other tenants which is in existence at the time of Tenant's installation.

Section 10.2  **Equipment Not to Interfere with Equipment of Others.**

Tenant agrees that its right to Equipment shall not be superior to the rights of other tenants and occupants of the Shopping Center (except that Tenant shall have the first right to install Equipment on the roof of the Demised Premises) and Tenant agrees that Tenant's Equipment shall not interfere with the equipment of other tenants and occupants of the Shopping Center.

## ARTICLE 11

Section 11.1  **Use; Operating Covenant; Exit Rights and Termination**.

(a)  Tenant shall initially open and until the seventh (7th) anniversary of the Commencement Date ("Tenants Initial Operating Covenant Period") continuously operate the Demised Premises as Dave & Busters' (or such tradename as Tenant is then operating substantially all of its other facilities engaged in such concept) for the purpose of conducting and operating an entertainment-recreation-amusement-restaurant-bar complex similar to other Dave & Buster facilities in the country providing goods and services, which goods and services may primarily include, but not be limited to, the provision, sale, rental and use for pecuniary consideration, virtual reality games, video games, so-called arcade games, rides and amusements, billiards, golf, play-for-fun blackjack, bowling, dance, nightclub and other amusements, food, beverages (alcoholic and non-alcoholic), party and catering facilities and play areas (some of which games, rides, etc. may provide for the opportunity to win prizes and/or other benefits, _e.g._, additional free games, by direct reward or through any other method, either directly or via a process of redemption).  Any one or more of the foregoing uses is sometimes referred to herein as an "Entertainment/Food Use").  The parties hereby recognize that this type of complex is in a constantly evolving state, as is the entertainment-recreation-amusement industry and that, provided Tenant operates the Dave & Busters herein in a consistent manner as it is then operating substantially all other Dave & Buster facilities in the United States, changes consistent with such evolution may occur.

Commencing after the seventh (7th) anniversary of the Commencement Date and until the tenth (10th) anniversary of the Commencement Date Tenant shall continue to operate the Demised Premises in accordance with the provisions applicable to the Tenant's Initial Operating Covenant subject to Tenant's rights under (b) below and Section 12.1 below (any period during which Tenant is obligated to operate is hereinafter called Tenant's Operating Covenant Period), provided and subject to a least two out of the following three (3) entities are in the Shopping Center being operated and open for business in substantially all of their premises at the time in question:  (1)  Bloomingdale's; (2) Lord & Taylor; (3) the theater complex on the third floor of the Shopping Center consisting of approximately twenty thousand (20,000) square feet (the "Theaters") ("Bloomingdale's, Lord & Taylor and the Theaters being collectively referred to as the "Key Occupants").  If any two out of three of the Key Occupants are not operating at any time after Tenant's Initial Operating Covenant Period and have not been so operating for a period of eighteen (18) months or more (which eighteen (18) month period may include periods prior to the end of Tenant's Initial Operating Covenant Period (such failure of operation being referred to as the "Failure of Co-Tenancy" and the last day of such period being referred to as the "Failure of Co-Tenancy Outside Date") commencing on the Failure of the Co-Tenancy Date, unless Landlord has replaced Bloomingdale's and/or Lord and Taylor, as the case may be, with a comparable first class full line department store or the Theater with a comparable first run theater, ("Replacement Co-Tenant") Tenant shall have the right ("Exit Right") to elect any one or more of the choices under (x), (y) or (z) below provided, notwithstanding the foregoing Tenant may not elect any such rights and such rights shall be suspended for so long as Gross Sales from the Demises Premises for the most recent twelve calendar months have not declined more than fifteen percent (15%) below Gross Sales for the three hundred sixty five (365) day period immediately preceding the first day of the Failure of Co-Tenancy.  In the event Tenant shall have an Exit Right, Tenant may elect on ninety (90) day written notice either: (x) to cease operating in the Demised Premises provided such Exit Right occurs after the tenth (10th) anniversary of the Opening Date, (y) make an "Isolated Assignment" as permitted under Section 12.1(b) below or (z) to terminate this Lease effective thirty (30) days after the giving of notice of termination, provided, however, if Tenant has not already elected to terminate this Lease, Tenant may not terminate this Lease at any time after a Replacement Co-Tenant is open and operating for business and at least two of the three key occupants (or their Replacement Co-Tenants) are so operating.  Tenant may continue to exercise its rights under subparagraph (z) even if Tenant has elected its rights under (x) or (y) unless and until a Replacement Co-Tenant is open and operating for business and there are at least two (2) out of the above (3) Key Occupants which are open and operating for business.  If Tenant shall elect its rights under subparagraph (z) to be effective Tenant must pay the unamortized portion (on a straight line twenty (20) year basis as of the date of termination) of the cash construction allowance payment made by Landlord plus if such right is elected at any time prior to the twelfth anniversary of the Commencement Date, Tenant shall also pay an amount equal to one (1) year's Annual Base Rent.

If Tenant shall not elect to terminate this Lease pursuant to subsection (z) above and shall remain open for business, commencing on the first day of the Failure of Co-Tenancy until the first to occur of (i) a Replacement Co-Tenant has been open and operating for nine (9) months and there are at least two (2) out of the above (3) Key Occupants which

are open and operating for business or (ii) Tenant exercises its rights to terminate this Lease, Annual Base Rent (not charges) shall be reduced in the same proportion as the reduction in Gross Sales for the then current Lease Year (or part thereof) below the Gross Sales for the 365 day period (or partial year) immediately prior to the first day of the Failure of Co-Tenancy.

(b)  After the tenth (10th) anniversary of the Commencement Date, Tenant shall not be obligated to operate or keep open any business of any kind or nature whatsoever at the Demised Premises (it being understood that Tenant is not required to operate or keep open as a Dave & Buster's or as an Entertainment/Food Use after the seventh (7th) Anniversary of the Commencement Date) and may cease operations in the Demised Premises (such cessation being hereinafter referred to as "Go Dark" or "Gone Dark"). For purposes of this Section 11.1, Tenant shall not have Gone Dark if Tenant temporarily ceases operations at the Demised Premises because of, as the case may be, casualty, condemnation, force majeure, remodelling and/or renovation and/or alteration whether or not in connection with an assignment or a subletting, "inventory taking" (not to exceed two (2) days per year) or a legal holiday or any other similar event or occurrence by or for the benefit of Tenant or an assignee or sublessee.  At any time while Tenant has Gone Dark pursuant to the provisions of this Section 11.1, Tenant shall nevertheless be obligated to pay all Annual Base Rent and Additional Rent due hereunder (except Percentage Rent, provided if Tenant shall elect to Go Dark, Tenant shall pay annually during such Go Dark periods an amount equal to the Percentage Rent paid for the Lease Year prior to the Go Dark prorated for any partial Lease Year during the Go Dark period).

If Tenant intends to Go Dark, Tenant may do so by giving at least six (6) months written notice ("Go Dark Notice") of Tenant's intent to Go Dark provided if Tenant elects to Go Dark pursuant to an Exit Right Tenant may do so by giving at least two (2) months prior written notice.  The written notice shall project a date on or about which Tenant intends to Go Dark.  Landlord shall keep such information strictly confidential.  The date on which Tenant Does Dark shall be the "Going Dark Effective Date".  If Tenant gives Landlord a Go Dark Notice, Landlord shall have a continuing right to elect to terminate and cancel this Lease ("Recapture") by giving Tenant notice of recapture any time prior to the first to occur of notice from Tenant that Tenant intends to re-open for business (provided Tenant or its transferee shall proceed diligently to reopen) or thirty (30) days after Tenant's Notice of Assignment pursuant to Section 12.1 is received by Landlord (the "Recapture Notice").  Landlord's right of termination hereunder is Landlord's sole remedy in the event Tenant elects to Go Dark provided that Tenant has paid and continues to pay all Rent due under the Lease during the period that Tenant has Gone Dark.  In the event Landlord elects to recapture the Lease, Landlord shall pay to Tenant, within ten (10) days of the effective date of Recapture, an amount equal to all of Tenant's unamortized improvement costs (including third party architect and engineer fees and further including, without limitation, leasehold improvement costs but excluding all movable fixtures, furniture and equipment and other personal property), less the unamortized portion of the Construction Allowance, both amortized on a straight line basis over the original term of this Lease and determined as of the effective date of Recapture.  This payment obligation is expressly intended to survive termination of this Lease.  Tenant shall, upon written request, provide reasonable documentation of such costs.

Anything contained herein to the contrary notwithstanding, in the event the then occupant of the Demised Premises Goes Dark and Landlord either does not effect or is prevented from effecting (because Landlord's election is nullified as provided aforesaid) a Recapture of the Demised Premises, and the then occupant resumes operations at the Demised Premises, the right of such user to thereafter Go Dark (and all rights, time periods and obligations flowing therefrom ) shall be reinstated as of the date the user recommenced operations at the Demised Premises.

(c)  Tenant may upon  one hundred eighty (180) days prior written notice terminate this Lease, whether or not an Exit Right occurs at any time, effective after the fifteenth (15th) anniversary of the Commencement Date upon payment of the unamortized portion (on a straight-line twenty (20) year basis) of the cash Construction Allowance.

(d)  Tenant may use the Demised Premises for any entertainment bar or restaurant use and, with Landlord's consent, not to be unreasonably withheld from and after the seventh (7th) anniversary of the Commencement Date, for any lawful use which is not in violation of the provisions of subsections (iii), (iv), (v) and (vi) of Section 12.1(b) below.

Section 11.2  **Restrictive Covenant**.

(a)    Anything in this Lease to the contrary notwithstanding, from and after August 4, 1994, for as long as the Premises is operated as a Dave & Buster's or as a concept

similar to Dave & Buster's under the same tradename Tenant is then operating substantially all of its other Dave & Buster operations in the United States whether or not under the name Dave & Buster's (the name Dave & Buster's or such other trade name as Tenant is then operating substantially all of its other Dave & Buster operations in the United States being hereinafter called collectively the "Dave & Buster's Trade Name"), and including any extensions of this lease, Landlord shall not permit nor enter into a lease which permits another tenant or occupant to use any portion of the Shopping Center or any other property owned or controlled by Landlord or any affiliate of Landlord within the area outlined on the plat attached as Exhibit A-1 (the "Restriction Area") for the operation, sale, use, or provision of so-called virtual reality games, bowling, golf simulation, or billiards, pool, shuffle board, dinner theater, carnival type redemption games, mid-way type games, coin operated and non-coin operated amusement games and attractions; or for so-called arcade games; or an arcade or game room (with five or more coin, token or attendant-operated video, pinball or other arcade or carnival games) or other amusements which are typical of the types of games or amusements found in a Dave & Buster's operation and being used in the Demised Premises.  Provided in any event such prohibited uses intended for use by children under the age of twelve (12) shall be permitted and further provided the current uses permitted in the business known as "Discovery Zone" shall not be amended, modified, or expanded.  It is the intention of the parties that the operation of such prohibited uses, without charge, incidental to the sale of such games or equipment is not prohibited (e.g. the demonstration of video games in connection with the sale of computer software).

(b)     Leases in existence as of August 4, 1994, with existing tenants shall be exempt from the restrictive covenants contained herein provided existing leases may not be amended, or modified, to permit the uses restricted hereby or to expand the use thereof where permitted.

(c)     Except in the Premises, dance halls, Texas two-step style type halls and dinner theaters are prohibited in the Shopping Center.  Topless and/or bottomless clubs and other noxious uses are absolutely prohibited within the entire Shopping Center.

In the event Landlord breaches any term of this Section 11.2 then, in addition to all remedies available to Tenant, whether pursuant to this Lease, at law, in equity or otherwise including, but not limited to, injunctive relief (in respect of all of which remedies Landlord shall fully reimburse Tenant for enforcement thereof including attorneys' fees.  Moreover in the event Tenant's Gross Sales are reduced by ten percent (10%), or more in any six (6) month period in comparison to the same six (6) month period of the Lease Year immediately preceding the breach), then Annual Base Rent shall be reduced by fifty percent (50%) until such breach is cured (without any corresponding equitable adjustment to the Gross Sales Base) provided such reduction in Gross Sales shall not be required as a condition to such reduction in Annual Base Rent in the event of an intentional or willful breach.  Landlord shall not breach the covenant granted by this Section 11.2 by selling or transferring ownership or control of the Shopping Center to an unaffiliated, bona-fide third party purchaser who owns or controls property within the Restriction Area, and as of the effective date of the transfer or sale, has an existing use or user which would violate this Section 11.2.  Thereafter, however, the purchaser/transferor's permitting any new use or entering into a lease with some person or entity for a use for any of its other properties within the Restriction Area which would violate the covenant set forth in this Section 11.2 shall constitute a breach.

Section 11.3  **Radius Restriction**.

Until the seventh (7th) anniversary of the Commencement Date and for so long thereafter as Tenant is operating in the Demised Premises an entertainment-recreation-amusement complex under the Dave & Buster's Trade Name Tenant agrees not to operate a restaurant-bar-entertainment-recreation-amusement complex under the Dave & Buster's Trade Name within the radius area shown on the map attached hereto as Exhibit K (the "Radius Area").  After the seventh (7th) anniversary of the Commencement Date, Tenant agrees that it will not assign this lease pursuant to Section 12.1(b) or close the Demised Premises, as the case may be (provided nothing herein shall be deemed to extend Tenant's Initial Operating Covenant Period or to restrict Tenant's right of assignment or subletting under this Lease), and then following such assignment or closing within an eighteen (18) month period thereafter open elsewhere within the Radius Area under the Dave & Buster's Trade Name for so long as (a) if there are ten or fewer Dave & Buster's stores in the Dave & Buster's operations, Gross Sales and profits from the Demised Premises for the prior three hundred sixty-five (365) days as determined by Tenant on a store wide basis consistently applied  are in the top twenty percent (20%) of the chain or (b) if there are eleven or more Dave & Buster's operations Gross Sales and profits as aforesaid are in the top thirty percent (30%).

If at any time after the seventh (7th) anniversary of the Commencement Date Gross Sales or profits are below the amounts specified above depending upon the number of stores in the chain, Tenant (1) may make an Isolated Transfer pursuant to subsection (b) of Section 12.1 (2) change the use of the Demised Premises subject to the provisions of Section 11.1(d), or (3) Go Dark after year ten (10) pursuant to the requirements of Section 11.1(b). Notwithstanding that Tenant elects (1), (2) or (3) in the foregoing sentence, unless Tenant also terminates this Lease, Tenant agrees not to open and operate a Dave & Buster's anywhere in Montgomery County, Maryland or Fairfax County, Virginia before the twelfth (12th anniversary of the Commencement Date and after the twelfth (12th) anniversary of the Commencement Date and until such time as this Lease may be terminated within Montgomery County, Maryland or within a one-mile radius of Tyson's Corner shopping center.

Anything contained in this Lease to the contrary notwithstanding, Tenant may elect to open an operation under the Dave & Buster's Trade Name or engage in other operations otherwise restricted by this Section 11.3 within the area identified as "Inner Harbor-Baltimore" shown on the map attached hereto as Exhibit K-1 after the fifth anniversary of the Commencement Date provided the Annual Base Rent, shall upon the opening of the premises in the Inner Harbor-Baltimore Area, be increased to eighty percent (80%) of the Annual Base Rent plus Percentage Rent for the 365 day period immediately prior to the opening of the premises in the Inner Harbor-Baltimore Area, but in no event lower than the Annual Base Rent then in effect. Effective with any such increase in rent the Gross Sales Base for the payment of Percentage Rent shall be adjusted upward proportionately.

## ARTICLE 12

Section 12.1 **Assignment and Subletting**.

(a)     Tenant shall have the absolute right at any time without Landlord's consent to transfer and assign this Lease ("Assign") and to Sublet ("Sublet") all but no less than all of the Demised Premises or to transfer Tenant's (collectively "Transfer"; the assignee, sublessee or transferee as hereinafter referred to as a Transferee") rights and obligations inclusive of the use clause, in this Lease (i) to a subsidiary or affiliate of Tenant or to Tenant's parent or (ii) in connection with or as a part of or pursuant to a merger consolidation, sale of stock or sale of substantially all of the assets of Tenant or Tenant's "going public" or as part of a Transfer of Tenant's interest in all or substantially all of its stores, provided Tenant shall remain liable unless released pursuant to subparagraph (c) below (a permitted assignment under this subsection (a) is referred to as "Unrestricted Transfer"). In addition, Tenant shall have the absolute right to license the operations referred to in Section 11.1 hereof or to grant concessions giving other parties the right to conduct such operations os long as such licensees and/or concessionaires do not have separate entrances (subject to Landlord approval, not to be unreasonably withheld) and are generally integrated into the operation of Tenant such that it appears to the general public that the Demised Premises is being operated by a sole owner.

(b)   Commencing after the seventh (7th) anniversary of the Commencement Date, Tenant shall have the right to Transfer its rights in and to the Demised Premises in whole or in part to a Transferee which may change the use of the Demised Premises subject to the following criteria (hereinafter called an "Isolated Assignment"): (i) the Transferee shall be a reputable tenant with good credit rating who is presently operating at least five (5) comparable facilities.; (ii) Tenant or such Transferee shall not sublet the Demised Premises into more than five (5) separate tenant spaces (provided nothing herein shall limit Tenant from granting multiple concessions licenses and other occupancy arrangements which are operated as part of the Dave & Buster's operation); (iii) the proposed use shall be a retail use typically found in and consistent with the character of comparable first class shopping centers in the Washington, D.C. Metropolitan area; (iv) the proposed uses does not conflict with or violate any exclusive or restriction in any other leases entered into by the Landlord with other tenants in the shopping center (provided no such exclusive or restriction includes an Entertainment/Food Use); (v) the use does not violate any governmental rules, regulations, code, or other requirement to be in violation of code or governmental regulations; (vi) in no event shall the Demised Premises be used as a first-run motion picture theater as its primary use (provided nothing herein shall be deemed to prohibit the showing of moving pictures in the Demised Premises as a part of Tenant's customary business operations), or for the sale of books, periodicals or magazines, or for the sale of records, music tapes, compact discs, video tapes, (provided the foregoing shall not prohibit incidental sales of such items which are incidental to another primary use). In the event of an Isolated Assignment, Landlord shall have a Recapture right as provided in Section 11.1 above for thirty (30) days after written notice of such proposed Isolated Assignment.

(c) The right to Tenant to assign or sublet requires, as a condition thereof, that, at the time of such assignment or sublease, Tenant shall not be in default of any monetary or material non-monetary term beyond any applicable grace or cure period in the performance and observance of any material obligations imposed upon Tenant by this Lease and such assignee or sublessee assumes in writing to Landlord all of the terms and conditions of the Lease. In the event Tenant assigns or sublets as herein provided, Tenant shall remain liable for the performance and observance of all the obligations to be performed by Tenant pursuant to the provisions of this Lease; provided if such assignment is to Transferee with a net worth (Generally Accepted Accounting Principles ("GAAP") assets exclusive of goodwill less GAAP liabilities) of more than Sixty Million Dollars ($60,000,000.00) (at the time of the assignment or if said assignee subsequently achieves such net worth), Tenant and its Guarantor shall thereafter be relieved of liability and further provided, however, that if Tenant assigns this Lease or sublets portions of the Demised Premises or grants licenses or concessions as permitted hereunder and Tenant has not been relieved of liability as set forth above, then Landlord, when giving notice to said assignee, sublessee, licensee or concessionaire in respect of any default, shall also serve a copy of such notice to the initial Tenant and no notice of default shall be effective until a copy of such notice is received by the initial Tenant [and, in the case of an assignment of this Lease pursuant to which initial Tenant remains liable hereunder, initial Tenant is provided a reasonable opportunity under the circumstances to either cure the default or enter into a new lease with Landlord for what would have been the balance of the term of this Lease, on the same terms and conditions as contained herein (with all prior monetary amounts due being paid by initial Tenant through the date of commencement of the new lease)]. In all events, initial Tenant shall not be liable for any extensions of term or other increase in the obligations of any assignee or sublessee unless expressly consented to, in writing, by initial Tenant.

