IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | |
|---|---|
| DAVE & BUSTER'S, INC., | : |
| Plaintiff | : |
| v. | : Case No. 13-cv-03390-RWT |
| WHITE FINT MALL, LLP f/k/a WHITE FLINT LIMITED PARTNERSHIP, | : |
| Defendant | : |

**DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**Introduction**

In its Opposition/Cross Motion, D&B contends that this case concerns the enforcement of the statute of limitations. While that may be true in part, in fact, the case is fundamentally about D&B's blatant, ongoing breach of one of the essential covenants in the Lease between the parties. D&B contends that the case is about the statute of limitations because D&B would have this Court twist the statute of limitations in a way so as to validate and endorse D&B's plan to continue its ongoing daily violation of a fundamental provision of the Lease.

Section 11.3 of the Lease includes a simple, straightforward radius clause and accompanying map of the Washington DC region. In that provision, in consideration for White Flint's multi-million dollar investment in the D&B Premises and the deal, D&B agreed not to "operate" a D&B store within a defined portion of the metro area. Notwithstanding that clear covenant in the Lease, D&B chose to open and thereafter operate another D&B within the area stated in the Lease.

D&B now claims that it only breached the Lease on the day that it "rebranded and opened the D&B at Arundel Mills Mall. However, in doing so, D&B ignores the clear language of the Lease by which it agreed not to "operate" a competing store within the agreed upon area and the obvious fact that its **"operation"** of a major Dave & Buster's entertainment center constitutes a new violation of the Lease each day that it continues.

In a further effort to cloud the simple and straightforward nature of this case, D&B also suggests that the Court cannot declare that D&B is in breach of the Lease because White Flint has not counterclaimed for breach of the Lease. D&B's contention is legally incorrect and devoid of logic. D&B has explicitly requested that this Court declare the rights and obligations of the parties in connection with White Flint's termination of the Lease. A determination of those rights necessarily involves making a determination as to whether D&B has breached the Lease; though that determination is not a difficult one under the present circumstances in which D&B's pleadings admit the facts necessary to establish that such a breach occurred.

## ARGUMENT

I. **The Statute of Limitations Does Not Bar White Flint From Terminating the Lease Based upon D&B's Continuous Breach of the Radius Covenant.**

    A. **D&B Mischaracterizes the Breach.**

In Count III of the Complaint and at page 2 of the Opposition, D&B complains of a "breach of the implied covenant of good faith and fair dealing" by White Flint. That allegation doesn't even rise to the level of the "pot calling the kettle black". After intense negotiation involving sophisticated businessmen and their lawyers, a 45-page lease (on D&B's form) with 53 pages of exhibits and a large radius map was executed and delivered by the parties. Like the balance of the Lease, the radius provision resulted from good faith, arms length negotiations and a determination by the parties as to the importance of the Dave & Buster's name in attracting

customers to White Flint's Mall and an acknowledgement of the significant investment by White Flint in the deal. With full knowledge of its promise to limit its operations in the Washington, DC area, D&B secretly negotiated and acquired a major business within the radius area and rebranded it as a D&B in direct violation of the Lease. This was done without notice to White Flint and absent any effort to renegotiate the radius provision protecting the rights of White Flint. The allegation by D&B is that the acquisition occurred in 2004 and then the location was renovated and the name changed. D&B claims that in '06, White Flint discovered what had been done and now asks this Court to ratify its bad faith by ruling that White Flint should have been forced to take legal action against D&B to enforce its rights at that time.

D&B also blatantly mischaracterizes the correspondence between the parties attached as Exhibits to the Complaint by stating that White Flint claimed the breach was in the "acquisition and rebranding of Jillian's." (D&B Opp. at p. 3). [1] To the contrary, the April 13, 2006 letter from Lerner Corporation (White Flint's property management company) attached to the Complaint as Exhibit B states:

> It has come to the Landlord's attention that Dave & Buster's <u>is operating</u> a Dave & Buster's restaurant in the former Jillian's location at Arundel Mills Mall.
>
> As you know, your March 7, 1995, Lease with the Landlord regarding your White Flint restaurant includes a radius restriction that you <u>are now violating by virtue of your operation</u> of the former Jillian's location referenced above.