Any person who shall, by operation of law, or otherwise, become an assignee of this Lease, other than as security for a monetary obligation (prior to any foreclosure thereof), or become vested with the leasehold interest hereunder, or a portion thereof, shall be bound by and liable upon all covenants and provisions contained in this Lease, whether the nature of covenants ordinarily running with the land or not, to the same extent as was the original tenant. In case of any transfer or vesting of the leasehold interest hereunder or any part thereof, either through foreclosure proceedings or otherwise by operation of law including any such transfer or vesting in any permitted leasehold mortgagee, if any, if so requested by Landlord, any person or persons claiming the leasehold interest hereunder or any part thereof so derived, shall promptly execute and deliver to Landlord a written assumption of the obligations of Tenant hereunder in such form that such person or persons shall thereupon be bound and liable upon all covenants and provisions of this Lease on the part of Tenant, to the same extent as was the original tenant.

(d) Anything contained herein to the contrary notwithstanding, in the event of a Transfer of this Lease including a subletting of all or substantially all of the Demised Premises in a transaction which only involves this Lease and the Demised Premises (and no other locations and/or operations of Tenant), to the extent Tenant receives any rental in excess of the Rents due hereunder from Tenant to Landlord, Tenant shall remit to Landlord, within thirty (30) days of receipt by Tenant, one hundred (100%) percent thereof; provided, however, Tenant shall first reimburse itself (together with interest thereon) for any actual, out-of-pocket costs associated with such assignment or subletting and paid to third parties including, but not limited to, brokerage fees, professional and non-professional fees, build-out allowances, free rent concessions and build-out costs (but never less than the rent otherwise due hereunder); and, provided, further, in no event shall Landlord be entitled to any amounts allocated, in good faith, to goodwill, or to Tenant's fixtures, equipment, improvements and other personalty ("Personalty") to the extent the allocation does not exceed the greater of (i) the then fair market value of the Personalty, or (ii) the depreciated cost of the Personalty, as shown on Tenant's regular books of account.

## ARTICLE 13

Section 13.1  **Fixtures**.

All counters, shelving and other trade equipment and all other trade and light fixtures and personal property installed by or at the expense of Tenant and all erections, additions and/or improvements not permanently affixed to and made an integral part of the Demised Premises (such as the HVAC, electrical, plumbing and sprinklers which are deemed permanently affixed to and made an integral part of the Demised Premises) which were made to, in or on the Demised Premises by or at the expense of Tenant and are susceptible of being removed from the Demised Premises without damaging in any manner the structure of the Demised Premises, shall remain the property of Tenant and Tenant may, but shall not be obligated to, remove the same or any part thereof within thirty (30) days after the

end of the term hereof, and provided that Tenant, at its sole cost and expense, shall make any repairs occasioned by such removal.

Section 13.2  **Landlord Waivers.**

Landlord waives any rights to any security interest or landlord lien in any equipment, furniture, games and electronic devices and other personal property of Tenant.

## ARTICLE 14

Section 14.1  **Exterior Signs and Canopy.**

Landlord shall at its expense and in accordance with and subject to all governmental approvals erect a sign facade as identified on Exhibit F and on the Approved Plans and Specifications (the "Rockville Facade Sign"). If Landlord shall expand the Shopping Center in a manner which affects visibility or prominence of the Facade Sign, Landlord shall promptly replace the Rockville Facade Sign with a substitute sign of substantially the same size with comparable visibility from automobile traffic on Rockville Pike. Landlord will also install Tenant's trade name and logo (1) on all existing ring road tenant signage in the locations set forth in Exhibit F, (2) at the main Enclosed Mall entrance, (3) at the central mall elevator which shall be at each level to identify Dave & Buster's, (4) on all tenant signage in the parking decks, (5) at the elevators, escalators and stairwells which lead to the Demised Premises, (6) on all mall directories and (7) on the free standing pylon identified on Exhibit F. The Landlord further agrees to program the two existing Rockville Pike read-out signs to provide, without charge to Tenant, for the message "Dave and Busters" every fourth message to run between six o'clock p.m. and midnight each Friday and Saturday evening during the Term while Tenant remains open. Spaces shall be provided adjacent to mall directories for Tenant's menu boards and video display. Tenant shall further have the right (i) to place the Dave & Buster's name and logo (or other trade name and logo, if changed) on the front and sides of the canopy over pedestrian bridges connecting the parking deck to the Demised Premises and within the parking deck identifying the entrance to the Demised Premises; (ii) to maintain directional and identification signs indicating the location and availability of valet parking and customer drop-off and cab service; and (iii) to maintain identification and directional signs to identify and direct delivery trucks to the Tenant's loading area and to make clear that such area is exclusively for the benefit of Tenant. Landlord acknowledges and agrees that the signage proposed by this Section is critical to Tenant's operations. Any such signs which materially depart from any design criteria contained in Exhibit "F" shall be subject to Landlord's approval, not to be withheld or delayed unreasonably. Landlord shall not utilize the exterior walls of the Shopping Center located immediately outside of the Demised Premises for signage or advertising purposes.

Section 14.2  **Interior Signs.**

Tenant shall have the right, at its sole risk and expense and in conformity with applicable laws and ordinances, to erect, maintain, place and install its usual and customary signs and fixtures in the interior of the Demised Premises.

## ARTICLE 15

Section 15.1  **All-Risk Insurance.**

Landlord shall, at its sole expense (except for the provisions of Section 15.4), maintain all-risk insurance on the Shopping Center including the Demised Premises (including, without limitation, all leasehold improvements and alterations made to the Demised Premises) that Landlord is obligated to rebuild and restore (as well as the appurtenances thereto), which insurance shall be carried under an insurance policy with an insurance company with a Best's rating of A-IX or higher. The amount of such insurance shall not be less than replacement cost of said improvements, less the cost of excavation, "footings" and "foundations" for said buildings, but including cost of demolition and increased costs of construction. All such insurance shall provide that no cancellation, reduction or other material changes therein shall be effective until at least ten (10) days after mailing of written notice thereof to Tenant. Certificates evidencing all such insurance shall be delivered to Tenant.

## Section 15.2 **Insurance Proceeds**.

In the event of any damage to or destruction of the Demised Premises or the Shopping Center or any appurtenances thereto, Landlord shall adjust the loss and settle all claims with the insurance companies issuing such policies. In the event Landlord elects to rebuild and restore the Shopping Center or a new shopping center Tenant shall have an option as provided in Section 16.2 below for a location of Material Comparability on Comparable Lease Terms (as defined in Section 16.2 hereof). The parties hereto do irrevocably assign so much of the proceeds from such insurance policies which are equal to the amount of the replacement cost of the Demised Premises including all leasehold improvements regardless of whom paid for or installed same for the purposes hereinafter stated to Landlord to be deposited by Landlord in a segregated escrow account established with a major money center bank or with Landlord's mortgagee (provided such mortgagee is a bank, insurance company or other institutional lender) for the benefit of Landlord and Tenant, and disbursed for repair, restoration, rebuilding or replacement, or any combination thereof, of the Demised Premises. Any proceeds in excess of the above amount shall be the sole property of Landlord but shall be used for the restoration of the Shopping Center to the extent required by this Agreement. If the proceeds necessary for such repair, restoration, rebuilding or replacement, or any combination thereof shall be inadequate to pay the cost thereof, Landlord shall suffer the deficiency. In connection herewith, Landlord covenants that it shall, at all times, keep the Shopping Center fully insured to replacement value. In the event Landlord does not elect to rebuild Tenant shall be entitled to the portion of the insurance proceeds as provided under Section 16.4 below.

## Section 15.3 **Waiver of Subrogation**.

Landlord and Tenant hereby release each other from any and all liability or responsibility (to the other or anyone claiming through or under them by way of subrogation or otherwise) for any loss or damage to property caused by fire or any of the extended coverage or supplementary insurance contract casualties even if such fire or other casualty shall have been caused by the fault or negligence of the other party, or anyone for whom such party may be responsible; provided, however, that this release shall be applicable and in force and effect only with respect to loss or damage occurring during such time as the releasor's policies shall contain a clause or endorsement to the effect that any such release shall not adversely affect or impair or prejudice the right of the releasor to recover thereunder. Landlord and Tenant each agree that their policies will include such a clause or endorsement so long as the same is obtainable from the insurance industry generally and if not obtainable from the insurance industry generally, shall so advise the other in writing no later than thirty (30) days prior to the date the clause or endorsement will expire and such notice shall release both parties from the obligation to obtain such a clause or endorsement after expiration, until such time that such clause or endorsement is again available generally from the insurance industry.

## Section 15.4 **Tenant's Contribution**.

Tenant shall pay, as additional rent, a proportionate share of Insurance Premiums based upon a fraction, the numerator of which shall be the number of square feet of the Demised Premises Square Footage and the denominator of which shall be the number of square feet which are covered by the policy of insurance, whether or not occupied (hereinafter called "Tenant's Proportionate Share of Insurance Premiums"). The premiums for the partial Lease Year at commencement of the term shall be prorated. Tenant shall pay Tenant's Proportionate Share of Insurance Premiums within ten (10) days prior to the due date of such premiums, or any installment thereof (but not more frequently than quarterly) but only upon demand for such payment by Landlord given not less than thirty (30) days prior to the due date of such premiums; which demand shall be accompanied by photocopies of the invoices for such premiums and a computation of the amount payable by Tenant. If Tenant pays Tenant's Proportionate Share of Insurance Premiums on an untimely basis, Tenant shall be responsible for any late payment penalty actually paid by Landlord to the insurance company. Landlord agrees to cause all insurance obtained by Landlord to be competitively priced so that Tenant is charged a prevailing market rate for insurance; in the event Landlord receives any rebates or credits, Landlord shall promptly pay to Tenant a share of the rebate or credit which is in the same proportion as Tenant's Proportionate Share of Insurance Premiums.

## Section 15.5 **Tenant's Public Liability Insurance**.

Tenant shall maintain, with respect to the Demised Premises, primary public liability insurance with limits of not less than $2,000,000.00 for injury or death from one accident and $250,000.00 property damage insurance, insuring Landlord and Tenant against injury to persons or damage to property as herein provided. Tenant shall maintain an umbrella

policy with respect to the Demised Premises increasing the coverage limits referred to above to at least $5,000,000 total for injury or death from one accident and $500,000 total for property damage insurance. Tenant shall also maintain all dram shop insurance required by state or local law or ordinance. Any or all such primary and umbrella insurance may be carried under a blanket policy covering the Demised Premises. A certificate of insurance shall be delivered to Landlord on or before the Commencement Date and no such policy shall be cancelled or modified without ten (10) days, prior written notice to Landlord. In addition, Tenant shall have the right to self-insure, with respect to property damage only (not personal liability  or dram shop coverage) so long as Tenant or any guarantor of Tenant has a net worth of not less than sixty million dollars ($60,000,000) (calculated in the same manner as provided in Section 12.1(c) above).

Section 15.6  **Insurance and Indemnification by Landlord**.

Landlord indemnifies and holds Tenant, Tenant's shareholders, officers, directors, agents and employees harmless from and against any and all claims, actions, damages (excluding consequential damages), loss, liability and expense (including, but not limited to, reasonable attorneys' fees and litigation costs), in connection with bodily or personal injury, damage to property, or loss of life, arising out of the use, operation or maintenance of any portion of the Shopping Center or appurtenances thereto, by Landlord, or by tenants of the Shopping Center other than Tenant, their contractors, subcontractors, subtenants, licensees, concessionaires, or respective agents, servants or employees, unless and to the extent any of the foregoing shall arise by reason of any negligent or willful act or omission of Tenant, Tenant's employees, agents or contractors. For the purpose of so protecting Tenant, Landlord shall keep in full force and effect a comprehensive general liability insurance policy covering the Shopping Center, with liability limits being not less than those provided for in Section 15.5 of this Lease and other policy provisions being substantially equivalent to those provided for in Section 15.5 of this Lease. Tenant and Guarantor shall be named as an additional insured in such policy and a copy of such insurance policy, or a certificate (or other document or instrument) evidencing such coverage, shall be delivered to Tenant prior to Landlord's tender of possession of the Demised Premises. Said certificate and policy shall provide that such policy shall not be cancelled or materially changed without at least ten (10) days prior written notice to Tenant. Renewal certificates or policies shall be delivered to Tenant not less than five (5) days prior to the expiration date of the expiring policy theretofore furnished pursuant to this Section.

Section 15.7  **Indemnification by Tenant**.

Tenant indemnifies and holds Landlord, Landlord's shareholders, officers, directors, agents and employees harmless from and against any and all claims, actions, damages (excluding consequential damages), loss, liability and expense (including but not limited to reasonable attorneys' fees and litigation costs) in connection with bodily or personal injury, damage to property, or loss of life arising out of the use, operation or maintenance of the Demised Premises or the easements appurtenant to the Demised Premises to which Tenant is given the right of exclusive use pursuant to Section 1.1 by Tenant, its contractors, subcontractors, subtenants, licensees, or concessionaires, or its or their respective customers, agents, servants or employees, unless and to the extent any of the foregoing shall arise by reason of any negligent or willful act or omission of Landlord, or Landlord's employees, agents or contractors.

## ARTICLE 16

Section 16.1  **Abatement or Adjustment of Rent**.

If the whole or any part of the Demised Premises or the Buildings shall be damaged or destroyed by fire or other casualty after the execution of this Lease and before the termination hereof, then in every case, Annual Base Rent payable pursuant to Article 4 herein and any other charges payable under this Lease (except Percentage Rent, in which event the Gross Sales Base shall be equitably adjusted to reflect any abatement of Annual Base Rent), shall be abated or adjusted, as the case may be (although Tenant shall not be relieved of any of Tenant's non-monetary obligations hereunder to the extent they may be performed under the circumstances), in proportion to the greater of either (i) that portion of the Demised Premises of which Tenant shall be deprived on account of such damage or destruction, or (ii) the extent of the deprivation to Tenant of the use and enjoyment of Tenant's business as conducted in the Demised Premises, and the repair, restoration, rebuilding or replacement or any combination thereof, of the improvements so damaged or destroyed and the term of this Lease, or option term(s) as the case may be, shall toll in accordance with the provisions in Section 20.17 hereof. Tenant shall be obligated to re-commence paying rent in accordance with Section 16.3.

Section 16.2  **Repairs and Restoration**

Except as set forth below, Landlord agrees that in the event of the damage or destruction of the Demised Premises or the Shopping Center, the Landlord forthwith shall proceed to repair, restore, replace or rebuild the Shopping Center, including the Common Areas and the Demised Premises (including all work comprising Tenant's Construction and any other improvements made thereto by Tenant), to substantially the condition in which the same were immediately prior to such damage or destruction and Landlord thereafter shall diligently prosecute said work to completion without delay or interruption except for events beyond the reasonable control of Landlord.  Landlord shall not be required to reconstruct the Shopping Center in the same configuration as existed prior to such damage or destruction but any reconfiguration shall provide for comparable size and location, access to the Enclosed Mall visibility, signage, vertical transportation availability and location of parking and shall otherwise be comparable in all material respects and shall allow to Tenant to operate its business in the Demised Premises in a manner comparable to its operation immediately prior to such changes or destruction and that Tenant's cost of operations in the Demised Premises as reconfigured do not increase as a result of such reconfiguration (hereinafter called collectively "Material Comparability").  Such reconfiguration shall be subject to Tenant's approval, provided Tenant agrees not to unreasonably withhold consent to reconfiguration of the Shopping Center if reconfiguration of the entire Shopping Center provides Material Comparability (including the parking decks adjacent to the Demised Premises) and the delivery and trash collection areas.  Notwithstanding the foregoing, if (a) the time to repair, restore, replace or rebuild is reasonably estimated by Landlord to exceed one (1) year from the date of such damage or destruction, (Landlord shall give Tenant notice of such fact as soon as practicable but no later than sixty (60) days after the damage or destruction); or (b) if Landlord does not complete such repairs, restoration, replacement or rebuilding and comply with conditions (a), (b) and (c) in Section 16.3 hereof within eighteen (18) months of such damage or destruction (although, if Landlord is proceeding with all due diligence, reasonable extensions shall be granted for delays caused by Force Majeure up to an additional ninety (90) days, but not thereafter unless the repair, restoration, replacement or rebuilding is at least eighty (80%) percent complete), then, within thirty (30) days after receipt of Landlord's notice that the repair, restoration, rebuilding or replacement will take longer than one (1) year, or in the case of (b) at any time after the date specified in (b) for completion in addition to any other rights and remedies hereunder (including, but not limited to, Tenant's rights pursuant to Section 18.3), whether at law, in equity or otherwise Tenant may cancel and terminate this Lease effective on the ninetieth day after Tenant delivers written notice of termination to Landlord.  Said notice of termination shall not be effective if Landlord within said ninety-day period shall complete and comply as aforesaid.  Notwithstanding the foregoing, if such damage or destruction shall occur: (a) during the last three (3) years of the term (or any option term, as the case may be) of this Lease; or (b) shall amount to fifty percent (50%) or more of the total leasable square footage of the Shopping Center (excluding department stores), this Lease may be terminated at the election of Landlord, provided that notice of such election to terminate this Lease shall be sent to Tenant within sixty (60) days after the occurrence of such damage or destruction and further in the event of (b) above and Landlord terminates the leases of all similarly affected tenants Landlord may terminate this Lease subject to Tenant's rights as set forth below.  Upon termination, as aforesaid, by either party hereto, this Lease and the term thereof shall cease and come to an end, any unearned rent or other charges paid in advance by Tenant shall be refunded to Tenant, and the parties shall be released hereunder, each to the other, from all liability and obligations hereunder thereafter arising.  In all other cases, Landlord shall proceed to repair, restore, replace or rebuild within the required time and neither Landlord or Tenant shall be entitled to terminate this Lease.  If Landlord shall terminate this Lease pursuant to this Section and shall rebuild either the Shopping Center or a new shopping center or retail center on the Land within five (5) years thereafter, Landlord shall provide to Tenant at its option exercisable within ninety (90) days after receipt of notice of Landlord's intention to rebuild which Landlord shall send at least one hundred twenty (120) days prior to commencement of rebuilding a location of Material Comparability improved with leasehold improvements of equal or greater value on the same terms as are set forth in this Lease for the balance of the Main Term and any renewals or extensions thereof with appropriate extension to take into any interruption of the Term resulting from interruption due to such damage or destruction and subsequent restoration (collectively "Comparable Lease Terms").  Tenant shall have thirty (30) days after written notice of Landlord's rebuilding to elect to exercise such option.

Section 16.3  **Tenant's Reentry**.

In the event the Demised Premises or the Shopping Center have been destroyed or damaged and the Lease has not been cancelled and Landlord has repaired, restored and/or rebuilt the Demised Premises and the Shopping Center as above provided, Tenant shall not

be required to accept delivery or possession of the Demised Premises and re-commence paying rent until either Tenant opens for business (i.e., Grand Re-opening) or all of the following shall have occurred:

(a)     Tenant shall have received written notice from Landlord advising Tenant of the contemplated date of completion for the Demised Premises, and authorizing Tenant to enter the Demised Premises, for the purpose of installing its trade fixtures and equipment and storing merchandise, and Tenant shall recommence paying rent on the earlier to occur of (i) one hundred twenty (120) days after receipt of said notice to do such work provided the condition of the Demised Premises will then reasonably allow Tenant to commence such work, or (ii) the date Tenant first recommences business to the public at the Demised Premises (any so-called "soft opening period"of up to ten (10) days);

(b)     The Demised Premises and the Shopping Center (specifically including, without limitation, the Enclosed Mall and the parking deck and other Common Areas) shall have been completed as nearly as practicable to the condition existing immediately prior to such destruction or damage or as reconfigured as permitted above and in compliance with all laws, ordinances, regulations and requirements of governmental authorities having jurisdiction thereof, subject to any limited redesign consented to by Tenant; and

(c)     A certificate of occupancy or an equivalent use permit, and all other requisite permits, if any, have been issued by the appropriate legal authorities issuing same, and Landlord shall have delivered to Tenant certified or photostatic copies of same.

Section 16.4  **Extension of Term and Extension of Obligation to Operate**.