This situation is virtually identical with that of *Kaliopulus v. Lumm, et ux.*, Court of Appeals of Maryland 155 Md. 30, 141 A.440 (1928). Kaliopulus sold a restaurant with the

---

[1] Likewise, D&B alleged in the Complaint that White Flint claimed D&B breached the radius covenant "by virtue of the acquisition and/or rebranding of Jillian's." Complaint at ¶ 12, citing the April 13, 2006 correspondence attached to the Complaint as Exhibit B.

3

building and fixtures therein to the Lumms. The sale of the restaurant located in Hagerstown had an additional provision:

> "And it is hereby agreed and understood by and between the parties hereto, and a part of the consideration of the purchase price aforesaid, that the said party of the first part is not to enter into, conduct, or finance any restaurant or dining room business within the corporate limits of Hagerstown, Md., for a period of ten years from June 1, 1921…"

The Lumms complained that in April 1922, Kaliopulus financed a competing restaurant in Hagerstown. The Lumms filed their complaint on April 30, 1927, alleging that out of the ten years of the covenant, the covenantor had continuously broken his contract during the period of five years and one month preceding the suit. Kaliopulus contended that the unexplained delay made the bill of complaint bad on demurrer.

While remanding to add an additional party defendant, the court went on to sustain the overruling of the demurrer pointing out:

> His initial refusal to abide by his contract was of his own choosing and his persistence in his course was according to his original design. Nor was the covenantor acting under the mistaken belief that he was lawfully exercising his own rights; but, fully knowing his own obligation and the rights of the covenantees, he repudiated his contractual obligation in pursuance of a preconceived plan to deprive the covenantees of their rights. … It does not appear from the complaint that there could have been any reason for the covenantees to believe that the continuous invasions of their rights by the covenantor was because he mistakenly conceived himself to be acting lawfully, and hence the covenantees were under no duty to protest to the covenantor against his actions; and, subject to any statute of limitations, the covenantees could assert their rights against the conscious wrongdoer by legal proceedings at any time most convenient to themselves. (Cases cited by the court).

And most importantly, the court went on to hold:

> In this connection it is important to bear in mind that the facts admitted by the demurrer show a breach of covenant de die in

>diem[2], and on the happening of any breach the covenantees had a right of action, no matter the number of preceding breaches, as each successive breach in the course of the continuing or recurring breaches was constantly creating fresh causes of action. The covenantees owed no duty to the covenantor to sue at law or to enjoin him in equity but the covenantor's obligation was continuous throughout the entire period of 10 years from June 1, 1921.

The language of the White Flint-D&B Lease is clear and unambiguous. So long as D&B operated a store at White Flint, D&B agreed not to operate within an area shown in detail in Exhibit K to the Lease that indisputably includes Arundel Mills Mall. Nothing in this covenant suggests that if White Flint fails to enjoin its operation, D&B is free to violate the covenant at its whim and without consequence. That the obligation is continuous is manifest on the face of the covenant and the plain language used to set that covenant forth in the Lease.

At pages 7 and 8 of the Opposition, D&B claims that the breach is of a "single event – the acquisition and rebranding of Jillian's in the Arundel Mills Mall." It has also claimed that there was "only one acquisition and re-branding of Jillian's in the Arundel Mills Mall" that has occurred. And again at page 8, "-- the single act of acquiring and re-branding the Jillian's restaurant in Arundel Mills Mall". D&B completely ignores the language of the covenant which is not precluding the acquisition of a restaurant but rather the "operation" of a competing Dave & Buster's.[3] Other cases throughout the country have discussed the effect of restrictive covenants imposing a continuous obligation.