If such damage or destruction is less than would otherwise permit Landlord to terminate this Lease and occurs during the last three (3) years of the terms (or any option term, as the case may be) and if at the time of such damage or destruction Tenant shall have the right to extend or further extend the term of this Lease, as provided in Article 3 hereof, then Tenant may elect to exercise such right within twenty (20) days after receiving notice of termination from Landlord pursuant to Section 16.2, and in such case, Landlord's notice of termination shall be void and of no effect and Landlord shall repair and restore the Demised Premises and the Buildings (specifically including, without limitation, the Enclosed Mall and the parking deck and the other Common Areas) and their respective appurtenances required by this Article provided Landlord's Lender shall have released such proceeds of insurance to allow rebuilding of such area and not a reduction in the principal balance of any loan on the Shopping Center.

Anything in this Lease to the contrary notwithstanding, if Landlord shall carry the insurance required to be carried under this Lease and the Landlord's mortgagee shall not make available the proceeds of insurance for restoration Landlord shall not be required to restore the Shopping Center or the Demised Premises, subject to Tenant's rights under Section 16.2 above to a location of Material Comparability on Comparable Lease Terms if Landlord rebuilds the Shopping Center or a new shopping center.

Section 16.5  **Sharing of Insurance Proceeds upon Termination**.

If either Landlord or Tenant terminates this Lease, and Landlord determines not to repair, rebuild, restore or replace the Demised Premises or the Shopping Center, there shall be paid to Tenant from the adjusted insurance proceeds an amount equal to the unamortized cost of Tenant Improvements.  Landlord shall receive the balance of any remaining adjusted insurance proceeds.


### ARTICLE 17

Section 17.1  **Total Taking**.

If after the execution of this Lease and prior to the expiration or earlier termination of the term hereof, the whole of the Demised Premises shall be taken under power of eminent domain by any public or private authority, or conveyed by Landlord to said authority in lieu of such taking, then this Lease and the term hereof shall cease and terminate as of the date of such taking, subject, however, to the right of Tenant, at its election, to continue to occupy the Demised Premises, subject to the terms and provisions of this Lease, for all or such part, as Tenant may determine, for the period between the date of such taking and the date when Tenant must cease operations in the Demised Premises

and surrender possession to the taking authority and any unearned rent or other charges, if any, paid in advance, shall be refunded to Tenant.

Section 17.2  **Partial Taking**.

If, after the execution of this Lease and prior to the expiration or earlier termination of the term hereof, any portion of the Demised Premises or the Shopping Center and their respective appurtenances shall be taken under the power of eminent domain by any public or private authority or is conveyed by Landlord to said authority in lieu of such taking:

     (a)    which results in a reduction by 20% or more of the Floor Area of the Shopping Center or a reduction by 20% or more of the Demised Premises Square Footage or a reduction of fifteen percent (15%) or more in the number or spaces in the parking deck servicing the Demised Premises and other parking areas; or

     (b)  · which would otherwise result, in Tenant's reasonable judgment, in a material and adverse effect upon Tenant's normal business operation;

then (unless in respect of an occurrence referred to in "(b)" above, Landlord promptly notifies Tenant, in writing, that it intends to and shall exert good faith efforts to obtain a substantial equivalent or otherwise removes the cause of the material and adverse effect, as the case may be, and, in fact, so obtains a substantial equivalent or otherwise removes the cause of the material and adverse effect, as the case may be, within one hundred twenty (120) days thereafter) Tenant may, at its election, terminate this Lease by giving Landlord notice of the exercise of Tenant's election within thirty (30) days after Tenant shall receive notice of such taking.  In the event of termination by Tenant under the provisions of this Section 17.2, this Lease and the term hereof shall cease and terminate as of the date of such taking, subject to the right of Tenant, at its election, to continue to occupy the Demised Premises, subject to the terms and provisions of this Lease, for all or such part, as Tenant may determine, for the period between the date of such taking and the date when Tenant must cease operations in the Demised Premises and surrender to possession the appropriating authority, and any unearned rent or other charges, if any, paid in advance by Tenant shall be refunded to Tenant.

If, after the execution of this Lease and prior to the expiration or earlier termination of the term, any portion of the Shopping Center and its respective appurtenances shall be taken under the power of eminent domain by any public or private authority or is conveyed by Landlord to said authority in lieu of such taking which results in a reduction by fifty percent (50%) or more of the Floor Area of the Shopping Center or a reduction of twenty-five percent (25%) or more in the number of parking spaces for the Shopping Center, within one hundred twenty (120) days thereafter, Landlord may, at its election, terminate this Lease by giving Tenant notice of the exercise of Landlord's election provided, however, it terminates all lease agreements of other tenants similarly affected.  In the event of termination by Landlord under the provision of this paragraph Section 17.2, this Lease and the term hereof shall cease and terminate as of the date of such taking, subject to the right of Tenant, at its election, to continue to occupy the Demised Premises, subject to the terms and provisions of this Lease, for all or such part, as Tenant may determine, for the period between the date of such taking and the date when Tenant must cease operations in the Demised Premises and surrender possession to the appropriating authority, and any unearned rent or other charges, if any, paid in advance by Tenant shall be refunded by Tenant.  If Landlord shall terminate this Lease pursuant to this paragraph and shall build a new shopping center or retail center on the Land, Landlord shall provide to Tenant a location of Material Comparability, improved with leasehold improvements of equal or greater value on the same terms as are set forth in this Lease.

Section 17.3  **Restoration**.

In the event of a taking in respect of which Tenant shall not have the right to elect to terminate this Lease or, having such right, shall not elect to terminate this Lease, this Lease and the term thereof shall continue in full force and effect and Landlord, at Landlord's sole cost and expense, forthwith shall restore the remaining portions of the Demised Premises and any and all other improvements made theretofore, the remaining portions of the Shopping Center necessary to Tenant's business operations (given any redesign necessitated by the remaining untaken portion of the Shopping Center).  Annual Base Rent, additional rent and any other charges payable by Tenant hereunder (except Percentage Rent, in which event the Gross Sales Base shall be equitably adjusted to reflect any abatement of Annual Base Rent), shall be suspended or abated until the completion of such restoration according to the nature and extent of the injury to the Demised Premises and other portions of the Shopping Center and to Tenant's business, and thereafter (*i.e.*, following restoration) the Annual Base Rent, additional rent, and any other charges (except

Percentage Rent) shall be proportionately reduced based upon the square footage of the Demised Premises remaining after said taking (and to the extent there is a proportionate reduction Annual Base Rent, the Gross Sales Base shall be proportionately reduced).

Section 17.4 **The Award**.

In the event of a taking of the whole of the Demised Premises, resulting in the termination of this Lease pursuant to the provisions of Article 17 hereof, Landlord and Tenant shall cooperate in applying for and in prosecuting any claim of such taking and the award shall be distributed in the following order of priority:

(a)     To a Mortgagee, if any, of Landlord's interest in the Demised Premises, there shall be paid such amounts as may be required by such Mortgage to be paid to the holder thereof;

(b)     To a Leasehold Mortgagee, if any, there shall be paid such amounts as may be required by such Mortgage to be paid by the holder thereof;

(c)     To Tenant, there shall be paid an amount equal to the Unamortized Cost of Tenant Improvements; and

(d)     To Landlord the balance of such award.

Section 17.5 **Temporary Taking**.

If, at any time during the term of this Lease, the whole or any part of the Demised Premises, or of Tenant's leasehold estate under this Lease, shall be taken in condemnation proceedings or by any right of eminent domain for temporary use or occupancy, and neither Landlord nor Tenant exercises any right of termination given by this Article 17, Tenant shall continue to pay the Annual Base Rent, Percentage Rent and all other charges payable by Tenant hereunder provided such Rent and other charges shall be equitably abated to take into account the amount and value of the portion of the Demised Premises so taken. In the event of any such taking of the character referred to in this Section 17.5, Tenant shall be entitled to receive the entire amount of the condemnation award for such taking, whether paid by way of damages, Annual Base Rent or otherwise, unless such period of temporary use or occupancy shall extend beyond the termination of this Lease, in which case the condemnation proceeds shall be apportioned between Landlord and Tenant as of the date of termination of this Lease. Tenant covenants that, upon the expiration of any such period of temporary use or occupancy during the term of this Lease, Tenant will, at its sole cost and expense (but only to the extent of the temporary taking award), restore the Demised Premises, as nearly as may be reasonably possible, to the condition in which the same were immediately prior to such temporary taking.

Section 17.6 **Release**.

In the event of any termination of this Lease as the result of the provisions of this Article 17, the parties, effective as of such termination, shall be released, each to the other, from all liability and obligations thereafter arising under this Lease.

## ARTICLE 18

Section 18.1 **Landlord's Remedies**.

In the event:   (i) Tenant or any assignee shall at any time be in default in the payment of Rent (whether Annual Base Rent Percentage Rent or Additional Rent) required to be paid by Tenant or any assignee for a period of ten (10) days after notice to Tenant and any assignee in writing of such default; or (ii) Tenant, any assignee or sublessee shall be in default in the observance or performance of any of the other covenants and agreements required to be performed and observed by Tenant, any assignee or sublessee hereunder for a period of thirty (30) days after notice to Tenant in writing of such default (or if such default shall reasonably take more than thirty (30) days to cure, Tenant, any assignee or sublessee shall not have commenced the same within the thirty (30) days and diligently prosecuted the same to completion but in no event more than six (6) months after the onset of the default), or (iii) if Tenant shall fail to commence the Tenant Work in a timely manner in the Demised Premises as required by Article 6 or shall fail to prosecute Tenant's Work with due diligence or fail to open the Demised Premises following competition of Tenant's Work, in each such case subject to events covered by Section 20.8 or (iv) within sixty (60) days after the commencement of any proceeding by or against Tenant or any assignee, or Guarantor, whether by the filing of a petition or otherwise,

seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal bankruptcy act or any other present or future applicable federal, state or other statute or law, such proceeding shall not have been dismissed (provided, however, that the non-dismissal of any such proceeding shall not be a default hereunder so long as all of Tenant's covenants and obligations hereunder had been and are being performed by or on behalf of Tenant), or (v) a custodian, receiver, trustee or liquidator of Tenant, any assignee, or Guarantor, or of all or substantially all of such party's property or the Demised Premises, shall be appointed in any proceedings brought by or against Tenant, any assignee, or Guarantor, and such proceedings shall not have been dismissed within sixty (60) days (provided, however, that the non-dismissal of any such proceeding shall not be a default hereunder so long be as all of Tenant's covenants and obligations hereunder had been and are being performed by or on behalf of Tenant); then Landlord shall be entitled, in addition to any and all rights or remedies of Landlord in this Lease or at law or in equity, at its election, to exercise any one or more of the following rights:

> (a)    to bring suit for the collection of the Rent (whether Annual Base Rent, Percentage Rent or Additional Rent) or other amounts for which Tenant may be in default, or for the performance of any other covenant or agreement devolving upon Tenant, all without entering into possession or terminating this Lease;

> (b)    to re-enter the Demised Premises, by summary proceedings or otherwise, and take possession thereof, without thereby terminating this Lease, and thereupon Landlord may expel all persons and remove all property therefrom, and relet the Demised Premises and receive the rent therefrom, applying the same first to the payment of the reasonable expense (including reasonable attorney's fees) of such re-entry and the reasonable cost of such reletting, and then to the payment of the monthly rental accruing hereunder, the balance, if any, to be held by Landlord and applied to rental obligations of Tenant as they become due and Tenant, whether or not the Demised Premises are relet, shall remain liable for any deficiency. It is agreed that the commencement and prosecution of any action by Landlord in forcible entry and detainer, ejectment or otherwise, or the appointment of a receiver, or any execution of any decree obtained in any action to recover possession of the Demised Premises, or any re-entry, shall not be construed as an election to terminate this Lease unless Landlord shall, in writing, expressly exercise its election to declare the term hereunder ended and so terminate this Lease, and, unless this Lease be expressly terminated, such re-entry or entry by Landlord, whether had or taken under summary proceedings or otherwise, shall not be deemed to have absolved or discharged Tenant from any of its obligations;

> (c)    to terminate this Lease by a ten (10) day notice to any Guarantor, as defined hereafter, then re-enter the Demised Premises and take possession thereof, and Tenant shall remain liable for all Rent (whether Annual Base Rent, Percentage Rent or Additional Rent) due under this Lease, less all rent received by Landlord from any replacement tenant or occupant, after deduction of Landlord's actual out of pocket costs of replacement), provided Landlord shall be required to take all reasonable steps to mitigate its damages and to release the Demised Premises (provided Landlord shall not be liable for failure to mitigate if Landlord acts in good faith and that Landlord may release the Demised Premises in whole or in part); wholly discharged from this Lease.  Landlord shall not be obligated to prefer the Demised Premises over any other available space in the Shopping Center.  In the event Landlord shall elect to terminate this Lease, as aforesaid, all rights and obligations of Landlord, and of any permitted successors or assigns, shall cease and determine, except that Landlord shall have and retain full right to sue for and collect all rents and other amounts for the payment of which Tenant shall remain responsible, and all damages to Landlord by reason of any such breach, Landlord having the duties and obligation to mitigate said damage as set forth above, and Tenant shall surrender and deliver up the Demised Premises to Landlord and upon any default by Tenant in so doing.  Landlord shall have the right to recover possession by summary proceedings or otherwise and to apply for the appointment of a receiver and for other ancillary relief in such action, provided that any Guarantor, as defined hereafter, shall have ten (10) days written notice after such application may have been filed and before any hearing thereon and Landlord shall again have and enjoy the Demised Premises, fully and completely, as if this Lease had never been made.

Anything contained herein to the contrary notwithstanding provided there is a bona fide dispute or Tenant disputes any amount which is due in good faith and pays the amount which is not in dispute, Tenant may cure any default at any time prior to final adjudication by a court of competent jurisdiction by paying Landlord all actual (but not consequential)

damages sustained by Landlord up to the date of such cure. Tenant may further exercise this right of cure only once every two (2) years during the Main Term of this Lease. To the extent Landlord is granted any right to accelerate any amount, sum or charge due hereunder, whether Annual Base Rent or otherwise, and whether such right may be implied hereunder, conferred by law, statute or otherwise, now or hereafter, Landlord hereby irrevocably waives such right of acceleration.

Section 18.2 **Landlord's Right to Cure**.

If Tenant shall default in the performance or observance of any agreement or condition in this Lease contained on its part to be performed or observed and shall not cure such default within thirty (30) days after notice from Landlord specifying the default (or if such default shall reasonably take more than thirty (30) days to cure, shall not have commenced the same within the thirty (30) days and diligently prosecuted the same to completion), Landlord may, at its option, without waiving any claim for damages for breach of agreement, at any time thereafter cure such default for the account of Tenant, and any amount paid or any contractual liability incurred by Landlord in so doing shall be deemed to be rent and paid or incurred for the account of Tenant and Tenant agrees to reimburse Landlord therefor and save Landlord harmless therefrom; provided that Landlord may cure any such default as aforesaid prior to the expiration of said waiting period, without notice to Tenant, if any emergency situation exists, or after notice to Tenant, if the curing of such default prior to the expiration of said waiting period is reasonably necessary to protect the Demised Premises or Landlord's interest therein, or to prevent injury or damage to persons or property. If Tenant shall fail to reimburse Landlord upon demand for any amount paid for the account of Tenant hereunder, said amount shall be added to and become due as a part of the next payment of rent due hereunder.

Section 18.3 **Tenant's Right to Cure**.

If Landlord shall breach, or fail to perform or observe, any agreement or condition in this Lease contained on Landlord's part to be performed or observed, which agreement or condition involves the payment of money to Tenant or to any third party, maintenance or repair of the Demised Premises or any portion of the Common Areas serving the Demised Premises (specifically including, without limitation, any portion of the parking garage or the roof), management or operation of the Shopping Center or obtaining insurance or rebuilding upon casualty as required by this Lease and such breach, if uncured, would materially or adversely impact or endanger Tenant's business operations in the Demised Premises, and if Landlord shall not cure such breach or failure within thirty (30) days after notice from Tenant specifying such breach or failure (or, if such breach or failure shall reasonably take more than thirty (30) days to cure, and Landlord shall not have commenced the same within the thirty (30) days and diligently prosecuted the same to completion), Tenant may, at Tenant's option without waiving any claim for damages for breach of agreement, at any time thereafter cure such breach or failure for the account of Landlord and any amount paid or any contractual liability incurred by Tenant in so doing shall be deemed paid or incurred for the account of Landlord and Landlord agrees to reimburse Tenant therefor and save Tenant harmless therefrom; provided that Tenant may cure any such breach or failure as aforesaid prior to the expiration of said waiting period, without notice to Landlord if an emergency situation exists, or after notice to Landlord, if the curing of such breach or failure prior to the expiration of said waiting period is reasonably necessary to protect the Demised Premises or Tenant's interest therein or to prevent injury or damage to persons or property. Any amounts not reimbursed by Landlord within thirty (30) days of Tenant's written demand therefor may be applied by Tenant as a credit against Tenant's next payment(s) of Annual Base Rent (but only after Tenant obtains a final non appealable judgment).

**ARTICLE 19**

Section 19.1 **Subordination of Lease**.

This Lease is, and shall be and remain, subject and subordinate to any present or future ground lease, or any other lease wherein Landlord or any lessor to Landlord is the lessee, or any other underlying leases, and to the lien of any or all mortgages, deeds of trust or security instruments, and to any or all utility easement agreements covering all or any part of the Shopping Center and to the rights and powers of the holder of any such lease, mortgage, deed of trust or security instrument, regardless of whether such lease, mortgage, deed of trust, security instrument or utility easement agreement now exists or hereafter may be created, and to any and all advances to be made pursuant to any such lease, mortgage, deed of trust or security instrument and to any interest thereunder, and to all modifications, consolidations, renewals, replacements and extensions of any of the aforementioned

instruments provided and only provided such ground lessor or holder enters into a non-disturbance agreement with Tenant pursuant to which ground lessor or holder agrees not to disturb Tenant if Tenant is complying within the terms of this Lease and agrees to be bound by all provisions of this Lease if such ground lessor or holder succeeds to the interest of Landlord. Tenant also agrees that any lessor, mortgagee or trustee may elect to have this Lease superior to any lease or lien of its mortgage, deed of trust or security instrument, and in the event of such election and upon notification by such lessor, mortgagee or trustee to Tenant to that effect, this Lease shall be deemed prior in lien to the said lease, mortgage, deed of trust or security instrument, as the case may be, whether this Lease is dated prior to or subsequent to the date of said lease, mortgage, deed of trust or security instrument.

The Ground Lessor and Landlord's current lender have approved and executed the forms of Non-Disturbance Agreements attached hereto as Exhibits J-1 and J-2 (the "NSDA's).

Section 19.2  **Quiet Enjoyment**.

Upon payment by the Tenant of the Rent herein provided for, and upon the observance and performance of all of the agreements, covenants, terms and conditions on Tenant's part to be observed and performed, Tenant shall peaceably and quietly hold and enjoy the Demised Premises for the Lease Term without hinderance or interruption by Landlord, subject, nevertheless, to the terms and conditions of this Lease, and mortgages, leases and other matters to which this Lease is subordinate. In addition, Landlord shall not be responsible to Tenant and Tenant shall have no claim against Landlord should Tenant's use and occupancy of the Demised Premises for the purposes and during the times set forth herein be prohibited, substantially impaired, limited or restricted in any way by reason of any law, ordinance or regulation of Federal, state, county, municipal, or other applicable governmental authority or by reason of any act of any legal or governmental or other public authority. Upon a breach of this covenant, Tenant shall have, except as limited by this Lease, all remedies available at law or in equity or as otherwise provided for in this Lease, and may exercise any such remedy independently or in combination.

Section 19.3  **Zoning and Good Title**.