---

[2] Meaning "from day to day."
[3] Section 11.3 states:

>"…for so long thereafter as tenant is operating in the demised premises an entertainment recreation amusement complex under the Dave & Buster's trade name, tenant agrees not to operate a restaurant, bar, entertainment, recreation, amusement complex

5

**B.     Under Maryland Law, the Statute of Limitations Does Not Bar White Flint From Asserting Claims Based upon D&B's Continuous Breach of the Lease.**

Starting from the incorrect premise that the breach was a single event that was completed prior to 2006, D&B begins its Opposition by arguing that Maryland strictly construes statutes of limitations and typically does not recognize "equitable tolling" exceptions. This argument is largely beside the point. Determining when an action "accrues" is not creating an exception, but is determining when the three-year period begins to run. Md. Code, Courts and Judicial Proceedings, §5-101 provides that "a civil action at law shall be filed within three years from the date it <u>accrues</u> unless another provision of the code provides a different period of time within which an action shall be commenced." (emphasis added). Because the term "accrues" is not defined in the statute, the question of when a cause of action accrues is left to judicial determination. *Poffenberger v. Risser*, 290 Md. 631, 633, 431 A.2d 677, 679 (1981).

While some states may treat continuous obligations differently, Maryland law recognizes that a continuous obligation can be breached continuously (not just repeatedly) over a period of time, with the result being that accrual of a cause of action for breach of a continuous obligation occurs continuously. However, the party claiming breach is limited to recovering damages incurred within the statutory period – i.e., within three years of filing suit in the case of a three-year statute of limitations. *The Singer Co., Link Simulation Systems Division Co. v. Baltimore Gas and Electric Co.,* 79 Md. App. at 475 ("accrual occurs continuously and a plaintiff may assert claims for damages occurring within the statutory period of limitations."). D&B attempts to distinguish *Singer* by narrowly interpreting the opinion to require multiple but separate breaches of a continuous obligation as opposed to a continuous breach of that obligation. (D&B

---

under the Dave & Buster's trade name within the radius area shown on the map attached hereto as Exhibit K ('the radius area')."

Opp. at 8).  This overly constrained reading of *Singer* is not supported by either the language of the opinion or the reasoning of the Maryland Court of Special Appeals.  The *Singer* Court cited numerous cases from other jurisdictions addressing the issue in a variety of contexts that included both continuous breaches and multiple successive breaches, and found the rule in those cases to be sound.[4]

One of the cases cited as being sound in *Singer* is *Indian Terr. Illuminating Oil Company v. Rosamond*, 190 Okla. 46, 120 P.2d 349 (1941), which involved a lessee's right to sue for breach of an implied covenant in an oil and gas lease to protect the lessor from drainage.  The court held that the implied covenant was a continuing covenant and that an action for breach could be maintained beyond the limitations period although damages would be limited to the five years preceding filing of suit.  The Court reasoned that "the right to maintain an action for [a continuing] breach continues so long as the breach continues, and plaintiff is damaged thereby." 120 P.2d at 352.  The court then stated the rule as follows:

> The rule is that a breach of a continuing covenant gives rise to a cause of action each day the breach continues, and any claim for breach back of the statutory period within which the action may be brought is barred.

*Id*. at 354.

A more recent illustration of this rule is found in *Lake St. Louis Comm. Assoc. v. Oak Bluff Preserve*, 956 SW2d 305 (Mo. Ct. App. 1997).  That case involved, *inter alia*, a limitations defense to a breach of contract counterclaim against a community association based on its failure

---

[4] . *See Airco Alloys Div., Airco, Inc. v. Niagara Mohawk Power Corp.*, 76 A.D.2d 68, 430 N.Y.S.2d 179 (Sup.Ct., App.Div.1980); *Dameron v. Sinai Hospital of Baltimore, Inc.,* 815 F.2d 975 (4th Cir.1987); *Barker v. Jeremiasen,* 676 P.2d 1259 (Colo.App.1984); *Bulova Watch Co. v. Celotex Corp.,* 46 N.Y.2d 606, 415 N.Y.S.2d 817, 389 N.E.2d 130 (1979); *Green v. Petersen,* 218 N.Y. 280, 112 N.E. 746 (1916); *Mead Reinsurance Corp. v. Town of Oyster Bay,* 138 A.D.2d 578, 526 N.Y.S.2d 159 (1988); *Franza's Universal Scrap Metal, Inc. v. Town of Islip,* 89 A.D.2d 843, 453 N.Y.S.2d 24 (1982). *Indian Territory Illuminating Oil Co. v. Rosamond,* 190 Okla. 46, 120 P.2d 349 (1941); *Sims v. Falvey,* 234 S.W.2d 465 (Tex.Civ.App.1950).