Landlord represents, warrants and covenants to Tenant that all of the following representations, warranties and covenants are true as of the date hereof upon which representations, warranties and covenants Tenant has relied in the execution of this Lease:

(a)    (i) The Ground Lessor is the fee simple owner of the Land and (ii) Landlord is the Ground Lessee of the Shopping Center, including the Demised Premises;

(b)    Landlord has full right and lawful authority to execute this Lease for the term, in the manner, and upon the conditions and provisions herein contained;

(c)    To Landlord's knowledge, after no independent investigation, there is no legal impediment to the construction and use of the Demised Premises as a Dave & Buster's Entertainment/Food Use;

(d)    To Landlord's knowledge, but without independent investigation, except for the permits and licenses Tenant must obtain and maintain as part of the Conditions Precedent, the Demised Premises are not subject to any easements, restrictions, zoning ordinances or similar governmental regulations which prevent their use as a Dave & Buster's entertainment center and the Demised Premises presently are zoned for such use;

(e)    To Landlord's knowledge, the Shopping Center is not subject to any easements or restrictions or other impediments which would now or in the future, regardless of the reason, impede, impair or otherwise adversely affect Tenant's use of the Buildings and the Operating Agreement does not prevent such use or prohibit any rights granted to Tenant under this Lease;

(f)    To Landlord's knowledge, the Shopping Center is in full compliance with all state and federal environmental laws, and all the rules and regulations of the applicable governmental subdivisions and agencies thereof. Landlord indemnifies, defends and holds Tenant harmless from and against any and all liabilities, claims, losses and costs, including without limitation Tenant's reasonable counsel and engineering fees, which Tenant may incur by reason of Landlord's breach of any of the provisions of this Section 19.3(f), and this indemnity is expressly intended to survive termination of this Lease; provided, however, if the breach is due to an event

which occurred during a period of time when Landlord had neither an ownership interest nor a leasehold interest in the Demised Premises, this indemnification shall be of no force or effect. If, at any time during the term hereof, Landlord takes corrective action respecting any Hazardous Material, Regulated Substance, or Environmental Law which action materially and adversely interferes with Tenant's business operation, Annual Base Rent and the other charges hereunder shall be equitably reduced or abated based upon the nature and scope of the action taken and the effect on Tenant's business operation. In all events, Landlord hereby indemnifies and holds Tenant harmless from and against any and all loss, cost or expense, including, but not limited to, engineering, clean-up or other professional fees, legal or otherwise, from, relating to or connected with the existence of any Hazardous Material or Regulated Substance in, on or under the Demised Premises or the Shopping Center (unless same was placed there by Tenant or Tenant's employees or contractors) and from or by reason of any investigation or claim in respect of any Environmental Law.

Anything contained in this Lease to the contrary notwithstanding, and notwithstanding any investigations, studies, analyses or the like conducted by or for the benefit of Tenant, to the extent compliance by Tenant pursuant to this Article 19 is due to any act or omission of Landlord respecting an environmental or other condition in connection with a Regulated Substance or Hazardous Material existing prior to the date hereof, Landlord shall, within thirty (30) days of request therefor, fully reimburse Tenant therefor. For purposes of this Lease, Regulated Substance or Hazardous Material shall be defined to mean the following:

"Hazardous Material" means any petroleum, petroleum products, fuel oil, derivatives of petroleum products or fuel oil, explosives, reactive materials, ignitable materials, corrosive materials, hazardous chemicals, hazardous wastes, hazardous substances, toxic substances, toxic chemicals, radioactive materials, medical waste, biomedical waste, asbestos, infectious materials and any other element, compound, mixture, solution or substance which may pose a present or potential hazard to human health or the environment.

"Regulated Substance" means substances defined as "extremely hazardous substances," "hazardous chemicals," "release," "regulated substances," "hazardous waste," "hazardous materials,"' "hazardous substances," "toxic substances," "pollutants," "toxic pollutants," "herbicides," "fungicides," "rodenticides," "insecticides," "contaminant," or "pesticides" in RCRA, the Superfund Amendments and Reauthorization Act, the Occupational Safety and Health Administration and Regulations, CERCLA, the Hazardous Materials Transportation Act, the Toxic Substance Control Act, the Federal Insecticide Fungicide and Rodenticide Act, the Clean Water Act, the Safe Drinking Water Act, or in other Environmental Laws, all as amended and effective on the date hereof and including subsequent amendment thereto, and including any regulations, rules, and ordinances adopted and publications promulgated pursuant to such laws.

For purposes of this Lease, Environmental Laws shall be defined to mean the following:

"Environmental Laws" means any and all federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, guidelines, policies or requirements of any governmental authority regulating or imposing standards of liability or standards of conduct (including common laws) concerning air, water, solid waste, Hazardous Materials, Regulated Substances, worker and community right-to-know, hazard communication, noise, radioactive material, resource protection, subdivision, inland wetlands and watercourses, health protection and similar environmental, health, safety, building, land use, and local government concerns as may now or at any time hereafter be in effect.

In the event Tenant introduces any Hazardous Material or Regulated Substance into the Demised Premises or violates any Environmental Laws, Tenant shall indemnify and defend and hold Landlord harmless from and against any and all liabilities, claims, losses and costs which Landlord may incur by reason of such introduction or violation by Tenant, and this indemnity is expressly intended to survive termination of this Lease.

## ARTICLE 20

Section 20.1 **Extension Period**.

Subject to the provisions of Article 3 hereof, all of the terms, provisions, covenants and agreements in this Lease contained shall apply during any extension or extensions of the original term hereof.

Section 20.2 **Holding Over**.

In the event that Tenant or anyone claiming under Tenant shall continue occupancy of the Demised Premises after the expiration of the term of this Lease without any agreement in writing between Landlord and Tenant with respect thereto, such occupancy shall not be deemed to extend or renew the term of this Lease, but such occupancy shall continue as a tenancy at will from month to month upon the covenants, provisions and conditions herein contained except that, upon thirty (30) days prior written notice, Annual Base Rent shall be increased to two hundred (200%) percent of the Annual Base Rent in effect during the preceding Lease Year.

Section 20.3 **Waivers**.

Failure of either party to complain of any act or omission on the part of the other party, no matter how long the same may continue, shall not be deemed to be a waiver by said party of any of its rights hereunder. No waiver by either party at any time, express or implied, of any breach of any provision of this Lease shall be deemed a waiver of a breach of any other provision of this Lease or a consent to any subsequent breach of the same or any other provision. If any action by either party shall require the consent or approval of the other party, the other party's consent to or approval of such action on any one occasion shall not be deemed a consent to or approval of said action on any subsequent occasion or a consent to or approval of any other action on the same or any subsequent occasion. Any and all rights and remedies which either party may have under this Lease or by operation of law, either at law or in equity, upon any breach, shall be distinct, separate and cumulative and shall not be deemed inconsistent with each other; and no one of them, whether exercised by said party or not, shall be deemed to be an exclusion of any other; and any two or more or all of such rights and remedies may be exercised at the same time.

Section 20.4 **Disputes**.

It is agreed that if at any time a dispute shall arise as to any amount or sum of money to be paid by one party to the other under the provisions hereof, the party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said party to institute suit for the recovery of such sum, and if it shall be adjudged that there was no legal obligation on the part of said party to pay such sum or any part thereof, said party shall be entitled to recover such sum or so much thereof as it was not legally required to pay under the provisions of this Lease; and if at any time a dispute shall arise between the parties hereto as to any work to be performed by either of them under the provisions hereof, the party against whom the obligation to perform the work is asserted may perform such work and pay the costs thereof "under protest" and the performance of such work shall in no event be regarded as a voluntary performance and shall survive the right on the part of said party to institute suit for the recovery of the costs of such work, and if it shall be adjudged that there was no legal obligation on the part of said party to perform the same or any part thereof, said party shall be entitled to recover the costs of such work or the cost of so much thereof as said party was not legally required to perform under the provisions of this Lease.

Section 20.5 **Notices**.

All notices and other communications authorized or required hereunder shall be in writing and shall be given by mailing the same by certified mail or registered mail, return receipt requested, postage prepaid, and any such notice or other communication shall be deemed to have been given when received by the party to whom such notice or other communication shall be addressed, or on the date noted that the addressee has refused delivery or on the date that the notice is returned to sender due to the inability of the postal authorities to deliver. If intended for Landlord, the same shall be mailed to:

White Flint Limited Partnership
c/o Lerner Corporation
11501 Huff Court
North Bethesda, Maryland 20895-1094

with a copy to the same address, Attention: Legal Department

hereinabove set forth or such other address as Landlord may hereafter designate by notice to Tenant, and if intended for Tenant, the same shall be mailed to Tenant, for courier delivery only at:

> 501 N. Broadway
> St. Louis, Missouri 63102
> Attn: Legal Department

> and for mail delivery only:

> at P.O. Box 14020
> St. Louis, Missouri 63178
> Attention: Legal Department

> with a copy to:

> Dave & Buster's
> 2751 Electronic Lane
> Dallas, Texas 75220
> Attn: Mr. Dave Corriveau

and with a further copy addressed to Guarantor, as hereinafter defined, for courier delivery only at:

> 501 N. Broadway
> St. Louis, Missouri 63102
> Attn: Legal Department

and for mail delivery only at:

> P.O. Box 14020
> St. Louis, Missouri 63178
> Attention: Legal Department

or to such other address or addresses as Tenant may hereafter designate by notice to Landlord.

Section 20.6 **Plate Glass.**

Subject to Articles 16 and 17, Tenant shall replace, at its expense, any and all plate glass damaged or broken from any cause (unless caused by the negligence of Landlord or its agents, servants, employees or contractors) in and about the Demised Premises.

Section 20.7 **Attorneys' Fees.**

If either party hereto be made or becomes a party to any litigation commenced by or against the other party involving the enforcement of any of the rights and remedies of such party, or arising on account of the default of the other party in the performance of such party's obligations hereunder, then the prevailing party in any such litigation, or the party becoming involved in such litigation because of a claim against such other party, as the case may be, shall receive from the other party all litigation expenses and reasonable attorneys' fees incurred by such party at trial and on appeal in connection with such litigation.

Section 20.8 **Force Majeure.**

In the event that Landlord or Tenant shall be delayed or hindered in or prevented from the performance of any act by reason of strikes, lockouts, unavailability of materials, failure of power, restrictive governmental laws or regulations, riots, insurrections, the act, failure to act, or default of the other party, war or other reason beyond its control, then performance of such act shall be excused for the period of the delay and the period for the performance of such act shall be extended for a period equivalent to the period of such delay ("Force Majeure"). Notwithstanding the foregoing, financial inability shall not be deemed to be a cause beyond control of either party.

Section 20.9 **Waiver of Landlord's Lien**.

Landlord shall not have, and hereby expressly waives any lien granted to Landlord, whether statutory or otherwise, in Tenant's personal property, fixtures, inventory, or stock-in-trade on the Demised Premises for non-payment of rent, default by Tenant, or any other reason whatsoever.

Section 20.10 **Estoppel Certificates**.

At any time and from time to time, Landlord and Tenant each agree, upon request in writing from the other, to execute, acknowledge and deliver to the other or to any person designated by the other, within ten (10) business days thereafter, a statement in writing certifying that this Lease is unmodified and is in full force and effect, or if there have been modifications, that the same is in full force and effect as modified (stating the modifications), that the other party is not in default in the performance of its covenants hereunder, or if there have been such defaults, specifying the same and the dates to which the rent and other charges have been paid, and such other information reasonably requested by a party.

Section 20.11 **Recordation**.

Simultaneously herewith, Landlord and Tenant have entered into a Short Form of Lease for recording in the form attached hereto and made a part hereof as Exhibit "C" supplementing this Lease. The party recording same shall bear all recording costs therefor. Upon the termination of this Lease, Tenant shall cooperate with Landlord in executing a recordable termination of any recorded Memorandum of Lease, failing which Landlord may attempt to unilaterally record same.

Section 20.12 **Invalidity of Particular Provision**.

If any term or provision of this Lease or the application hereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law. In the event of an ambiguity, no negative inference shall be drawn against the party whose counsel drafted this Lease or the provision(s) containing the ambiguity.

Section 20.13 **Transfer of Interest**.

Landlord shall promptly notify Tenant in writing of any change in the ownership of the Demised Premises or the Buildings, giving the name and address of the new owner and instructions regarding the payment of Rent. In the event of any change in or transfer of title of Landlord in and to the Demised Premises or any part thereof, whether voluntary or involuntary, or by act of Landlord or by operation of law, Tenant shall be under no obligation to pay Rent or other charges to any successor landlord until Tenant shall have been notified in writing of such change in title, together with a direction from Landlord to make payments to the successor landlord.

If during the term hereof Landlord's interest in this Lease shall be acquired by more than one person, firm, corporation, or other entity, whether by conveyance, operation of law or otherwise, Landlord shall by notice to Tenant signed by all of the then lessors hereunder appoint one such lessor to whom rent and all charges hereunder may be paid by Tenant and upon whom all notices which Tenant may give hereunder may be served. Until such appointment shall be made, Tenant shall be authorized from time to time to select any one of such lessors and to pay all rent and all charges coming due hereunder to, and serve all notices upon, the lessor so selected until such time as such appointment shall have been made as aforesaid. The service of any notice upon and the payment of any rent or other charges to the appointed or selected lessor as herein provided shall constitute service of notice upon, and payment of rent or other charges to, Landlord.

Section 20.14 **Captions and Definitions**.

The captions of the Sections of this Lease are for convenience only and are not a part of this Lease and do not in any way limit or amplify the terms and provisions of this Lease. The word "Landlord" and the pronouns referring thereto, shall mean, where the context so admits or requires, the persons, firm or corporation named herein as Landlord or the mortgagee in possession for the time being of the land and building comprising the Demised Premises and if there is more than one Landlord, the covenants of Landlord shall be the joint and several obligation of each of them. The word "rent" as used herein shall

be deemed to include Annual Base Rent, Percentage Rent, additional rent and any other charges payable by Tenant under this Lease. Any pronoun shall be read in the singular or plural number and in such gender as the context may require. Except as in this Lease otherwise provided, the terms and provisions of this Lease shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

Nothing contained herein shall be deemed or construed by the parties hereto nor by any third party as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that neither any provision contained herein, nor any acts of the parties hereto, shall be deemed to create any relationship between the parties hereto other than the relationship of Landlord and Tenant.

Section 20.15 **Brokerage**.

Landlord and Tenant represent and warrant each to the other that each has not dealt with any real estate agent or broker in connection with this transaction and agree to indemnify and save each other harmless from and against all loss, cost and expense incurred by reason of the breach of such representation and warranty.

Section 20.16 **Entire Agreement**.

This instrument contains the entire and only agreement between the parties, and no oral statement or representations or prior written matter not contained in this instrument shall have any force and effect. This Lease shall not be modified in any way except by a writing executed by both Parties. The parties agree that if there exists a latent or patent ambiguity in this Lease, such ambiguity shall not be construed against Tenant merely because Tenant has drafted the provisions of this Lease.

Section 20.17 **Tolling of Lease Term**.

In the event the Annual Base Rent shall completely abate pursuant to the terms of this Lease and the abatement is caused by the acts or omissions or Landlord or Landlord's agents, employees or contractors, the term of this Lease, and/or the option term(s), as the case may be, shall toll for the period of such abatement, in which event the monthly installments of Annual Base Rent, following the end of the period of such abatement, shall recommence and thereafter continue at the same rental rate that was in effect at the time of such abatement, the remaining scheduled Annual Base Rent increases shall be postponed for the period of such abatement to reflect such tolling, the expiration date of this Lease and the optional term(s) shall be extended for the period of such abatement and the Percentage Rent shall be adjusted in accordance with the principles set forth in Section 4.2(b) above (regarding the "stub" period) for the periods (i) from the end of the last full Lease Year prior to the abatement through the date such abatement commences, (ii) from the date the payment of Annual Base Rent recommences, as established pursuant to the terms of this Lease, through the last day of the next February thereafter, and (iii) the period of time following the originally scheduled expiration date for which this Lease is extended due to the tolling provisions herein provided.

Section 20.18 **Tenant's Financing**.

Tenant may, from time to time, if Tenant is not then in default hereunder beyond the applicable grace or cure period, secure financing or general credit lines, and grant the lenders as security therefor a security interest in Tenant's fixtures, personalty, inventory and equipment (collectively "Personalty") and the right to enter and re-enter the Demised Premises to realize upon the security covered by the security interest, and a collateral assignment of Tenant's leasehold interest in the Demised Premises, with rights of reassignment; provided, however, such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness. If Tenant is not then in default under the provision hereof beyond the applicable grace or cure period, upon written request by Tenant, Landlord agrees to evidence Landlord's consent in writing to such security interest and assignment. Landlord hereby acknowledges that Landlord does not have a lien on any of Tenant's Personalty, and Landlord hereby waives its lien or related rights, if any, granted or conferred upon Landlord, by statute or otherwise, on any of Tenant's Personalty; to the extent any such lien is nevertheless imposed upon Tenant's Personalty, Landlord hereby subordinates such lien to the lien of any holder of indebtedness of Tenant.

Section 20.19   **Late Charges.**

In the event either party fails to pay any amount when due, then interest shall accrue on such overdue amount from and after the fifth (5th) day following notice that such amount has not been paid. Interest shall accrue at the greater of (i) three (3) percentage points above the prime rate as published in the eastern edition of the Wall Street Journal, or a comparable newspaper if the Wall Street Journal shall not publish the prime rate during such period, or (ii) twelve percent (12%).

Section 20.20   **Guaranty.**

Tenant shall cause its parent, Edison Brothers Stores, Inc. ("Guarantor"), to execute a guaranty hereof in the form attached hereto and made a part hereof as Exhibit "G".

Section 20.21   **Supplemental Agreement.**

As soon as practicable following the Commencement Date, the parties shall enter into an agreement stipulating the following:   the actual Commencement Date and the termination date of the original and each additional term, if exercised, of the Lease.

## ARTICLE 21

Section 21.1   **Permits and Zoning: Conditions Precedent.**

This Lease and Tenant's obligations hereunder are expressly made subject to the obtaining, fulfilling or confirming of the following (collectively, the "Conditions Precedent"):

(a)   within forty-five (45) days after the date of full execution and delivery hereof, Tenant shall (i) have determined that operation and maintenance of a Dave & Buster's is feasible under all of the laws, rules and other circumstances applicable to the Demised Premises and that all zoning and related approvals and Permits needed to allow the operation of a Dave & Buster's as contemplated by Tenant hereunder have been or will be issued; and (ii) obtain the approvals required for the construction and operation of a Dave & Buster's or Tenant is satisfied that Tenant will be able to obtain such approvals ("Approvals") and Tenant agrees to diligently and in good faith proceed to achieve all Approvals on a time schedule that will accommodate a February 15, 1996 opening date;

(b)   receipt of all Approvals based on final approved Plans and Specifications and all permits required by all governmental authorities having jurisdiction are received to allow Tenant to proceed with construction;

(c)   Within five (5) business days after full execution and delivery hereof Tenant is provided with minimum net worth statement as to the general partners of Landlord showing a combined net worth in excess of Fifty Million Dollars ($50,000,000.00) and a certification in form reasonably acceptable to Tenant assuring the availability of funds to pay for costs of Landlord's Work and the Construction Allowance ("Landlord Security for Construction Allowance").

(d)   Landlord shall have provided to Tenant the NSDA required by Section 19.1 in the forms attached as Exhibit J, which NSDA's shall be provided within thirty (30) days after the date of full execution and delivery hereof.

(e)   Tenant shall have received a title commitment including all matters of record affecting the Land and that Shopping Center (Tenant shall have thirty (30) days after receipt of such title report but no more than forty-five (45) days after the date of full execution and delivery hereof to determine whether any items referred to in the report are objectionable to Tenant and within thirty (30) days thereafter Landlord shall report to Tenant whether such defects have been cured).

In the event any Conditions Precedents are not satisfied or waived on or before the date specified, Tenant may terminate this Lease by giving written notice to Landlord within five (5) days after the expiration of the date specified above, in which event neither party shall have any liability or obligation to the other except to the extent expressly provided to the contrary. Landlord and Tenant agrees to proceed diligently and in good faith to fulfill their respective Conditions Precedent and to notify the other once a condition is fulfilled. Tenant's determination that a condition has not been fulfilled or satisfied shall be conclusive and binding upon the parties, absent fraud.