7

to maintain a marina in accordance with a contract with the lot owner.  The court held: "The <u>failure to maintain is a wrong which continues from day to day, it creates a fresh injury from day to day, and it is capable of being terminated</u>. Accordingly, a cause of action exists for damages suffered for failure to maintain the existing marina. Damages may be claimed for the five-year period immediately preceding the filing of the counterclaim."  956 S.W.2d at 309 (emphasis added).  See also, *Carnegie Realty Co. v. Carolina C. & O. Ry. Co.*, 136 Tenn. 300, 189 SW 371, 373 (Tenn. 1916) (holding that grantee's violation of a contract to maintain and operate a passenger station on the lots conveyed to the railway company was a continuous obligation and "the right to sue for its breach runs along with the breach, and will include damages sustained within [the limitations period].").

      The rule espoused in these cases – that an action based on an ongoing breach of a continuous obligation continues to accrue each day the breach continues – is consistent with Maryland's treatment of continuous breaches.  *See also*, *Pumphrey v. Pelton*, 250 Md. 662, 670, 245 A.2d 301, 305 (1968) (stating that a franchisee's breach of a promise not to sell non-Dairy Queen products for eight years was "a continuing one" and not "a series of broken incidents") and *Kaliopulus v. Lumm*, (*supra*).

      The rule is also consistent with Maryland's approach to continuous violations of tort duties.  S*ee, Litz v. Maryland Dept. of Environment,* __ Md.  , 76 A.3d 1076 (2013)(negligence claim alleging facts based upon ongoing and continuous duties, the violations of which did not cease more than three years before the filing of suit, was not time-barred, but damages were limited to those incurred based upon violations within the three years before suit was filed.). In *Litz,* the Court of Appeals differentiated between ongoing consequences of a wrongful act and on-going, continuous violations over a period of time.

Here, despite D&B's mischaracterization of the contract language and correspondence between the parties, D&B's breach was not a single act with permanent adverse consequences. Rather, it was a continuous violation of a contractual covenant that D&B could have stopped at any time. Had D&B ceased to operate the Arundel Mills Mall more than three years prior to this suit, then limitations would have barred White Flint from bringing an action more than three years after the breach ended. However, D&B chose to continue the breach and in so doing it continued to allow a claim for breach to accrue on a daily basis with the only caveat being that any damages incurred more than three years before the action was commenced would not be recoverable.

### C. The Cases Cited by D&B are Distinguishable and/or Inconsistent with Maryland Law.

D&B cites several decisions of this Court, each of which is factually different and none of which can or does change Maryland law as to continuous breach.

*Abbott v. Gordon*, No. DKC 09-0372, 2009 WL 2426052 (D. Md. August 6, 2009) involved tort claims of tortious interference with contract, tortious interference with perspective advantage, and defamation arising out of a contract related to the sale of property. The plaintiffs had placed a contract on the property, but the property was sold to defendants who had entered into a contract prior to the defendants' contract. Pertinent here, the Court held that any claim for tortious interference with a contract arose when the sale to the defendants was consummated and the contract with defendants was allegedly breached. Nonetheless, while factually inapposite, *Abbott* actually supports White Flint to the extent *Abbott* recognizes under Maryland law that the statute of limitations is tolled by the continuous violations of contractual covenants.[5]

---

[5] Technically, the statute of limitations is not tolled, but instead a cause of action continues to accrue.

9

*Ruddy v. Equitable Life Insurance Society of United States*, No. DKC 00-70, 2000 WL 964770 (D. Md. June 20, 2000) was a vanishing premium case asserting contract and tort claims. The gist of the action was that misrepresentations were made by Equitable's agent that were contradicted by the terms of the written policy.  The policy was later cancelled for nonpayment of premiums.  Plaintiff filed suit just less than three years after the policy was cancelled, but more than three years after the policy was issued.  The court held that the alleged breach occurred when the written policy failed to incorporate the alleged oral representations.  The facts of the *Ruddy* case are fundamentally different from those in the present dispute before this Court such that the *Ruddy* decision in no way adds any meaningful information to aid the Court's analysis in the present case.