Section 21.2 **Termination in Event of Change in Laws.**

Tenant may terminate this Lease on thirty (30) days prior written notice if there is any change in State or Montgomery County laws which prohibit the sale of alcoholic beverages or which prohibit redemption or arcade activities or otherwise materially adversely limit redemption or arcade type activities currently conducted by Tenant in other Dave & Buster operations.

## ARTICLE 22

Section 22.1 **Limitation of Liability.**

Notwithstanding anything contained to the contrary in (a) above or elsewhere in this Lease, but without in any manner releasing, impairing or otherwise affecting Tenant's rights or Landlord's obligations under this Lease, in the event of any default under the terms of this Lease, Tenant will not seek to satisfy any claim for damages based upon such default against any partner of Landlord, except where the claim for damages is based upon the exclusions to this limitation enumerated below, but instead will satisfy such claim solely from the interest of Landlord in the Shopping Center. The foregoing limitation of liability recovery of a claim for damages shall not apply to the following instances of defaults:

(i)    completion of Landlord's work and payment of the Construction Allowance;

(ii)    a breach of the environmental representation contained in Section 19.3;

(iii)    fraud;

(iv)    misuse of any proceeds paid under any insurance policies by reason of damage, loss or destruction of any portion of the Demised Premises or Buildings or of any condemnation award;

**IN WITNESS WHEREOF**, the parties hereto have executed this Lease the day and year first above written by their respective officers thereunto duly authorized.

**LANDLORD:**

**WHITE FLINT LIMITED PARTNERSHIP**

By its general partner:
Lerner Enterprises Limited Partnership

By: _____
Name: Theodore N. Lerner
Title: General Partner

By: _____
Name: Mark D. Lerner
Title: General Partner

ATTEST:
By: _____
Name: Robert C. Fowler
Title: Senior Counsel

**TENANT:**

**D&B HOLDING, INC.**

ATTEST:
By: _____
Name: _____ m _____
Title: Asst _____

By: _____
Name: Alan A. Sachs
Title: Vice President

December 5, 1994                                          Page 1 of 3

                                                                569-D
                                                                JKR
                                                             12/05/94

                         DESCRIPTION OF
                          PROPERTY OF
             WHITE FLINT ASSOCIATES PARTNERSHIP
               PART OF LIBER 3154 FOLIO 396
               PARCEL ONE - WHITE FLINT PARK
                  PLAT BOOK 84 PLAT NO. 8715

     All of that piece or parcel of land, situate, lying and being
in the Rockville (4th) Election District of Montgomery County,
Maryland; the same being part of the land conveyed to White Flint
Associates Partnership from Richard Borden Industries, Inc. by a
deed dated 4 October, 1963 and recorded among the Land Records of
said Montgomery County in Liber 3154 at Folio 396; the same also
being Parcel One as shown on a Plat of Subdivision entitled "Parcel
One, White Flint Park" and recorded among the said Land Records in
Plat Book 84 as Plat No. 8715; and the same being more particularly
described as follows:

     BEGINNING FOR THE SAME at a point on the easterly right of way
line of Rockville Pike (Maryland Route 355), at the northwesterly
corner of Parcel One and at the beginning of the 30th or 123.37
feet curved line of Liber 3154 Folio 396; thence running with and
along said right of way line the following ten (10) courses; with
and along the outlines of Liber 3154 Folio 396, the following
nineteen (19) courses; and with and along the outlines of Parcel
One, the following twenty-three (23) courses

  1.  468.55 feet along the arc of a curve deflecting to the left,
                         having a radius of 22858.32 feet
                         (chord:  South  20°  44'  56"  East,
                         468.54 feet) to a PK Nail found at a
                         point of tangency; thence

  2.  South 21° 20' 10" East, 2.98 feet to a point; thence

  3.  North 68° 39' 50" East, 14.00 feet to a point; thence

  4.  South 21° 20' 10" East, 30.00 feet to a point; thence

  5.  South 68° 39' 50" West, 14.00 feet to a point; thence

  6.  South 21° 20' 10" East, 683.00 feet to a point; thence

  7.  North 68° 39' 50" East, 42.00 feet to a point; thence


Parcel One - White Flint Park (L. 3154 F. 396)      Job No. 569-D

December 5, 1994

8.   South 21° 20' 10" East,  40.00 feet to a point; thence leaving
                             the right of way line of Rockville
                             Pike, still with the outlines of
                             Parcel One and the outlines of Liber
                             3154 Folio 396

9.   South 68° 39' 50" West,  42.00 feet to a point; thence

10.  South 21° 20' 10" East,  53.12 feet to a point; thence

11.  North 87° 52' 10" East,  313.43 feet to a rebar & cap set;
                             thence leaving the outlines of Liber
                             3154 Folio 396 and still with the
                             outlines of Parcel One

12.  South 22° 38' 00" East,  425.94 feet to an iron pipe found;
                             thence

13.  North 88° 30' 30" East,  136.86 feet to a point; thence

14.  North 01° 27' 40" West,  18.04 feet to a point; thence

15.  North 88° 38' 20" East,  146.97 feet to a point; thence

16.  North 01° 31' 06" West,  106.76 feet to an iron pipe found;
                             thence

17.  North 00° 59' 26" West,  300.17 feet to an iron pipe found;
                             thence

18.  North 87° 52' 25" East,  423.06 feet to a point; thence

19.  North 02° 00' 40" East,  525.35 feet to a concrete monument
                             found; thence

20.  North 05° 15' 30" West,  565.43 feet to a concrete monument
                             found, passing over a rebar & cap
                             found at 296.13 feet from the
                             beginning, thereof; thence

21.  South 87° 19' 57" West,  618.24 feet to a point; thence

22.  North 02° 46' 23" West,  117.72 feet to an iron pipe found;
                             thence

<u>Parcel One - White Flint Park (L. 3154 F. 396)</u>        <u>Job No. 569-D</u>

December 5, 1994                                      Page 3 of 3

23.   South 87° 00' 17" West, 980.23   feet   to   the   point   of
                              beginning, containing 40.73236 acres
                              of land, more or less.

        This description is in the datum of Plat No. 8715 and is in
accordance with a survey by Rodgers & Associates, Inc. entitled
"ALTA/ACSM Land Title Survey, Property of White Flint Associates",
dated November, 1994, Job No. 569-D.

        ~~Subject   to   any   easements,   rights   of   way,   covenants,~~
~~restrictions   or   other   matters   recorded~~ or otherwise affecting the
~~property.~~

File=Descrip\569DPONE.DES


Parcel One – White Flint Park (L. 3154 F. 396)        Job No. 569-D

EXHIBIT A-¹



EXHIBIT B



**3rd Level WHITE FLINT** North Bethesda, MD

EXHIBIT C

## MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE is made as of this _____ day of January, 1995 by and between WHITE FLINT LIMITED PARTNERSHIP, a Maryland Limited Partnership ("Landlord") and **D&B HOLDING, INC.** a Delaware corporation ("Tenant").

### RECITALS

1.   Landlord and Tenant are parties to a certain Lease dated as of the _____ day of _____, 1995.

2.   The parties have entered into this Memorandum of Lease for the purpose of recording this Memorandum among the Land Records of Montgomery County, Maryland.

NOW, THEREFORE, Landlord and Tenant, in consideration of the mutual promises contained in the Lease and herein, the parties agree and acknowledge that the Lease contains, <u>inter alia</u>, the following provisions:

    1.   <u>Name and Address of Lessor</u>:

        White Flint Limited Partnership,
        a Maryland limited partnership
        c/o Lerner Corporation
        11501 Huff Court
        North Bethesda, Maryland 20895-1094

    2.   <u>Name and Address of Tenant</u>:

        D&B Holding, Inc.
        a Delaware corporation
        501 North Broadway
        St. Louis, Missouri 63102

    3.   <u>Description of the Lease</u>:   Lease between Landlord and Tenant dated as of the _____ day of February, 1995.

    4.   <u>Description of the Leased Premises</u>.   The Leased Premises is that portion of the Land described in Exhibit A attached hereto shown on the plan attached as Exhibit B hereto, each said Exhibit being incorporated herein by reference and made a part hereof.

    5.   <u>Term of Lease</u>.

        a.   Date of Commencement of the Term:   _____, 1996.

        b.   Termination Date of initial term _____, 20____.

    6.   <u>Renewal Options</u>:   Three renewal terms of five (5) years each.  The maximum date to which the Lease may be renewed is _____, 20__.

7.   <u>Other Terms</u>.  All other terms and conditions are as provided in the Lease.

**IN WITNESS WHEREOF**, the parties hereto have executed this Memorandum of Lease the day and year first above written.

<u>**LANDLORD**</u>:

**WHITE FLINT LIMITED PARTNERSHIP**

By its general partner:
    Lerner Enterprises Limited
    Partnership

**ATTEST:**

By:_____          By:_____
    Name:_____               Name: Theodore N. Lerner
    Title:_____              Title: General Partner


                                       By:_____
                                           Name: Mark D. Lerner
                                           Title: General Partner


<u>**TENANT**</u>:

**D&B HOLDING, INC.**

**ATTEST:**

By:_____          By:_____
    Name:_____               Name:_____
    Title:_____              Title:_____

STATE OF MARYLAND:  COUNTY OF MONTGOMERY:  TO WIT:

     I HEREBY CERTIFY that on this ___ day of _____,
1994, before me, a Notary Public for the state and county
aforesaid, personally appeared _____, known to me
or satisfactorily proven to be the person whose name is subscribed
to the foregoing instrument, who acknowledged that he is the
General Partner of the Landlord and that he has been duly
authorized to execute, and has executed, the foregoing instrument
on behalf of the said entity for the purposes therein set forth,
and that the same is its act and deed.

     IN WITNESS WHEREOF, I have set my hand and Notarial Seal,
the day and year first above written.

_____
     Notary Public

My commission expires on _____.


STATE OF MISSOURI: __COUNTY__ OF __ST. CHARLES__ : TO WIT:

     I HEREBY CERTIFY that on this ___ day of __FEBRUARY__, 1995
~~1994~~, before me, a Notary Public for the state and county
aforesaid, personally appeared _____, known to me
or satisfactorily proven to be the person whose name is subscribed
to the foregoing instrument, who acknowledged that he is the Vice
President of the Tenant and that he has been duly authorized to
execute, and has executed, the foregoing instrument on behalf of
the said entity for the purposes therein set forth, and that the
same is its act and deed.

     IN WITNESS WHEREOF, I have set my hand and Notarial Seal,
the day and year first above written.

_____
     Notary Public

My commission expires on _____.


THE UNDERSIGNED, an attorney admitted to practice before the Court
of Appeals of Maryland, hereby certifies that the above instrument
was prepared by me or under my supervision.

_____
     Attorney-at-Law


TO THE RECORDING OFFICER:  Upon its recordation, please return this
instrument to Morton P. Fisher, Jr., Esquire, Ballard Spahr Andrews
& Ingersoll, Suite 1900, 300 East Lombard Street, Baltimore,
Maryland 21202.

EXHIBIT D

## ALTA PLAIN ENGLISH TITLE INSURANCE COMMITMENT
### SCHEDULE B SECTION 2

COMMITMENT NUMBER: C-9912-

### EXCEPTIONS

Any policy we issue will have the following exceptions unless they are taken care of to our satisfaction.

General Exceptions:

1. Rights or claims of parties in possession not shown by the public records.

2. Encroachments, overlaps, boundary line disputes, any other matters which would be disclosed by an accurate survey and inspection of the premises.

3. Easements or claims of easements not shown by the public records.

4. Any lien or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law, and not shown by the public records.

5. Taxes or special assessments which are not shown as existing liens by the public records.

Special Exceptions:

1. Taxes, State, County and Municipal and other public charges (including, but not limited to, assessments by any State, County, Municipality, Metropolitan District or Commission) payable on an annual basis have been paid through, to and including the fiscal year ending June 30, 1994. However, this policy of title insurance does not insure against possible future tax levies and/or frontage benefit assessments, nor against such public charges and assessments, or the balance thereof for existing or proposed improvements which may have been levied or assessed, or to be levied or assessed, but which are not now due and payable to said State, County, Municipality, Metropolitan District or Commission.

2. Washington Suburban Sanitary Commission charges subsequent to December 31, 1993, not yet due and payable.

3. Rights of parties in Possession, as Tenants only, under recorded or unrecorded leases.

4. Slope easement and Right of Way granted to State Roads Commissions in Liber 2123, folio 294.

5. Rights of ways granted to W.S.S.C. in Liber 1634 folio 229; Liber 1751 folio 507; Liber

2311 folio 541; Liber 2540 folio 300; Liber 3416 folio 169; Liber 4889 folio 122; Liber 4992 folio 098; Liber 5031 folio 484; Liber 5126 folio 424; Liber 6568 folio 359; and Liber 9904 folio 189.

6. Reciprocal Easement Agreement dated December 10, 1973 by and between Kensington Gem, Inc. and White Flint Associates, recorded in Liber 4483, folio 509.

7. Easement Agreement dated December 10, 1973 by and between Parkview-Gem Maryland, Inc. and White Flint Associates, recorded in Liber 4478, folio 421.

8. Memorandum of Construction Operation and Reciprocal Easement Agreement dated September 2, 1975 between Federated Department Stores, Inc., Adcor Realty, et al, recorded in Liber 4697, folio 814 and as amended in Liber 4726, folio 533, and re-recorded in Liber 4734, folio 520.

9. Agreement to W.S.S.C. dated January 8, 1975 and recorded in Liber 4698, folio 024.

10. License Agreements in Liber 4726, folio 611 and Liber 4726, folio 626.

11. Recission Agreement dated April 24, 1980 by and between Washington Suburban Sanitary Commission and White Flint Associates, recorded in Liber 5516, folio 449.

12. Easement to State Roads Commission dated March 29, 1979 and recorded in Liber 5543, folio 072.

13. Covenants, conditions and restrictions establishing building restriction area near Huff Court property, recorded in Liber 5846, folio 315.

14. Agreement re: Zoning dated May 23, 1966 and recorded in Liber 3584, folio 600.

15. Minimum Building Restriction Line per owner's dedication on recorded plat entitled, "Parcel One, White Flint Park", recorded in Plat Book 84 at Plat 8715.

16. Easement Area for outlet ditch as shown on said plat.

17. 40' Building Restriction Line as shown on said plat.

18. 12' Right of Way for Sanitary Sewer shown on said plat.

19. 25' Wide Slope Easement along street per owner's dedication on said plat.

20. Temporary Slope Easement per Owner's dedication on said plat.

21. Right of Way dated January 10, 1962 and recorded in Liber 2942, folio 464 to Kent Washington Inc. (for sewer).

22. Memorandum of Lease by and between White Flint Associates, a limited partnership (Lessor) and White Flint, a limited partnership, (Lessee) dated December 9, 1974, recorded in Liber 4599, folio 874, and First Amendment to Memorandum of Lease recorded in Liber 4697, folio 801.

23. Memorandum of Lease dated September 2, 1975 by and between White Flint, a limited partnership, (Landlord) and Federated Department Stores, Inc., (Tenant) recorded in Liber 4697, folio 806.

24. Memorandum of Lease dated September 2, 1975 by and between White Flint, a limited partnership (Landlord), and ADCOR Realty Corporation (Tenant) recorded in Liber 4697, folio 809.

25. Attornment Agreement dated September 2, 1975 by and between White Flint Associates, (Lessor), White Flint, a limited partnership (Sublandlord), and Federated Department Stores, Inc. (Subtenant), recorded in Liber 4698, folio 001.

26. Attornment Agreement dated September 2, 1975 by and between White Flint Associates, (Lessor), White Flint, a limited partnership (Sublandlord) and ADCOR Realty Corporation (Subtenant), recorded in Liber 4698, folio 009.

27. Subordination Agreement dated September 2, 1975, by and between White Flint, a limited partnership, (Ground Lessee), Federated Department Stores. ADCOR Realty Corporation, and American Security and Trust Company, etal, recorded in Liber 4698, folio 18.

28. First Amendment to Lease dated November 20, 1975 by and between White Flint, a limited partnership (Landlord), and Federated Department Stores, Inc. (Tenant) recorded in Liber 4726, folio 542.

29. First Amendment to Sub-Lease Agreement dated November 13, 1975 to and between White Flint, a limited partnership (Landlord), and ADCOR Realty Corporation (Tenant) recorded in Liber 4726, folio 545.

30. License Agreement, Auto-Wash of Rockville, Inc., dated October 31, 1975 and recorded in Liber 4726, folio 634.

31. License Agreement, H&C Car Wash, Inc. dated October 31, 1975 and recorded in Liber 4726, folio 643.

32. Memorandum of Lease dated June 17, 1977 by and between White Flint, a limited partnership (Landlord), and Federated Department Stores, Inc. (Tenant), recorded in Liber 4982, folio 483.

33. Attornment Agreement dated June 17, 1977 by and between White Flint Associates

(Lessor), White Flint, a limited partnership (Sublandlord), and Federated Department Stores, Inc., recorded in Liber 4982, folio 491.

34. Non-Disturbance and Attornment Agreement dated July 5, 1977 by and between White Flint, a limited partnership (Landlord), Federated Department Stores, Inc., (Tenant), The Equitable Life Assurance Society of the United States, etal, recorded in Liber 4982, folio 500.

35. First Amendment to Lease dated May 1, 1978 by and between White Flint, a limited partnership, (Landlord). and Federated Department Stores, Inc. (Tenant), recorded in Liber 5147, folio 731.

36. Agreement dated August 21, 1978, by and between White Flint, a limited partnership (Landlord), and ADCOR Realty Corporation (Tenant), recorded in Liber 5197, folio 879.

37. Lease between White Flint, a limited partnership (Lessor) and The United States Postal Service recorded in Liber 6320, folio 819.

38. Assignment and Assumption of Lease dated May 3, 1988 by and between Federated Department Stores, Inc. (Assignor), and I. Magnin, Inc. (Assignee), recorded in Liber 8309, folio 119.

39. Assignment and Assumption of Lease dated July 29, 1988 by and between Federated Department Stores, Inc. (Assignor), and Bloomingdale's White Flint Real Estate, Inc., (Assignee), recorded in Liber 8434, folio 741.

40. Assignment and Assumption of Operating Agreement dated July 29, 1988 by and between Federated Department Stores, Inc. (Assignor) and Bloomingdale's White Flint Real Estate Inc. (Assignee) recorded in Liber 8434, folio 751.

41. Assignment and Assumption of Operating Agreement dated July 29, 1988 by and between Federated Department Stores, Inc. (Assignor), and Bloomingdale's White Flint Real Estate, Inc. (Assignee) recorded in Liber 8434, folio 761.

42. Subject to the following: (provided Landlord obtains non-disturbance agreements in accordance with the Lease):

    (a) Deed of Trust from White Flint, a Maryland limited partnership, to John R. Neale and Malcom A. Belt, Trustees for American Security and Trust Company, dated December 11, 1974 and recorded among the Land Records of Montgomery County, Maryland, in Liber 4599, folio 878, securing the sum of $45,000,000.00.

    (b) Deed of Appointment of Substitute Trustees, dated November 21, 1975, and recorded among the Land Records of Montgomery County, Maryland, in Liber 4726, folio 551.

    (c) Modification of Deed of Trust dated November 24, 1975 and recorded among the Land Records of Montgomery County, Maryland, in Liber 4726, folio

556, by and between White Flint, a Maryland limited partnership, White Flint Associates, a Maryland limited partnership and Henry H. Glassie and William B. Beebee, Substituted Trustees for The Equitable Life Assurance Society of the United States.

(d)  Assignment dated November 21, 1975 by and between American Security and Trust Company of Washington, D.C. (Assignor) and The Equitable Life Assurance Society of the United States recorded in Liber 4726, folio 553.

(e)  Deed of Trust dated December 1, 1977 by and between White Flint, a Maryland limited partnership (Borrower), White Flint Associates, a Maryland limited partnership (Owner), and Henry H. Glassie and William B. Beebee, Trustees for The Equitable Life Assurance Society of the United States, securing the sum of $10,000,000.00, and recorded in Liber 5057, folio 753.