*Comi v. International Longshoremen's Association, Local No. 333*, No: RDB-06-2927, 2007 WL 4268945 (D. Md. November 30, 2007) involved a labor dispute under a collective bargaining agreement arising out of plaintiff's permanent suspension from employment for refusing to take a drug test after an accident.  There is a six month limitations period for such claims.  Defendant moved for summary judgment on the ground that Plaintiff did not file his suit until almost a full year after he had received notification that he remained terminated.  With respect to a separate count for breach of the duty of fair representation, the plaintiff argued that the duty continued beyond the formal notice of termination.  The court applied federal law in holding that the informal conversations after formal action had been taken did not toll the six-month limitations period.  In the present case, this Court is asked to analyze Maryland law relative to limitations with respect to contract actions.  It is unclear what relevance federal labor law has on the case at hand.

The Plaintiff argues extensively the rationale of *Wesminster Investing Corp. v. Lamps Unlimited, Inc.,* 237 Va. 543, 549, 379 S.E.2d 316, 319 (Va. 1989).  The simple answer to the *Winchester* case is that it is Virginia law, not Maryland law.  Virginia has taken a wholly different approach to the questions of limitations and continuous breach.  Virginia's statute of limitations is five years in contract as opposed to Maryland's three years.  In addition, Virginia has wholly rejected any equitable approach to the defense of limitations.  The discovery rule has been rejected.  The Court's Opinion in *Westminster* rejected the rule as espoused in *Indian Terr. Illuminating Oil Company v. Rosamond*, 190 Okla. 46, 120 P.2d 349 (1941).  *Westminster*, therefore, is inconsistent with Maryland law since the Maryland Court cited and adopted that rule in *Singer, et al. v. Baltimore Gas & Electric (supra)*.

**II.     As a Matter of Law, White Flint Did Not Waive Its Right to Terminate the Lease Based upon D&B's Violation of the Radius Clause.**

Waiver is the intentional relinquishment of a known right.  *Food Fair Stores v . Blumberg*, 234 Md. 521, 531, 200 A.2d 166 (1964).  Therefore, in order to overcome summary judgment on the issue of whether White Flint waived its right to terminate the Lease based upon D&B's breach of the radius restriction covenant, D&B first has to come forward with evidence that White Flint intended to relinquish that right.

Further, when there is a no-waiver clause in a contract, a party alleging waiver must show an intent by the allegedly waiving party to waive both the contract provision at issue and the terms of the non-waiver clause as well. *Hovnanian Land Inv. Grp., LLC v. Annapolis Towne Ctr. at Parole, LLC*, 421 Md. 94, 123, 25 A.3d 967, 984 (2011).  Therefore, D&B would have to come forward with evidence that White Flint also intended to waive the no-waiver clause in the contract.

D&B argues that the no-waiver clause is inapplicable because it only applies if White Flint failed to complain, and White Flint did complain in its April 13, 2006 letter. This argument lacks merit (to say nothing of stretching the bounds of logic). The gist of D&B's waiver argument is that White Flint continued to perform under the Lease without complaint for six years after the April 13, 2006 reservation of rights letter. Pursuant to the plain language of Section 20.3, a failure to complain at any time does not constitute a waiver. The no-waiver provision thus applies to White Flint's failure to complain after April 13, 2006 regardless of whether White Flint had previously complained of the breach. Moreover, the April 13, 2006 letter was not a "complaint" in the context of Section 20.3, but rather was a reservation of White Flint's rights under the Lease. D&B's argument that the no-waiver clause is inapplicable because White Flint reserved its rights under the Lease is based on an overly broad and illogical interpretation of the contract language that defies common sense. Nonetheless, even if the no-waiver clause were not applicable, White Flint is still entitled to summary judgment because the reservation of rights evidences an indisputable intent not to relinquish its rights under the Lease.