(f)  Consolidation and Modification of Deeds of Trust dated December 1, 1977 by and between White Flint, a Maryland limited partnership (Borrower), White Flint Associates, a Maryland limited partnership (Owner), and Henry H. Glassie and William B. Beebee, Trustees for The Equitable Life Assurance Society of the United States, recorded in Liber 5057, folio 768.

(g)  Modification of Deed of Trust Providing Substitute Security in Part (also Spreading Agreement and Partial Release of Deed of Trust) dated March 29, 1978 by and between White Flint, a Maryland limited partnership (Borrower), White Flint Associates (Owner), and The Equitable Life Assurance Society of the United States, recorded in Liber 5142, folio 138.

(h)  Assignment of Lessor's Interest in Lease dated November 24, 1975 by and between White Flint, a Maryland limited partnership, and The Equitable Life Assurance Society of the United States recorded in Liber 4726, folio 577.

(i)  Assignment of Lessor's Interest in Lease dated December 1, 1977 by and between White Flint, a Maryland limited partnership, and The Equitable Life Assurance Society of the United States recorded in Liber 5057, folio 775.

(j)  Financing Statement between White Flint, a Maryland limited partnership, White Flint Associates, a Maryland Limited Partnership, and The Equitable Life Assurance Society of the United States, recorded among the Land Records of Montgomery County, Maryland, November 24, 1975 in Liber 4726, folio 580, and among the Financing Records of Montgomery County, Maryland in Liber 260, folio 3 and filed with the State Department of Assessments and Taxation on December 12, 1975 at Liber 2235, folio 288.

(k)  Financing Statement between White Flint, a Maryland limited partnership, White Flint Associates, a Maryland limited partnership, and The Equitable Life Assurance Society of the United States, recorded among the Land Records of Montgomery County, Maryland, dated November 24, 1975 recorded among the Land Records of Montgomery County, Maryland, in Liber 4726, folio 583.

(l)      Financing Statement between White Flint, a Maryland limited partnership, White Flint Associates, a Maryland limited partnership, and The Equitable Life Assurance Society of the United States, dated December 1, 1977, recorded among the Land Records Montgomery County in Liber 5057, folio 772, and among the Financing Records of Montgomery County, Maryland in 0286, folio 629. and with the State Department of Assessments and Taxation in Liber 2401, folio 1012 - No. 86206. See Also Continuation Statement recorded among the Land Records of Montgomery County, Maryland, in Liber 5998, folio 449.


(m)     Financing Statement between White Flint, a Maryland limited partnership, White Flint Associates, a Maryland limited partnership, and The Equitable Life Assurance Society of the United States, dated February 3, 1983 and recorded among the Land Records of Montgomery County, Maryland, in Liber 6077, folio 051.

ENDORSEMENT TO TITLE POLICY
SERIAL NUMBER

No. E4379.94

CHARGE
$

ISSUED BY

# STEWART TITLE

## GUARANTY COMPANY
### HEREIN CALLED THE COMPANY

Schedule B, Section 2, Special Exceptions, is hereby amended as follows:

As to Exception Numbered Five (5), the rights of ways in Liber 1751, folio 507, Liber 2540, folio 300, and Liber 5126, folio 424 are hereby deleted.

Exception Numbered Twenty-one (21) is hereby deleted.

This Endorsement is made a part of said policy and is subject to the schedules, conditions and stipulations therein, except as modified by the provisions hereof.

Nothing herein contained shall be construed as extending or changing the effective date of said policy, unless otherwise expressly stated. Signed under seal for the Company, but this Endorsement is to be valid only when it bears an authorized countersignature, this the 6th day of December 19 94

STEWART TITLE
GUARANTY COMPANY

*Carlos Morris*
Chairman of the Board

*Stewart Morris*
President

Countersigned by:
NEW ENTERPRISE TITLE GROUP, INC.
Authorized Signatory
By:
Company

EXHIBIT E

WHITE FLINT

LANDLORD AND TENANT WORK LETTERS

PREFACE:

This Exhibit E describes the obligations of Landlord and Tenant in the design and construction of the Demised Premises. Each term used in this Exhibit which is defined in the main body of the Lease (herein called the "Lease") to which this Exhibit is attached shall have the same meaning when used herein. Wherever and whenever the Landlord's or Tenant's approval is required pursuant to this Exhibit E, such approval shall not be unreasonably delayed or conditioned.

Landlord's Work

Landlord at Landlord's sole cost and expense shall furnish and install the following work except as otherwise noted.

1. Landlord to demolish to a shell condition all prior Tenant improvements within the Demised Premises except for White Flint Eatery Offices, two walk-in refrigeration boxes, and any other prior Tenant improvements that the Tenant advises the Landlord to retain.

2. Landlord to furnish and install sprinkler mains, branch lines and sprinkler heads in accordance with Tenant's requirements as to height and location of mains, branch lines and heads.

3. Landlord to furnish and install fully operational roof top HVAC units (except that Tenant shall bring electrical and gas service to the equipment for Landlord hookup) sized to Tenant's requirements and located in accordance with Tenant's plans.

4. Landlord to furnish and install gas, electric, sewer and cold water, sized to meet Tenant's requirements, stubbed to location(s) within the Demised Premises as designated by Tenant. Tenant is responsible for: all distribution and connections of utilities within the Demised Premises; distribution of utilities to roof-top mounted HVAC equipment being installed by Landlord; back-flow preventers; and separate metering of its utilities.

5. Landlord to raise the existing roof structure in designated locations to a clear height to bottom of the structure of 20'- 0" ( (17'0") above maximum raised (not to exceed 3') platform areas). It is understood and agreed that Tenant will not be installing ceilings in certain areas of the Demised Premises; therefore, Landlord's roof structure/insulation shall be designed to meet all code requirements which apply in the absence of a ceiling.

6. Landlord to insulate the roof over the Demised Premises (with minimum R-19 insulation).

7. Landlord to furnish and install ~~skylight over center court bar area and additional~~ skylight(s) in accordance with Tenant's plans.

8. Landlord to reinforce existing floor slab to meet code for assembly use and Tenant's raised floor areas.

9. Landlord to furnish and install full-length interior storefront with entrance(s) pursuant to a mutually agreed upon design (but typical of Dave & Buster's other facilities).

10. Landlord to furnish and install sign facade above Borders Books and Music sign on building ready for installation of Tenant's sign.

11. Landlord to furnish and install cosmetic improvements on center court elevator shafts reasonably satisfactory to Landlord and Tenant in accordance with the letter agreement dated August 4, 1994.

12. Landlord to dedicate one of the two existing freight elevators so that it exclusively serves the Demised Premises. Landlord shall improve such freight elevator as necessary to meet code and all insurance requirements and shall key for Tenant's exclusive use.

13. Landlord to add Tenant's logo and name signage on the existing ring road tenant signage and other Tenant directional signage in common areas.

14. Landlord to furnish and install all additional exits required by code including, if necessary, all additional ramp and doors leading to parking areas to meet Tenant's egress requirements.

15. Landlord to provide construction drawings and obtain a permit for Landlord's work.

16. ~~Landlord to remove stairs and kitchen located above centercourt mall elevators.~~     *ML*

17. Landlord to provide existing trash chute for Tenant's use (in common with others) and provide dumpsters and compactors to meet Tenant's normal requirements.

18. Landlord to provide for removal of all hazardous material, if required by law.

19. Landlord to undertake such work as necessary outside the Demised Premises and elsewhere in the Shopping Center to accomplish its work set forth above and to permit Tenant's occupancy.

A.   SCOPE OF WORK:

Tenant, at its sole cost and expense, shall perform all work required to complete the Demised Premises to a finished condition ready for the conduct of business therein (hereinafter sometimes referred to as the "Tenant's Work").

All work performed by Tenant shall be commenced and completed in accordance with the criteria and procedures hereinafter set forth.

The cost of all work performed by Landlord on behalf of Tenant at Tenant's request, if any, shall become due and payable in full before work is authorized to begin.

The criteria and/or outline specifications as set forth herein represent minimum standards for the design, construction and finish of the Demised Premises by Tenant.

Tenants at Tenant's sole cost and expense shall furnish and install the following work:

1. Tenant to furnish and install sprinkler drops in walk in boxes and in other locations required as a result of Tenant installed equipment or trade fixtures and fire suppression systems for Tenant's kitchenhoods.

2.   Tenant to furnish and install all HVAC distribution ductwork, VAV boxes and controls, exhaust hoods, and make-up air duct and fans and fire dampers.

3.   Tenant to furnish and install all electrical distribution and connections and arrange and pay for meters including service to roof top HVAC units (for Landlord's hook-up).

4.   Tenant to furnish and install all required outlets, lighting fixtures, exit signs, fire alarm bells, subpanels, transformers, and strobes pursuant to Tenant's approved plans.

5.   Tenant to furnish and install all gas piping to Tenant's equipment and arrange and pay for meters.

6.   Tenant to furnish and install all sewer piping and water piping to Tenant's bathroom, kitchen,, restaurant and bars and make connections to Landlord provided main sewer and water lines.

7.   Tenant to furnish and install all interior Tenant improvements including but not limited to interior partitions and doors, fixtures, equipment, floor and wall coverings, signs, lighting fixtures, and ceilings in accordance with Tenant's approved plans.

8.   Tenant to furnish and install all cosmetic improvements to existing pedestrian bridge to Tenant entrance in accordance with Tenant's approved plans.

9.   Tenant to furnish and install Tenant's exterior building signage, including electrical connections. Tenant shall have the right to connect such signage to the nearest Landlord electric panel (with capacity) the cost of hook-up and energy to be paid by the Tenant.

10.   Tenant to furnish and install waterproofing on all slabs under kitchen, restroom, bars and other wet areas.

11.   Tenant to provide construction drawings and obtain a permit for Tenant's work.

1.   General:

(a)   Jurisdiction and Codes: The project is being developed in and under the jurisdiction of Montgomery County, Maryland. All design and construction work shall comply with all applicable statutes, ordinances, regulations, laws and codes, including without limiting the foregoing, the National Electric Code: The National Board of Fire Underwriters; requirements of Landlord's fire insurance underwriter; the State of Maryland; Potomac Electric Power Company; W.S.S.C.; C & P Telephone Company; Washington Gas; and all applicable Montgomery County Building and OSHA codes, order and ordinances.

(b)   Permits and Approvals: Prior to the commencement of construction, building and other permits shall be obtained and posted in a prominent place within the Demised Premises.

(c)   Landlord's written approval shall be obtained by Tenant prior to the undertaking of any construction work which deviates from Tenant's working drawings and specifications, as approved by Landlord, or the undertaking of any modifications whatsoever to Landlord's building shell and/or utilities and other work not explicitly shown on said working drawings and specifications. Landlord's approval of the foregoing shall not constitute the assumption of any responsibility by Landlord for the accuracy or sufficiency thereof, and Tenant shall be solely responsible therefor.

(d) Materials: Only first-class materials shall be used in the construction of the Demised Premises.

2. Flooring:

(a) Flooring shall be typical of Dave & Buster's flooring.

3. Storefronts:

(a) Must harmonize with general quality and character of the Dave and Buster's facilities and must not project past the lease line fronting on the mall without prior written approval of Landlord. Awnings, light fixtures, special window treatments or the like which extend beyond lease line may be considered by Landlord. Tenant should give special attention to a design which will not create a dust collecting surface.

(b) If storefront is set back from the lease line regardless of distance, flooring in that setback area must be identical to mall floor if required by Landlord.

(c) Glass Storefront: (1) Track must be flush with mall and the Demised Premises floor so as not to be a hazard to anyone entering or exiting said premises. A thin bead of elastomeric caulking on both sides of the door track shall be used to prevent accumulation of dirt in this area.

(2) Where aluminum framing is used, material must be dark anodized finish, stainless steel, bronze, or brass.

(3) No show-window bulkheads in excess of 6" will be permitted.

(4) All glass joints to be cemented with clear silicone.

(5) No metal clips are permitted at glass joints.

(d) Structural Support: the head section of storefront must be supported by a steel framework to which door track, housing for grilles, etc. will be attached. Structural calculations must be submitted when overhead grilles are used.

(e) Show Windows must be suitably finished in the same quality and manner as the Demised Premises.

(f) Soffits must be USG Imperial Plaster System painted or plaster painted.

(g) Wood Storefronts (see 4(e) below).

(h) Planters must be self-contained, individual units not requiring drainage.

(i) Storefront finish must be acceptable permanent material paint, vinyl, paper, laminate (except high gloss and metallic), etc. are not permitted.

(j) Wide open storefronts are not permitted.

(k) Storefront must be flush with front edge of neutral strips.

(l) Rolling grilles must have a dark anodized finish on the bar and guides.

(m) Nothing may be attached to the storefront glass, frames, or doors (i.e., burglar alarm tape, contacts, credit card stickers, hours, etc.).

4.   Walls, Partitions and Finishes:

(a) All interior partitions shall be metal stud construction and shall have one (1) layer of " drywall with taped, spackled, sanded and pointed up joints and screw holes as per code requirements.

(b) Tenant shall provide and install fire stops as may be required by code at demising wall partitions separating the Demised Premises from other store premises.

(c) One (1) layer of 5/8" drywall must be applied above existing drywall provided by Landlord at wall separating Demised Premises from service corridors to meet Montgomery County fire safety code requirements.

(d) No material may be applied to any wall which does not have a class C 200 Flame Spread Rating. No coatings which attempt to give this rating will be acceptable.

(e) Any wood material used anywhere in the Demised Premises must be kiln dried, moisture content 12%, mill quality finish and have a class C 200 Flame Spread Rating.

(f) Furring must be fire treated materials as per Montgomery County codes.

(g) All walls and exposed surfaces in sales area must be covered with a permanent wall covering.

(h) Tenant shall fireproof beams with a sprayed-on material. Tenant shall fireproof columns according to Landlord's specifications.

(i) Laminates (all colors) approved for use on counter-tops only. High gloss or metallic laminates may be used as finish material.

(j) Walls dividing the Demised Premises from service corridor and food service facilities shall be two (2) layers of drywall and insulation on side of the Demised Premises by Tenant.

(k) Temporary storefront barricades will be installed by Landlord, at Tenant's expense, if required.

5.   Roof and Roof Openings:

Roof openings, including necessary curbs and flashings to accommodate the installation of the Landlord's and Tenant's Work, shall be located as directed by Landlord. Tenant shall employ Landlord's roofer for such work as Tenant's own agent and contractor and the work shall be performed in such a manner that Landlord's building schedule and Landlord's roofing guarantee and the work to be performed by other tenants of the Shopping Center will not be adversely affected. The costs of Landlord's roofer shall be reasonable and competitive.

6.   Ceilings:

(a) Except as set forth on approved plans, ceilings must be of a non-combustible fire-rated material suspended on an adequate metal suspension system. Landlord acknowledges that portions of the Demised Premises shall not have ceilings.

(b) All ceilings must be 2' x 2' tegular ceiling tiles, Armstrong cirrus tile or equal or drywall minimum.

(c) All areas above Tenant's ceiling are to be insulated including ducts which pierce the roof and Tenant shall install back draft dampers to prevent heating and cooling loss.

7.   Fire Protection Sprinkler:

(a) Tenant to provide and install fire protection sprinkler system for Tenant installed walk-in boxes and equipment, fire hose cabinets, fire extinguishers and other equipment within the Demised Premises in accordance with Landlord's insurance underwriters' Fire Rating Inspection Bureau, and code requirements. Since the entire fire protection system for the project is required to be an interrelated, centrally controlled installation, Tenant shall cause its sprinkler work to be designed and installed by a qualified sprinkler contractor, in accordance with Landlord's requirements and shall submit to Landlord for Landlord's approval, plans and specifications for Tenant's modifications to Landlord's installed sprinkler system which have been approved by the Fire Rating Inspection Bureau.  Landlord's approval of the foregoing shall not constitute the assumption of any responsibility by Landlord for the accuracy or sufficiency thereof, and Tenant shall be solely responsible therefor.

(b) The sprinkler control valve (OS & Y) must be clearly visible with clear access maintained.  A clear plexiglass panel must be placed below valve and must be clearly marked.

8.   Structural:

(a) Any alterations and/or additions and reinforcements to Landlord's structure to accommodate the Tenant's Work must be first approved by Landlord in writing.  The Landlord has agreed, at Tenant's sole cost and expense and at its option, to remove the four (4) existing columns identified on Exhibit E-1 as a part of Landlord's Work.  In connection therewith, Landlord has agreed to bear the cost of any tests reasonably required to identify the accuracy of Landlord's as-built footing and column drawings. Landlord shall provide the results of the tests so performed to Tenant.  If the test results show that the removal of such columns will not require the reinforcement of other columns or upgrade of the footings, Tenant shall have the right to proceed with removal of the columns and shall bear the total cost of all work and materials required to remove the columns and to reinforce any structural roof beams required by removal of the columns.  If the test results show that the removal of the columns require the reinforcement of other columns or upgrade of the footings, Tenant shall have the option to (i) proceed with removal of the columns and bear the total costs of reinforcement of other columns or the upgrading of footings or (ii) terminate this Lease by written notice to Landlord within fifteen (15) days of receipt of the test results.  In any and all events, Tenant shall bear the total costs of removal of columns and reinforcement of structural roof beams required by removal of the columns.

(b) Tenant may make concrete floor penetrations only after written approval of Landlord.  Structural engineer plan review at cost of Tenant.

(c) In either (a) or (b) above, Tenant shall leave Landlord's structure as strong or stronger than original design with finishes unimpaired.

(d) Tenant will submit information as to the size and type of Tenant's HVAC equipment to be provided and installed on the roof by Landlord and Landlord shall place such equipment where it

can be conveniently supported and run conduits and ducts to the Demised Premises to hook-ups in locations designated by Tenant.

9.   Plumbing:

(a) Permits, fees and water meters to be obtained by Tenant at its sole expense.

(b) All plumbing distribution and fixtures within the Demised Premises, including, without limitation, toilets, sinks, urinals, drains, hot water heaters, water coolers, etc. and connections into Landlord provided water and sewer lines to be performed by Tenant.

10.   Lighting:

(a) Lighting shall be typical of Dave & Buster's lighting.

11.   Telephone:

(a) Conduits, cabinets and outlets from junction points determined by Landlord to and within the Demised Premises as determined by Tenant.

12.   HVAC:

Tenant will have a stand alone HVAC system provided by Landlord in accordance with <u>Exhibit E-2</u> (to be provided by Tenant within thirty (30) days).

13.   Electrical:

The Landlord will be providing Tenant with 2000 amp (after being stepped down), 120/208 volt three (3) phase service to the Demised Premises.

Tenant shall be responsible for the transforming of power and the distribution of same within the Demised Premises.

(aa)   Shall be in accordance with all applicable national and local codes.

(bb)   Changing utility meter into Tenant's name with the Potomac Electric Power Company prior to the start of construction on the premises.

**B.   PRELIMINARY PROCEDURES:**

1.   a.   Landlord's address   White Flint, c/o Lerner Corporation, 11501 Huff Court, North Bethesda, Maryland 20895-1094, Attn: Tenant Coordination.

b.   Store address   (Store Name), White Flint, 11301 Rockville Pike, North Bethesda, Maryland 20895-1021.

2.   It is understood that Tenant shall be fully responsible for the conduct of its employees, agents and independent contractors.

3.   A field inspection of the Demised Premises shall be made by Tenant's architect to verify all dimensions and field conditions. If available, Landlord will furnish architectural and mechanical drawings to Tenant, however, Landlord assumes no responsibility for accuracy of such drawings.

4.   Within seventy-five (75) days after execution of the Lease and satisfaction of all conditions precedent, Tenant shall submit to Landlord for its approval working drawings and specifications,

which shall have been prepared in strict compliance with all Exhibits to the Lease and the requirements set forth therein.

(a)   Working drawings, to the minimum scales set forth below, and specifications shall include but not be limited to five (5) sets and one (1) sepia of each of the following:

(1)   Key plan showing locations of the Demised Premises.

(2)   Floor plan at a minimum scale of 1/8 = 1'0".