D&B next argues that waiver is a fact issue that cannot be resolved on summary judgment. However, like many issues that are based on a party's intent, there is a factual issue only insofar as there are disputed material facts and/or reasonable minds can differ on whether the facts could amount to a waiver. D&B has presented no such evidence because it does not exist.

### III. The Radius Restriction is Enforceable as a Matter of Law.

Plaintiff has further contended that the radius restriction in the lease is "unenforceable." (Complaint, ¶ 41; memo pg. 15). That contention is made without offering any support or

explanation for the assertion. This contention is equally in error. As demonstrated herein, the radius restriction in the subject Lease is enforceable based upon settled law.

Courts have generally enforced radius restrictions in commercial leases. Maryland's courts have followed the weight of authority in this regard and enforced radius restriction in commercial leases where a significant economic purpose has been demonstrated. See, *Diamond Point Plaza Ltd. P'ship.* v. *Wells Fargo Bank, N.A.,* 400 Md. 718, 753, 929 A. 2d 932, 952 (2007). In reaching the conclusion of enforceability of radius restrictions, the *Diamond Point* court reasoned:

> Read in context, it would seem clear that the purpose of the radius restriction was to protect the percentage rent <u>by precluding competing operations</u> within the same market area that might siphon sales from the Diamond Point Plaza store. The percentage rent, of course, needs no protection if operation of the Diamond Point Plaza store is properly discontinued. *See Winrock Enter., Inc. v. House of Fabrics of N. M., Inc.,* 91 N.M. 661, 579 P. 2d 787 (N.M. 1978)

400 Md. at 753, 929 A. 2d at 953, fn. 7. This rationale applies with equal force in the instant matter as the lease in question also contains a percentage rent provision. In 6 *Williston on Contracts* § 13:10 (4th ed.), the author expounds upon the economic rationale behind the enforcement of radius restrictions, observing:

> "Just as a lessor may agree that it will restrict the use of its property so as to protect the legitimate business interest of its lessee, so too, a lessee's covenant not to establish a competing enterprise, within a reasonably limited territory, so as to protect the lessor's business interests has been upheld as valid" citing to the Supreme Court of New Mexico's decision in *Winrock*, supra. *Id* at § 13:10

*Williston* expounds upon the enforceability issue quoting from *Winrock* referring to its holding as "unquestionably correct" given the " 'tremendous sums of money necessary to construct shopping centers'…[T]he radius clause, in conjunction with a percentage lease, served the legitimate business function of protecting the lessor and other tenants from having their flow

of business drained by a competing store owned by a shopping center lessee and situated so closely that is it would likely draw away customers. Declaring that the covenant was 'merely ancillary to a lawful lease,' necessary for the protection of the lessor and 'no broader than necessary to protect [the lessor] from the dangers of an unjust use of [the legitimate fruits]' of the lease contract by the lessee…" *Id.* § 13:10.

In discussing the radius restriction in *Diamond Point v. Wells Fargo (supra)*, (929 A.2d at 952), the court refers to longstanding Maryland law that:

> If to the court, the language is unambiguous, the court must 'give effect to its plain meaning and not contemplate what the parties may have subjectively intended by certain terms at the time of formation.' (Case cited).
>
> …
>
> Applying these precepts, we agree with the conclusion of the circuit court that there is no ambiguity in the language of Article 4(H) and that its plain intent and meaning is to prohibit Sam's Club while operating a store in the leased premises at Diamond Point Plaza, from simultaneously owning, managing or operating another similar store within seven miles from that shopping center."

The language here is similar to that in *Diamond Point*. It is clear, unambiguous and not susceptible to any other meaning. It says what the court indicated in *Diamond Plaza* would be enforceable as a matter of law. If D&B operates another D&B restaurant within the agreed-upon area, that operation constitutes a clear violation of the Lease. D&B's contention that this particular provision of the fully negotiated commercial lease is somehow unenforceable is merely a self-serving attempt to excuse its desire to ignore its contractual obligations. D&B cannot now claim that there is something unreasonable about a provision that was part and parcel of a larger agreement amongst the parties negotiated in good faith. The Lease, including the

14

radius language, was prepared and negotiated by experienced and sophisticated businessmen and their attorneys and fully agreed to by Dave & Buster's.