(3)   Overall sections at 1/4" scale.

(4)   Reflected ceiling plan (to include electrical lighting plan) at 1/8" scale.

(5)   Plan, elevation and section of storefront of 1/4" scale.

(6)   Interior elevations at 1/2" scale.

(7)   Details of special conditions at 1-1/2" scale. Location and weights of heavy equipment such as safes, equipment cases, refrigeration equipment and any masonry facing materials must be shown on drawings.

(8)   Details of storefront at 1-1/2" scale.

(9)   Door schedule with jamb details.

(10) Finish and color schedule.

(11) Sprinkler and plumbing at 1/8" scale. Approved sprinkler drawings should be forwarded only after all approvals are obtained.

(12) Electrical plans at 1/8" scale.

(13) Electrical details and fixture schedules.

(14) Mechanical plans at 1/8" scale.

(15) Fixture drawings and specifications.

(16) Samples of carpet, if any, along with Steiner Tunnel test report for that specific material.

(17) Samples of all storefront materials including toespace material.

(18) Store fixture plan showing cuts of all trade fixtures.

(b)   Within fourteen (14) days of receipt by Landlord of Tenant's full working drawings and specifications, as aforesaid, Landlord will review and comment upon the same. If any of the working drawings and specifications are returned to Tenant with comments, and not bearing the unconditional approval of Landlord, said working drawings and specifications shall be immediately revised by Tenant in accordance with Landlord's comments and resubmitted to Landlord for approval within fourteen (14) days of their receipt by Tenant.

(c)   As soon as Tenant receives final approval of all working drawings and specifications, application shall be made by Tenant for all appropriate building permits.

(d)   Changes of materials or finishes after final approval by Landlord of working drawings require Landlord approval.

(e)   Tenant's working drawings and specification must be sealed by a full-time architect licensed in the State of Maryland.

5.   Tenant shall commence construction of the Tenant's Work in the Demised Premises not later than a period necessary for bidding, permitting, and negotiating bids (estimated to be approximately eight (8) weeks) and after approval by Landlord of Tenant's working drawings and specifications and receipt and approval of all appropriate building permits, submittal of insurance binder, and approval of Tenant's general contractor and subcontractors.

## C.   CONSTRUCTION REQUIREMENTS

1.   Tenant shall submit to Landlord, via certified, registered or air express mail, at least ten (10) days prior to the commencement of construction for approval, the following information:

(a) The names and addresses of the general contractor, all subcontractors and construction supervisor Tenant intends to engage in the construction of its Demised Premises with contractors' qualification statements, A.I.A. Document A305.

(b) Intentionally Deleted.

(c) Insurance as required in Part F.

2.   All contractors engaged by Tenant shall be bondable, licensed contractors, possessing good labor relations, capable of performing quality workmanship and working in harmony with Landlord's general contractor and other contractors on the job. All work shall be coordinated with general project work.

3.   Construction shall comply in all respects with applicable federal, state, county and/or local statues, ordinances, regulations, laws and codes.  All required building and other permits in connection with construction and completion of the Demised Premises shall be obtained and paid for by Tenant.

4.   All of Landlord's and Tenant's Work shall be performed in a good and workmanlike manner and shall be prosecuted to completion with all due diligence.

5.   Landlord shall have the right to perform on behalf of and for the account of the Tenant, subject to reimbursement by Tenant, any of the Tenant's Work which Landlord determines shall be so performed.   Such work shall be limited to work, either during construction or the period following the opening of the Demised Premises to the public, which Landlord deems necessary to be done on an emergency basis and which pertains to structural components, the general utility systems for the project or the erection of temporary safety barricades and temporary signs, or other work in a condition which would, in Landlord's sole judgement, reflect negatively upon the reputation of the Shopping Center if left uncorrected.

6.   Tenant may use no space except the Demised Premises for storage without approval of Landlord's job superintendent.  Any material found in other areas will be subject to disposal by Landlord at Tenant's expense.   Landlord shall have no responsibility or liability whatsoever, except for gross or willful negligence, for any loss of, or damage to, any materials, fixtures, equipment, merchandise or other property belonging to Tenant installed or left in the Demised Premises or anywhere else at the Shopping Center.

7.   All of the Tenant's Work shall be subject to the inspection of Landlord and any work found not in compliance with the Lease or the Exhibits attached thereto and/or good construction standards shall be corrected.  If such corrective work shall not be immediately undertaken, Landlord may make the same for the account of Tenant and Tenant shall reimburse Landlord, as Additional Rent, the cost thereof plus twenty percent (20%) for Landlord's overhead and administrative costs.

8.   Tenant shall apply and pay for all utility meters, permits, sewer charges and the like.

9.   Upon completion of the Tenant's Work, all facilities shall be in full use without defect.

10.  Upon completion of the Tenant's Work, warranties (one (1) year minimum on all work and equipment) shall be assigned by Tenant to Landlord, subject, however, to the right of Tenant to hold and utilize such warranties unless Tenant shall be in default under the Lease.

(a)   Tenant shall require that any contractor or subcontractor performing the Tenant's Work shall be responsible for the replacement or repair without additional charge to Landlord of any and all work done or furnished by or through such contractor or subcontractor which shall become defective within one (1) year after substantial completion of the work.  The correction of such work shall include, without additional charge to Landlord, all additional expenses and damages in connection with such removal, replacement of, or any part of the work or any part of the buildings or Shopping Center which may be damaged or disturbed thereby.

11.  All work performed by Tenant during the term of the Lease shall be performed so as to cause a minimum of interference with other tenants and the operation of the Shopping Center.  Tenant shall take all precautionary steps to protect its facilities and the facilities of others affected by the Tenant's Work and properly police same.  Construction equipment and materials are to be located in confined areas and truck traffic is to be routed in and from the site as directed by Landlord so as not to burden the construction and/or operation of the Shopping Center.  Any damage or loss to property of Landlord or other tenants or third parties in the Shopping Center occasioned by or arising from acts of Tenant, its employees, agents or contractors shall be the responsibility of Tenant and Tenant hereby indemnifies and holds harmless Landlord therefrom.

12.  Each Tenant contractor shall be required to maintain continuous protection of adjacent premises in such manner as to prevent any damage to such adjacent property and the improvements thereon or therein by reason of the performance of the Tenant's Work, and promptly to repair any such property or improvements so damaged to the condition prior thereto.  Each Tenant contractor shall be required to properly protect the Tenant's Work with lights, guard rails, and barricades and secure all parts of the Tenant's Work against storm and accident.

13.  No approval by Landlord is valid unless in writing and signed by Landlord.

14.  Tenant shall furnish Landlord with lien waivers and sworn statements, in such form as may be required by Landlord, from all persons performing labor and/or supply materials in connection with the Tenant's Work showing that all of said persons have been compensated in full and full completion of Tenant's punchlist.

D.   **TEMPORARY FACILITIES DURING CONSTRUCTION**

1.   Temporary utilities and any other services to the Demised Premises not otherwise provided by Landlord shall be the responsibility of Tenant from the date Tenant commences the Tenant's Work.

2.   Contractors and/or subcontractors participating in the Tenant's Work, shall be required to remove and dispose of, at Tenant's sole cost and expense, all debris and rubbish caused by or resulting from the Tenant's Work and upon completion, to remove all temporary structures, surplus materials, debris and rubbish of whatever kind remaining on any part of the Shopping Center or in proximity thereto which was brought in or created in the performance of the Tenant's Work (including, without limitation stocking refuse).   Tenant shall cause its contractors and/or subcontractors to deposit daily all of the above-mentioned debris, rubbish, etc. in receptacles to be provided by Tenant at Tenant's cost at locations selected by Landlord.   Landlord's receptacles may not be used without approval.   If allowed by Landlord, Tenant shall pay Landlord, promptly following request therefor, for the use of any mall receptacles.   If at any time Tenant's contractors and/or subcontractors shall neglect, refuse or fail to remove any debris, rubbish, surplus materials or temporary structures, Landlord at its sole option may remove the same at Tenant's expense, without prior notice to Tenant.   Tenant shall pay for all costs associated with its trash removal.

3.   Temporary enclosure barricades and temporary signs at the storefront shall be constructed by Tenant in accordance with Landlord's requirements for such barricades and/or signs.   It is understood and agreed by Tenant that the construction barricade may not be removed until Landlord has inspected the work and all items on any punchlist have been completed by Tenant to Landlord's and the building inspector's and fire marshall's satisfaction.   The removal of any barricade without Landlord's permission shall be a default under the Lease.

4.   The barricade maybe moved out a maximum of 3' past the lease line during construction.   If Tenant does not have a rear service door, tenant may install a pre-hung door in the barricade; otherwise, no openings are permitted.

E.   **CERTIFICATES OF ACCEPTANCE**

1.   Upon completion of the Tenant's Work and fixture work within the Demised Premises, Landlord's architect may inspect the same, and if the Demised Premises are acceptable, issue an Architect's Certificate of Acceptance.   The issuing of such a Certificate shall be contingent upon all of the following:

(a) The satisfactory completion by Tenant of the Tenant's Work in accordance with the working drawings and specification therefor, as approved by Landlord.

(b) Tenant shall have furnished Landlord with waivers of liens and sworn statements, in such form as may be required by Landlord, from all persons performing labor and/or supplying materials in connection with the Tenant's Work showing that all of said persons have been compensated in full.

(c)   Tenant shall have reimbursed Landlord for the cost of any of the Tenant's Work or other work done for Tenant by Landlord in accordance with the provisions hereof.

2.   Upon completion of the Tenant's Work, Tenant's architect and/or mechanical engineer shall certify to Landlord, in form acceptable to Landlord, that the mechanical system in the Demised Premises has been installed in compliance with the provisions of

Section A12 hereof and meets the design criteria and specifications set forth therein. Such Certificate shall not be required if Tenant, with Landlord's approval, makes no material modifications to any existing mechanical system previously installed in the Demised Premises.

## F.   INSURANCE

1.  Tenant or its general contractor shall secure, pay for and maintain, during the continuance of construction and fixturing work within the Demised Premises, the following insurance and in the amounts as set forth below.

(a)  Workmen's Compensation, Employer's Liability Insurance with limits of not less than $100,000.00 and as required by state law and any insurance required by any Employee Benefit Acts or other statutes applicable where the work is to be performed as will protect the general contractor and subcontractors from any and all liability under the aforementioned acts.

(b)  Comprehensive General Liability Insurance for combined bodily injury, personal injury, and property damage liability in an amount not less than $1,000,000.00 per occurrence whether involving personal injury liability (or death resulting therefrom) or property damage liability or a combination thereof with the minimum aggregate limit of $1,000,000.00. Such insurance shall provide for broad form comprehensive liability coverage including contractual liability coverage and shall insure the general contractor and/ or subcontractors against any and all claims for personal injury, including death resulting therefrom and damage to the property of others and arising from his operations under his contract and whether such operations are performed by the general contractor, subcontractors or any of their subcontractors, or by anyone directly or indirectly employed by any of them.

(c)  Comprehensive Automobile Liability Insurance, including the ownership, maintenance and operation of any automotive equipment, owned, hired, and non-owned in the following minimum amounts:

(i) Bodily injury, each person $1,000,000.00

(ii) Bodily injury, each occurrence $1,000,000.00

(iii) Property Damage liability $1,000,000.00

Such insurance shall insure the general contractor and/or subcontractors against any and all claims for bodily injury, including death resulting therefrom and damage to the property of others arising from operations under his contract and whether such operations are performed by the general contractor, subcontractors, or any of their subcontractors or by anyone directly or indirectly employed by any of them.

(d)  Protective Liability Insurance in such amounts as will insure Tenant against any and all liability to third parties for damage because of bodily injury liability (or death resulting therefrom) and property damage liability of others or a combination thereof which may arise from performance of the Tenant's Work and any other liability for damages which the general contractor and/or subcontractors are required to insure under any provisions herein. Said insurance shall be provided in minimum amounts as follows:

(i) Bodily injury, each person $1,000,000.00

(ii) Bodily injury, each occurrence $1,000,000.00

(iii) Property Damage, each occurrence $1,000,000.00

(iv) Property Damage, aggregate $1,000,000.00

(c) Builder's Risk Insurance pursuant to a completed Value Form covering "at risk" perils covering the Tenant's Work as it relates to the building within which the Demised Premises is located, within a radius of 100 feet of said Demised Premises.

2. All insurance policies shall name both <u>White Flint Limited Partnership</u> and <u>Lerner Corporation</u> and Tenant or its general contractor, as the case may be, as Additional Insureds. Certificates of insurance shall provide that no change or cancellation of such insurance coverage shall be undertaken without thirty (30) days written notice to Landlord. All insurance policies shall contain an express waiver of any right of subrogation by the insurance company against Landlord and Lerner Corporation. Tenant shall deliver the necessary insurance certificates to Landlord prior to commencing work and Tenant will not permit its contractor(s) to commence any work until all required insurance has been obtained and certified copies of policies have been delivered to Landlord.

**EXHIBIT F**

**SIGNAGE EXHIBIT**

Tenant shall have the right to the following signage:

(1) <u>Rockville Facade Sign</u>: The Rockville Facade Sign (as defined in Article 11) to be erected and installed by Tenant in accordance with and subject to all governmental approvals, which Landlord shall obtain at its expense. Landlord shall, in addition to the Construction Allowance set forth in Article 6, reimburse Tenant for the actual costs of erection and installation of such facade (Tenant to bear the costs of installation of the sign itself) in the manner set forth in Article 6. The design criteria and location for the Rockville Facade Sign are set forth on attached Exhibit F-1.

(2) <u>On-Site Directional Signage</u>: Inclusion of Tenant's trade name and logo, to be installed by Landlord at its expense, on all ring road and other tenant directional signage at the locations set forth on attached Exhibit F-2, subject to replacement or substitution on other ring road and directional signage as may installed by Landlord from time to time (provided the replacement or substitute signage provides substantially similar visibility and prominence).

(3) <u>On-Site Reader Boards</u>: Inclusion of Tenant's trade name from time to time on the two (2) existing reader boards pictured on attached Exhibit F-3. Tenant's trade name or other message shall be displayed no less than every fourth message between 6:00 p.m. and midnight each Friday and Saturday.

(4) <u>On-Site Pylon Sign</u>: Inclusion of Tenant's trade name and logo on the pylon sign pictured on attached Exhibit F-4. The design criteria and location for the pylon signage are set forth therein.

(5) <u>Storefront Signage</u>: Interior storefront shall be as set forth in Exhibit F-5; exterior storefront signage shall be as set forth in Exhibit F-6.

Landlord shall at all times use its best efforts to assure Tenant's rights to or provide (as the case may be) the signage provided in (1) - (4) above. Landlord shall at all times defend Tenant and pay all legal costs and expenses incurred in defending the rights set forth in (1) - (4) above against any challenges.

If at any time Tenant is required as a result of a non-governmental instituted action, (or as a result of a governmental action triggered by another tenant or Landlord,) to remove the Rockville Facade Sign described in (1) above, and within any twelve month period succeeding such removal Tenant's Gross Sales decrease by more than three percent (3%) over the twelve month period immediately preceding such removal (the aforegoing being hereinafter referred to as a "Signage Default"), then in that event, and until such time as the Rockville Facade Sign described in (1) above is restored, Tenant's sole and exclusive remedy shall be as follows: In the event of a Signage Default, Tenant's Annual Base Rent shall be reduced by (1) $50,000 for any reduction of up to five percent (5%) plus (2) $10,000 for each additional one percent (1%) decrease over five percent (5%), not to exceed a reduction in total amount of One Hundred Thousand Dollars ($100,000.00) per annum (twelve month period) prorated for each day such Signage Default exists.

In the event Tenant is required to remove such Rockville Facade Sign during the first eighteen (18) months of the Main Term, the initial twelve (12) month period immediately succeeding such

removal shall be compared to an arbitrary figure of $15,000,000 which the parties hereto deem reasonable. The Landlord acknowledges that Tenant has made no representation with regard to such first year sales. All subsequent twelve (12) month periods shall be compared to actual Annual Gross Sales during months 7 through 18 of the Main Term. There shall be an equitable adjustment of sales for any temporary closings during either period factoring in seasonal adjustments.

By way of example, if Tenant is required to remove its sign in month thirty-six and for the twelve month period immediately succeeding such removal Tenant's Gross Sales are $18,000,000 as compared to Gross Sales of $21,000,000 for the twelve month period immediately preceding such removal then Tenant's Annual Base Rent shall be reduced for such period by $100,000. If Gross Sales for that period were $20,160,000 then Annual Base Rent would be reduced by $50,000.

In addition, if Tenant is required to remove the Rockville Facade Sign, Landlord shall pay the costs of removal and shall reimburse Tenant for the unamortized costs of the sign itself.

**EXHIBIT F-1**

**To be supplied by Tenant**

**EXHIBIT F-2**

**ATTACHED**



# WHITE FLINT MALL

**ENTRANCE INDOOR PARKING**

ART DISPLAY CO.

DESIGNERS AND MANUFACTURERS OF ENVIRONMENTAL GRAPHICS SINCE 1947
2315 18th PLACE, N.E. WASHINGTON, D.C. 20018   202-529-8884   (Fax) 202-269-3111
THIS DESIGN IS THE SOLE PROPERTY OF ART DISPLAY CO. AND MAY NOT BE USED OR REPRODUCED WITHOUT PERMISSION

ROCKVILLE LANE

LOT 1
LOT 8
LOT 2
LOT 3
LOT 6
LEVEL 1
LOT 4
LOT 5

PARKING DECK LOT 7
HUFF COURT
RING ROAD
WHITE FLINT BLVD.
NICHOLSON LANE

BLOOMINGDALE'S
LORD & TAYLOR

PARKING DECK
PARKING DECK 3RD LEVEL

REAR PLAZA
WHITE FLINT PLAZA

D&B

Detail on directional
signage attached

SCALE:
DATE: 1-4-95
REP:
SA/ WFLMAP DISK: 6

# WHITE FLINT - Directional Signage

<u>Top View</u>

<u>Side View</u>



Top, edge of sign face, sides and back painted to match Pittsburgh Paint No. 3041 Gloucester Green

42"W x 48"H Aluminum Sign Panel

Sign Panel Face Laminated with 3M Scotchlite (reflective) White Vinyl

1/4" border line to match Duron Paint No. 5925N Graphite and is inset 1/2" from edge of vinyl

42"W x 6"H Aluminum Sign Panel

4" x 4" square extruded aluminum sign posts on 45° angle. Painted to match Pittsburgh Paint No. 3041 Gloucester Green

### Bloomingdale's Lord & Taylor Borders Books & Music Theatres

**Dave & Buster's ➜**

# Directional Sign Unit with Large and Small Panels



ART DISPLAY CO.

DESIGNERS AND MANUFACTURERS OF ENVIRONMENTAL GRAPHICS SINCE 1947
2315 18th PLACE, N.E. WASHINGTON, D.C. 20018   202-529-8884   (F) 202-269-3111
THIS DESIGN IS THE SOLE PROPERTY OF ART DISPLAY CO. & MAY NOT BE USED OR REPRODUCED WITHOUT PERMISSION

| | |
|---|---|
| SCALE: | 3/4" = 1' |
| DATE: | 5-11-94 |
| REP. | D.K./J.W. |

WHITE FLINT MALL
PARKING DECK ENTRANCE IDENTICICATION

24"

12'-0"

4"

**ENTRANCE INDOOR PARKING**

Dave & Buster's · Bloomingdale's · Theatres · Lord & Taylor · The Eatery · Borders Books & Music

Unauthorized Vehicles Will Be Towed Away At Violators Risk and Expense. If Towed Call Montrose Towing 301-468-1104

Logotype:
Diamond Shape Bkgd.
Gold Reflective Vinyl w/
Graphics to Match Duron
#5925N Graphite

Top, edge and face:
Pittsburgh Paint 3041
Gloucester Green

Sign Panel Face:
Laminated with White
Reflective vinyl with
1/4" border line to Match
Duron 5925N Graphite and
inset 1/2" from edge of vinyl

Sign Panel Face:
Lettering to match Duron
5925N Graphite

Precast Parking Deck
Facia

ART DISPLAY CO.