**IV.   Under the Federal Declaratory Judgment Act, the Court Can Enter a Judgment Declaring that the Lease is Terminated as a Result of D&B's Uncured Default.**

In Paragraph 43 of the Complaint, D&B alleged that "[a] judicial determination of the parties' rights and duties under the Lease is necessary and appropriate at this time, under these circumstances, so that the parties may ascertain their contractual rights and obligations." In the relief clause, D&B requested "a judicial determination as to the parties' rights and obligations under the Lease, including a determination that Defendant's claimed breach under Section 11.3 of the Lease is time barred, and that D&B is not in default under the Lease[.]" (Compl. at p. 12, ¶1). There can be no doubt that D&B has requested a declaration of the parties' rights and obligations, and not merely a declaration that any claimed breach is barred by limitations or waiver. This broad request for declaratory relief necessarily encompasses whether the Lease even continues to be in effect.

In addition, D&B has asked for injunctive relief specifically enforcing the Lease, as well as "such other and further relief as the Court may deem just and proper." (Compl. at p. 12, ¶¶ 2 and 6). There has to be a determination of the issue of whether the Lease has been lawfully terminated as a result of D&B's breach in order to allow this Court to "enforce" the Lease as D&B has requested.

Therefore, the issue of D&B's breach necessarily is subsumed within the claims in the Complaint. No counterclaim is necessary to bring the question before the Court.

## **CONCLUSION**

For the many reasons cited herein, White Flint is entitled to summary judgment in its favor. D&B, by its calculated breach of the radius clause in the Lease, seeks to profit by

changing the restriction from the length of the Lease to three years. According to D&B, if no legal enforcement action was taken by White Flint within three years of the initial instance of D&B's ongoing breach, D&B would be free to ignore any obligation under the covenant for the remainder of the Term. Such a construction of the Lease would leave White Flint in the ominous position of deciding whether to sue an operating tenant in order to preserve its rights under the Lease. D&B's twisted application of the limitations doctrine would require White Flint to terminate the Lease within three years of the initial breach by D&B or excuse D&B from its obligations permanently.

Of course, such a result would fit into D&B's plan, to seek a ruling from this Court removing the radius provision – and D&B's obligations thereunder – from the Lease. D&B asks this Court to re-write the Lease and allow D&B to benefit from its own blatant misconduct.

Fortunately for parties who contract in good faith and honor their contractual obligations, Maryland law on the issue is clear. While a claim for damages may be limited by limitations, the obligations under the contract between the parties always remain. The claim in question is not for damages and the question of the statute of limitations as a defense to a damage claim is not before the Court. What White Flint contends is that by virtue of the breach of the radius provision and its failure to cure the same within the time period proscribed in the Lease, D&B defaulted thereunder. The decision as to whether to take legal action against D&B at that time was – and continues to be – up to White Flint's discretion. (*Kaliopulus v. Lumm (supra)*). Every day that D&B opened its doors at Arundel Mills for the operation of a D&B, the same constituted an event of default under the Lease. That default perpetuates itself by continuing today.

Respectfully submitted,

BRAULT GRAHAM, LLC

 /s/ James M. Brault
James M. Brault
Albert D. Brault
101 South Washington Street
Rockville, Maryland 20850
301-424-1060 (Telephone)
301-424-7991 (Fax)
jmbrault@braultgraham.com
adb@braultgraham.com
*Counsel for Defendant White Flint Mall, LLP*
*f/k/a White Flint Limited Partnership*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of January, 2014, a true and accurate copy of the foregoing was e-filed and served via the CM/ECF filing system upon:

> Edward S. Scheideman, Esq.
> Paul D. Schmitt, Esq.
> DLA Piper LLP (US)
> 500 8th Street, N.W.
> Washington, D.C. 20004

 /s/ James M. Brault
James M. Brault