DESIGNERS AND MANUFACTURERS OF ENVIRONMENTAL GRAPHICS SINCE 1947

2315 18th PLACE, N.E. WASHINGTON, D.C. 20018   202-529-8884   (fax) 202-269-3111

THIS DESIGN IS THE SOLE PROPERTY OF ART DISPLAY CO. AND MAY NOT BE USED OR REPRODUCED WITHOUT PERMISSION

SCALE: 3/4"=1'
DATE: 1-5-95
REP: D.K./j.w.

**EXHIBIT F-3**



**EXHIBIT F-3**



**EXHIBIT F-3**



**EXHIBIT F-4**



## LEASE GUARANTY

In consideration of the sum of Ten Dollars ($10.00) and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned (the "Guarantor"), its successors and assigns, does hereby guarantee to WHITE FLINT LIMITED PARTNERSHIP (the "Landlord"), its successors and assigns, the full and faithful performance and observance by D&B HOLDING, INC. INC., (the "Tenant"), its successors and assigns, of all the terms, covenants, conditions and agreements of that certain Lease by and between Landlord and Tenant dated the 7th day of _March_, 199 5 , (the "Lease").  Guarantor agrees and covenants with Landlord as follows:

(a)  that the undersigned will unconditionally guarantee to the Landlord the prompt and punctual payment of any and all Rent and other amounts that may be or will become due to Landlord from time to time under the Lease and will well and truly perform all of the covenants in the Lease to be performed by Tenant thereunder and, in addition, will pay all damages that may arise in consequence of an Event or Default under the Lease (but excluding any consequential damages or damages in the nature of loss of profits) and all reasonable attorneys' fees and other costs that may be incurred by Landlord in enforcing Tenant's covenants and agreements set forth in the Lease, or in enforcing the covenants and agreements of the undersigned herein.  Guarantor waives any rights to notices to Tenant other than notices of default and notices pertaining to the exercise of default remedies (collectively, "Default Notices") copies of which shall be sent to Guarantor.

(b)  that, at the option of Landlord, the undersigned may be joined in any action or proceedings commenced by Landlord against Tenant in connection with or based upon the Lease or any provision thereof, and that recovery may be had against the undersigned in any such action or proceeding, or in any independent action or proceeding against the undersigned, without any requirement that Landlord or its respective successors or assigns first assert, prosecute or exhaust any remedy or claim against Tenant, its successors or assigns; all to the effect that the liability of the undersigned hereunder shall be deemed primary;

(c)  that, in the event of any bankruptcy reorganization, winding-up, or similar proceeding with respect to Tenant, no limitation on Tenant's liability under the Lease which may now or hereafter be imposed by any federal, state or other statute, law or regulation applicable to such proceedings shall in any way limit the undersigned's obligation hereunder, which obligation is coextensive with Tenant's liability as set forth in the Lease, without regard to any such statutory limitation;

(d)  that this Lease Guaranty shall be absolute, present and unconditional and shall remain in full force and effect and shall extend to any renewal, extension, indulgence, modification or amendment of the Lease, whether or not the undersigned shall have had notice thereof (except renewals, extensions, indulgences, modifications or amendments shall be binding on Guarantor only if Tenant is a subsidiary of Guarantor or Guarantor consents in writing thereto);

(e)  that the validity of the Lease Guaranty and the obligations of the undersigned hereunder shall in nowise be terminated, limited, diminished, affected or impaired by reason of any action which Landlord might take or be forced to take against Tenant, or by reason of failure to enforce any of the rights or remedies reserved to Landlord in the Lease or otherwise;

J:\WPF\CLI\76354.2
December 28, 1994

(f) that the interest of Landlord under this Guaranty may be assigned by Landlord, with or without consent of the Guarantor, by way of collateral security to a mortgagee or to any successor of assignee of Landlord which assumes all of Landlord's obligations under the Lease and acknowledges its consent to the Guaranty;

Guarantor shall be relieved of its obligations hereunder at such time as Tenant shall be relieved of liability under Section 12.1 of the Lease.

In any action or proceeding brought on, under or by virtue of this Lease Guaranty, the Guarantor, Landlord and Tenant each shall and do hereby waive trial by jury.

To the extent Guarantor or any successor thereof shall be obligated to pay any money or perform any obligation on behalf of Tenant under this Guaranty, Guarantor shall have right of subrogation against Tenant and Landlord assigns to Guarantor all of its rights and remedies against Tenant to Guarantor to the extent of such payment or performance.

The use of the singular herein shall include the plural. Each term used in this Lease Guaranty, unless otherwise defined herein, shall have the same meaning as when used in the Lease. This Lease Guaranty shall be governed by and construed in accordance with the laws of the State of Maryland.

IN WITNESS WHEREOF, the undersigned has caused this Lease Guaranty to be executed as of even date with the Lease.

WITNESS/ATTEST:

GUARANTOR;
Edison Brothers Stores, Inc.,
a Delaware corporation

By: _____
Name:   Andrew E. Newman
Title:   Chairman

The undersigned, Landlord and Tenant, each acknowledge the terms of this Guaranty and agree to be bound by the terms hereof as they pertain to Landlord and Tenant.

LANDLORD:

WHITE FLINT LIMITED
PARTNERSHIP

By its general partner:
Lerner Enterprises Limited
Partnership

ATTEST:

By: _____
Name: Robert C. Fowler
Title: Senior Counsel

By: _____
Name: Theodore N. Lerner
Title: General Partner

By: _____
Name:  Mark D. Lerner
Title: General Partner

**TENANT**:

D&B HOLDING, INC.

**ATTEST:**

By: _____
    Name:  Thomas M Fowe
    Title: Asst Secretary

By: _____
Name:  MARK I. LITOW
Title: Vice President

**<u>EXHIBIT H</u>**

**<u>Guaranty of Construction Allowance</u>**

**EXHIBIT I**

**Landlord's Work**

**INTENTIONALLY DELETED**

# NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS AGREEMENT dated as of the _____ day of March, 1995, is by and between WHITE FLINT ASSOCIATES LIMITED PARTNERSHIP, a Maryland limited partnership, with offices at 11501 Huff Court, Kensington, Maryland 20895 ("Owner") and D&B Holding, Inc., a Delaware corporation, with offices at 501 North Broadway, St. Louis, Missouri 63102 ("Tenant").

WHEREAS, Owner is the ground lessor under that certain ground lease dated August 27, 1975, by and between Owner, as lessor, and White Flint Limited Partnership, a Maryland limited partnership ("Landlord"), as lessee, a memorandum of which has been recorded in Liber 4697, Folio 801 of the land records of Montgomery County, Maryland (the "Ground Lease").

WHEREAS, Landlord has entered into and executed that certain Lease Agreement dated _____ with Tenant (the "Lease") pursuant to which Landlord is leasing to Tenant a portion of the Shopping Center building, known as "White Flint" as described in the Lease (the "Demised Premises"), situated on the land, which is demised under and subject to the Ground Lease.

WHEREAS, the parties hereto desire to provide for the non-disturbance of Tenant by the Owner and the attornment by Tenant to the Owner.

NOW THEREFORE, in consideration of the sum of Ten Dollars ($10.00) and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1) Owner certifies that the Ground Lease is presently in full force and effect and unmodified.

2) Owner consents to the demise and granting, execution and delivery of the Lease by Landlord to and with Tenant.

3) As long as no default exists under the Lease which is continuing beyond the expiration of any applicable grace or cure period, the Lease shall not be canceled or terminated by Owner in connection with or by reason of the expiration or sooner termination of the Ground Lease prior to the date provided in the Lease for the expiration of the term thereof, and Tenant shall not be evicted from the Demised Premises, nor shall its possession of the Demised Premises be disturbed, and the Lease shall continue in full force and effect as a direct lease and demise of the Demised Premises from Owner upon all the terms and provisions set forth in the Lease. If the Ground Lease shall be terminated, Owner shall be bound to Tenant under all the terms, covenants and conditions of the Lease for the balance of the term thereof remaining, with the same force and effect as if Owner were the Landlord, except that the Owner shall not be (a) liable for any act or omission of any prior landlord under the Lease; or (b) subject to any offsets or defenses which Tenant might have against any prior landlord other than those expressly set forth in the Lease; or (c) bound by any rent or additional rent which Tenant might have paid for more than the current month to any prior landlord under the Lease.

4) If the Ground Lease shall terminate prior to the date provided in the Lease for the expiration of the Term thereof, Tenant shall be bound to the Owner under all of the terms, covenants and conditions of the Lease for the balance of the Term thereof remaining and any extensions or renewals thereof which may be effected in accordance with any option therefor in the Lease, with the same force and effect as if the Owner were the Landlord under the Lease, and Tenant does hereby attorn to the Owner, as its Landlord, said attornment to be effective and self-operative without the execution of any further instruments, upon the termination of the Ground Lease. The respective rights and obligations of Tenant

*and other than those resulting from Tenant's inability to enjoy full beneficial use of the Demised Premises

and Owner upon such attornment, to the extent of the then remaining balance of the Term of the Lease and any such extensions and renewals, shall be and are the same as now set forth therein except as herein otherwise expressly provided.

5)    This Agreement may not be modified except by an agreement in writing signed by the parties thereto or their respected successors in interest. This agreement shall inure to the benefit of and be binding upon the parties hereto, the respective heirs, legal representatives, successors and assigns.

6)    All notices, demands or requests made pursuant to, under, or by virtue of this Agreement must be in writing and mailed to the party to which the notice, demand, or request is being made by certified or registered mail, return receipt requested, in a pre-paid wrapper, at its address set forth above. Any party may change the place that notices and demands are to be sent by written notice delivered in accordance with this Agreement.

7)    This Agreement shall be governed by the laws of the State of Maryland.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be duly executed as of the day and year first above written.

WITNESS                                OWNER:

                                       WHITE FLINT ASSOCIATES LIMITED
                                       PARTNERSHIP, a Maryland limited
                                       partnership


_____        By:   _____
                                       Albert Abramson, General Partner


ATTEST:                                TENANT:

                                       D&B HOLDING, INC., a Delaware
                                       corporation


_____        By:   _____
Name: _____           Name: _____
Title: _____          Title: _____
                                       Date: _____


2

STATE OF MARYLAND

                     ss:

COUNTY OF MONTGOMERY

        I, _____, a Notary Public in and for _____, do hereby certify that Albert Abramson, who is personally well known to me as the person named as General Partner in the foregoing and annexed Non-Disturbance and Attornment Agreement, bearing date as of the _____ day of _____, 1995, to acknowledge the same personally appeared before me in my said jurisdiction, and as General Partner as aforesaid, acknowledged the same to be the act and deed of White Flint Associates Limited Partnership, a party thereto, and delivered the same as such.

        GIVEN under my hand and official seal this ___ day of _____, 1995.


                                                _____
                                                NOTARY PUBLIC

My Commission Expires:

_____

STATE OF

               **ss:**

COUNTY OF

      I, _____, a Notary Public in and for _____, do hereby certify that David Overton, who is personally well known to me as the person named as Attorney-In-Fact in the foregoing and annexed Non-Disturbance and Attornment Agreement, bearing date as of the _____ day of _____, 1995, to acknowledge the same personally appeared before me in my said jurisdiction, and as Attorney-In-Fact as aforesaid, and by virtue of the authority vested in him by said Non-Disturbance Agreement acknowledged the same to be the act and deed of D&B Holding, Inc., a corporate party thereto, and delivered the same as such.

      GIVEN under my hand and official seal this ___ day of _____, 1995.

                                  _____

                                  NOTARY PUBLIC

My Commission Expires:

_____

4

EXHIBIT J-2

## NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS NON-DISTURBANCE AND ATTORNMENT AGREEMENT ("Agreement") made as of the _____ day of _____, 199_ by and among _____, a _____ corporation with offices at _____ (hereinafter called "Lessee"), party of the first part, and _____ and _____, Trustees, either of whom may act (hereinafter called the "Trustees"), parties of the second part, and consented to by THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, a New York corporation, having an office at 787 Seventh Avenue, New York, New York (hereinafter called "Beneficiary");

W I T N E S S E T H :

WHEREAS, by Lease Agreement dated _____, 1994, by and between WHITE FLINT LIMITED PARTNERSHIP, a Maryland limited partnership (hereinafter called "Lessor"), and the Lessee, Lessor leased to Lessee for a term of approximately _____ and for the purposes therein described, approximately _____ square feet in the building and improvements known as White Flint and located at Kensington, Maryland and therein more fully described (hereinafter called the "Lease"); and

WHEREAS, Beneficiary is the holder of a Deed of Trust dated December 7, 1977, covering certain property known as White Flint Mall (hereinafter referred to as the "Deed of Trust") owned by the Lessor; and

WHEREAS, the Lessee has requested the Beneficiary, to recognize the Lessee's right to continuing and undisturbed possession and enjoyment of the space demised under the Lease for the term therein set forth; and

WHEREAS, the Beneficiary has agreed, subject to the terms and conditions of this Agreement, to recognize the Lessee's said right to possession under the Lease, and has authorized and directed the Trustees, and the Trustees have accordingly agreed, to recognize the Lessee's said right to possession under the Lease, provided that the Lessee agrees to the terms, conditions and provisions hereof.

NOW, THEREFORE, in consideration of the premises and the sum of One Dollar ($1.00) in hand paid by each of the parties hereto to the other and for other good and valuable consideration, receipt whereof is hereby acknowledged, the parties hereto mutually covenant and agree as follows:

1.    The Lessee now is and shall at all times continue to be subject and subordinate in each and every respect to the Deed of Trust and to any and all increases, renewals, modifications, extensions, substitutions, replacements and/or consolidations of the Deed of Trust and to any future deed of trust or deeds of trust affecting the Premises and held by Beneficiary.

2.    So long as no default exists, nor any event has occurred which has continued to exist for such period of time (after notice, if any, required by the Lease) as would entitle the Lessor under the Lease to terminate the Lease or would cause, without any further action of such Lessor, the termination of the Lease or would entitle such Lessor to dispossess the Lessee thereunder, the Lease shall not be terminated, nor shall the Lessee's use, possession or enjoyment of the leased premises be interfered with, nor shall the leasehold estate granted by the Lease be affected in any other manner, in any foreclosure or any action or proceeding instituted under or in connection with the

Deed of Trust or in case the Beneficiary takes possession of the
mortgaged premises pursuant to any provisions of the Deed of
Trust, or in the event of a transfer of title to the real estate
by deed in lieu of foreclosure, and any party acquiring the
interests of the Lessor as a result of any such action or
proceeding, its successors and assigns (herein called the
"Purchaser") shall without further action be bound to Lessee
under the Lease from and after the transfer as if originally
named as Lessor therein, except that the Purchaser shall not be
(a) liable for any act or omission of any prior lessor under the
Lease; or (b) subject to any offsets or defenses which Lessee
might have against any prior Lessor other than those expressly
set forth in the Lease; or (c) bound by any rent or additional
rent which Lessee might have paid for more than the current month
to any prior lessor under the Lease; or (d) bound by any
amendment or modification of the Lease made without the prior
written consent of Beneficiary.

3.    If the interests of Lessor under the Lease shall be
transferred by reason of foreclosure or other proceedings for
enforcement of the Deed of Trust, Lessee shall be bound to the
Purchaser under all of the terms, covenants and conditions of the
Lease for the balance of the term thereof remaining and any
extensions or renewals thereof which may be effected in
accordance with any option therefor in the Lease, with the same
force and effect as if the Purchaser were the lessor under the
Lease, and Lessee does hereby attorn to the Purchaser, including
the Beneficiary if it be the Purchaser, as its lessor, said
attornment to be effective and self-operative without the
execution of any further instruments, upon Purchaser succeeding
to the interest of the Lessor under the Lease.  The respective
rights and obligations of Lessee and Purchaser upon such
attornment, to the extent of the then remaining balance of the
term of the Lease and any such extensions and renewals, shall be
and are the same as now set forth therein except as herein
otherwise expressly provided.

4.    All provisions, covenants and agreements in this
Agreement contained shall be deemed to touch and concern and run
with the land and shall bind, inure to the benefit of, and
equally relate to, the Lessee and its successors and assigns,
jointly and severally, the Trustees, their survivor, the heirs of
their survivor, or other successor or successors in trust and
those claiming by, through or under them, and the Beneficiary and
its successors and assigns or other holder or holders of the Deed
of Trust, or promissory note secured hereunder, including an
endorsee, assignee or pledge thereof receiving title thereto by
or through the Beneficiary or its successors and assigns.

IN TESTIMONY WHEREOF, _____
signed hereto by _____ has caused its corporate name to be
by _____, its President, attested
to be hereunto affixed and does hereby constitute and appoint
said David Overton, its President, its true and lawful Attorney-
in-Fact for it and in its name to act for and deliver this
Agreement as its act and deed, and The Equitable Life Assurance
Society of the United States, a New York corporation, has caused
this Agreement to be signed by _____, its
_____, attested by _____, its
_____, and its corporate seal to be hereunto
affixed, and does hereby constitute and appoint
_____, its _____, its true and lawful
Attorney-in-Fact for it and in its name to act for and deliver
this Agreement as its act and deed, and _____
and _____, Trustees, have hereunto placed their
respective hands and seals all as of the day and year first
hereinabove written.

(signature page to follow)

2

WITNESS:                          LESSEE:
                                  _____
                                  _____
                                  _____

_____           By: _____
                                  Name:_____
                                  Title:_____

ATTEST:                           BENEFICIARY:
                                  THE EQUITABLE LIFE ASSURANCE
                                  SOCIETY OF THE UNITED STATES

_____           By: _____
                                  Name:_____
                                  Title:_____

                                  TRUSTEES:


                                  _____
                                  Name:_____


                                  _____
                                  Name:_____

3

## IF A CORPORATION

```
                              )
_____       ) ss
                              )
```

I, _____, a Notary Public in and for
_____, do hereby certify that _____, who
is personally well known to me as the person named as Attorney-
In-Fact in the foregoing and annexed Non-Disturbance and
Attornment Agreement, bearing date as of the _____ day of
_____, 199_, to acknowledge the same personally appeared before
me in my said jurisdiction, and as Attorney-In-Fact as aforesaid,
and by virtue of the authority vested in him by said Non-
Disturbance Agreement acknowledged the same to be the act and
deed of _____, a corporate party
thereto, and delivered the same as such.
    GIVEN under my hand and official seal this _____ day of
_____, 199_.


                              _____
                                   NOTARY PUBLIC
My Commission Expires:_____

DISTRICT OF COLUMBIA )
                     ) ss
                     )

     I, _____, a Notary Public in and for the District of Columbia, do hereby certify that _____, who is personally well known to me as the person named as Attorney-In-Fact in the foregoing and annexed Non-Disturbance and Attornment Agreement, bearing date as of the _____ day of _____, 199_, to acknowledge the same personally appeared before me in my said jurisdiction, and as Attorney-In-Fact as aforesaid, and by virtue of the authority vested in him by said Non-Disturbance Agreement acknowledged the same to be the act and deed of The Equitable Life Assurance Society of the United States, a corporate party thereto, and delivered the same as such.

     GIVEN under my hand and official seal this _____ day of _____, 199_.

                                  _____
                                  NOTARY PUBLIC

My Commission Expires:_____

```
DISTRICT OF COLUMBIA    )
                        )  ss
                        )
```

I, _____, a Notary Public in and for the District of Columbia, do hereby certify that _____ and _____, Trustee, parties hereto who are personally well known to me as the persons who executed the foregoing and annexed Non-Disturbance and Attornment Agreement, bearing date as of the _____ day of _____, 199_, to acknowledge the same personally appeared before me in my said jurisdiction, acknowledged the same to be their act and deed as Trustees.

GIVEN under my hand and official seal this _____ day of _____, 199_.

_____
NOTARY PUBLIC, D.C.

My Commission Expires:_____

## **EXHIBIT K**

## **Radius Areas**

## EXHIBIT K-1

**The area bounded by Baltimore Street (North), Howard Street (West), President Street (East) and Federal Hill (South).**